IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

CHERYL N. WALKER, ADMINISTRATOR   *
OF KENNETH B. WALKER'S ESTATE,   *
CHERYL N. WALKER, individually, and   *
CHERYL N. WALKER, Legal Guardian of   *
KAYLA WALKER, A DEPENDENT MINOR,   *
  *
   Plaintiffs,   *
  *
v.   *   CIVIL ACTION FILE NO.:
  *   4:04-CV-161 (CDL)
SHERIFF RALPH JOHNSON, individually and in   *
his official capacity as Sheriff of Muscogee   *
County, Georgia; DEPUTY DAVID GLISSON,   *
individually and in his official capacity as   *
Sheriff's Deputy of Muscogee County;   *
MUSCOGEE COUNTY, GEORGIA;   *
SERGENT FELIX DAVILLA; individually;   *
SERGENT RICKY STINSON; individually   *
and in his official capacity as Metro   *
Narcotics Task Force Special Agent in Charge;   *
SERGENT JAMES PRICE III, individually   *
and in his official capacity as an agent of the   *
Metro Narcotics Task Force; SERGENT JASON   *
WHITTEN, individually and in his official   *
capacity as an agent of the Metro Narcotics   *
Task Force; JODY WILLIFORD; individually   *
and in his official capacity as an agent of the   *
Metro Narcotics Task Force; JONNIE   *
ELLERBIE, individually and in his official   *
capacity as an agent of the Metro Narcotics   *
Task Force; JONATHAN MEMMO,   *
individually and in his official capacity as an agent   *
of the Metro Narcotics Task Force; and the CITY   *
OF COLUMBUS, GEORGIA, a consolidated   *
government,   *
  *
   Defendants.   *

## MEMORANDUM OF LAW IN SUPPORT OF
## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

### INTRODUCTION

Plaintiffs' amended, nine count Complaint is based on the highly publicized, December 10, 2003 incident involving Mr. Kenneth Walker and three other passengers in a SUV that was stopped by Muscogee County Sheriff's deputies for suspected criminal drug related activity. During the stop, Mr. Walker was fatally shot by Deputy David Glisson.[1]

Plaintiffs have sued the Muscogee County Sheriff, 14 of his deputies, including Deputy Glisson,[2] and Muscogee County and the City of Columbus, Georgia, a consolidated government (collectively "Muscogee County").[3] The Amended Complaint purports to allege 42 U.S.C. § 1983 claims against all named Defendants for deprivation of equal protection based on racially discriminatory intent, unlawful seizure, excessive force and deliberate indifference in the failure to train and supervise (Counts I-IV). The Amended Complaint also purports to allege a 42 U.S.C. § 1985 conspiracy claim (Count V) against all named Defendants. The Amended Complaint then purports to allege a state law wrongful death claim (Count VI) only against Deputy Glisson and additional state law claims for false arrest, false imprisonment, assault and battery and failure to provide medical care against all named Defendants (Count VII).

---

[1]     Deputy Glisson is no longer employed by the Muscogee County Sheriff's Office and is represented by separate counsel in this matter. To the extent, however, that this motion is filed on behalf of the Muscogee County Sheriff and his deputies, who are arms of the State of Georgia, this motion also covers Deputy Glisson as a defendant in his official capacity. "It is well established that a suit against a defendant governmental officer in his official capacity is the same as a suit against the entity of which the officer is an agent." *Manders v. Lee*, 285 F.3d 983, 990 (11th Cir. 2002)(panel decision)("*Manders I*"), citing *McMillian v. Monroe County*, 520 U.S. 781, 785 n.2 (1997); *Ky. v. Graham*, 473 U.S. 159 (1985).

[2]     The Sheriff, Deputy Glisson and six of the other deputies are sued in their official and individual capacities. The remaining deputy is sued only in his individual capacity.

[3]     Muscogee County and the City of Columbus are a consolidated government and should be treated as the same entity for purposes of this lawsuit and this motion. *Bowen v. City of Columbus*, 256 Ga. 462, 462-64, 349 S.E.2d 740, 741-42 (1986). It is therefore appropriate to refer to them collectively as "Muscogee County."

All these claims fail as a matter of law based on numerous, important and well established reasons, including Eleventh Amendment immunity, the *Monell* doctrine, qualified immunity, sovereign immunity and official state law immunity.

First, the § 1983 claims against the Sheriff and his deputies in their official capacities and against Muscogee County relate to alleged Muscogee County Sheriff's Office policies, procedures and customs and to Plaintiffs' claim that those policies, procedures and customs are causally linked to the legal injuries alleged.[4]  The Sheriff and his deputies, however, ***are state, not municipal***, actors.  Muscogee County has no control over their office or policies, procedures or customs.  The Sheriff and his deputies are, therefore, entitled to Eleventh Amendment immunity for the § 1983 official capacity claims.  Nor can Muscogee County be liable for these claims.  It does not control and is not responsible for the Sheriff or his deputies.

Second, even if the Sheriff and his deputies were not state actors – but instead, were municipal actors – they would still be entitled to summary judgment on the § 1983 official capacity claims.  These claims would have to be treated as claims against Muscogee County.  In accordance with the *Monell* doctrine, Muscogee County could not be liable for such claims because there is absolutely no evidence of county policies or customs being the moving force behind or in any way causally linked to the legal injuries alleged.

Third, the Sheriff and his deputies are entitled to qualified immunity for the § 1983 claims against them in their individual capacities.[5]  There is no evidence demonstrating that the Sheriff or his deputies violated clearly established statutory or constitutional rights of which a reasonable person would have known.

---

[4]     *See* Plaintiffs' Amended Complaint at ¶¶48-49, 55, 63-66 & 74-75.
[5]     Since this motion is not filed on behalf of Deputy Glisson in his individual capacity, it takes no position as to whether Deputy Glisson is entitled to qualified immunity.

Fourth, in the absence of any viable § 1983 claims, Plaintiffs' 42 U.S.C. § 1985 conspiracy claim necessarily fails.

Finally, fifth, Plaintiffs' state law claims fail because the Sheriff and his deputies – to the extent named in their official capacities – and Muscogee County are entitled to sovereign immunity. At the same time, state law official immunity applies to the claims against the Sheriff and his deputies in their individual capacities because there is no evidence that the Sheriff or his deputies performed the discretionary functions at issue here with actual malice or with actual intent to cause injury.[6]

Consequently, Defendants' Motion for Summary Judgment should, respectfully, be granted, and judgment should be entered in Defendants' favor as to all claims in Plaintiffs' Complaint, as amended.

## INDISPUTABLE FACTS

Given the number of pertinent indisputable facts, Defendants have elected not to restate them, but, rather, to incorporate herein by reference their Statement of Material Facts As To Which There Is No Genuine Issue To Be Tried.

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

An issue of fact is "material" if, under the applicable substantive law, it might affect the outcome of the case. *Allen v. Tyson Foods*, 121 F.3d 642, 646 (11th Cir. 1997). An issue of fact

---

[6]    Again, since this motion is not filed on behalf of Deputy Glisson in his individual capacity, it takes no position as to whether Deputy Glisson is entitled to state law official immunity.

is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the non-moving party. *Id.* A court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

The moving party bears "the initial responsibility of informing the . . . court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof at trial, the moving party may discharge this "initial responsibility" by showing that there is an absence of evidence to support the non-moving party's case or by showing that the non-moving party will be unable to prove its case at trial. *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437-38 (11th Cir. 1991). To survive summary judgment, the non-moving party bearing the ultimate burden of proof at trial must come forward with evidence sufficient to withstand a directed verdict motion. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993).

On summary judgment, "the evidence of the non-movant is to be believed." *Anderson*, 477 U.S. at 255. The Court must view all the evidence and all factual inferences drawn therefrom in the light most favorable to the nonmoving party and determine whether that evidence could reasonably sustain a jury verdict. *Celotex*, 477 U.S. at 322-23; *Allen*, 121 F.3d at 646.

## ARGUMENT AND CITATION OF AUTHORITY

In accordance with the indisputable facts and standard of review, Defendants are entitled to summary judgment.

## I.    ELEVENTH AMENDMENT IMMUNITY

### A.    *In General*

The Eleventh Amendment to the United States Constitution provides immunity by restricting federal judicial power:

> [t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

It protects a state from being sued in federal court without the state's consent.[7]  As a result, parties with claims against a non-consenting state must resort to the state's own courts. *Manders II*, 338 F.3d at 1308.  The Eleventh Amendment is "a recognition that states, though part of a union, retain attributes of sovereignty, including immunity from being compelled to appear in the courts of another sovereign against their will." *Id.*, *quoting McClendon v. Georgia Dep't of Cmty. Health*, 261 F.3d 1252, 1256 (11th Cir. 2001).

Eleventh Amendment immunity also bars suits brought in federal court when an "arm of the state" is sued. *Manders II*, 338 F.3d at 1308.  To receive Eleventh Amendment immunity, a defendant need not be labeled a "state officer" or "state official," but need only be acting as an

---

[7]    *Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003)(*en banc*)("*Manders II*"), *cert. denied*, 124 S. Ct. 1061 (2004).  "Although the express language of the *[Eleventh] [A]mendment* does not bar suits against a state by its own citizens, the Supreme Court has held that an unconsenting state is immune from lawsuits brought in federal court by the state's own citizens." *Id.*, *quoting Carr v. City of Florence*, 916 F.2d 1521, 1524 (11th Cir. 1990)(emphasis in original), *citing Hans v. Louisiana*, 134 U.S. 1 (1890).  "[I]n the absence of consent[,] a suit in which the State or one of its agencies or departments is named as the defendant is proscribed by the *Eleventh Amendment*." *Manders II*, 338 F.3d at 1308, *quoting Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984).

"arm of the state," which includes agents and instrumentalities of the state.[8]  Whether a defendant is an "arm of the state" must be assessed in light of the particular function in which the defendant was engaged when taking the actions out of which liability is asserted to arise. *Manders II*, 338 F.3d at 1308.  Four factors are considered in such an assessment: (1) how state law defines the entity; (2) what degree of control the state maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity. *Id.* at 1309.

**B.**      ***Eleventh Amendment Immunity For Official Capacity Claims Related To Formulating Use Of Force Policy And Training And Arresting And Detaining Suspects***

Applying the four factor test set forth above, and examining Georgia law governing sheriffs, *Manders II* held that a sheriff is an "arm of the state" in establishing jail use of force policy and in deputy training and discipline and that a sheriff is entitled to Eleventh Amendment immunity for those functions. 338 F.3d at 1328.  Subsequently, in *Mladek v. Day*, 293 F. Supp. 2d 1297 (M.D. Ga. 2003), this Court stated that the *Manders II* doctrine with respect to the sheriff being an arm of the state and being entitled to Eleventh Amendment immunity was not limited to just a sheriff's operation of county jails, but rather, also encompassed sheriffs and their deputies for actions during an arrest and subsequent detention. *Id.* at 1304.

As this Court found, the *Manders II* holding:

> ***is clearly not limited to the operation of jails.***  Based upon an exhaustive review of Georgia law, the Eleventh Circuit found that Georgia sheriffs act as "state officers" in a variety of functions and when they "wear these state hats," they are entitled to official immunity.  The Eleventh Circuit explained that the proper inquiry is whether the Sheriff (or his deputy) acted for the state in the

---

[8]      *Manders II*, 338 F.3d at 1308, *citing Regents of the Univ. of Cal. v. Doe*, 519 U.S. 425, 429-30 (1997); *Skandalakis v. Geeslin*, 303 B.R. 533, 537 (Bankr. M.D. Ga. 2004)(Eleventh Amendment immunity applies not only to those cases in which the state is itself named as a party, but also to those cases in which the action is against state agents).

> particular function at issue in the case. ***Although the precise
> function at issue in Manders was the implementation of a force
> policy in the operation of a county jail, the Eleventh Circuit made
> it clear that it found no distinction between that function and the
> law enforcement function performed by sheriffs when they arrest
> citizens for violations of the law.***

*Id.* at 1304 (emphasis added)(citations omitted). Consequently, *Manders II* and *Mladek* squarely

hold that Georgia sheriffs and their deputies are acting for the State of Georgia and entitled to

Eleventh Amendment immunity when arresting and detaining suspects and when formulating

policies related to use of force and related training. This also means that Georgia sheriffs and

their deputies are entitled to Eleventh Amendment immunity for official capacity claims brought

against them as a result of arresting and detaining suspects and/or formulating policies related to

use of force.[9] *E.g.*, *Mladek*, 293 F. Supp. 2d at 1304.

### C.   *The Sheriff And His Deputies Have Eleventh Amendment Immunity From 42 U.S.C. § 1983 Official Capacity Claims*

Here, in accordance with the above, Sheriff Johnson and his deputies are entitled to

Eleventh Amendment immunity for Plaintiffs' § 1983 official capacity claims set forth in

Amended Complaint Counts I through IV. The law enforcement functions at issue were the

same type covered by *Manders II* and *Mladek*. They involved detaining suspects and use of

force. There is no reason to even apply in detail the four factor *Manders II* analysis. The

Eleventh Circuit and this Court have already ruled that Eleventh Amendment immunity applies

to official capacity claims in this setting.[10]

---

[9]       Claims against sheriffs and deputies in their official capacities are equivalent suits against
the state because a lawsuit against a government officer in his official capacity is the same as a suit
against the entity of which the officer is an agent. *Manders I*, *supra*, 285 F.3d at 990.

[10]       Defendants note that at the hearing on their motion for judgment on the pleadings,
Plaintiffs' counsel went to great lengths to argue that discovery was necessary to demonstrate that officers
involved in this case were not actually arms of the state. Discovery is now complete, and the only
evidence is that all officers involved, including the Metro agents and SRT members, were members of the
Muscogee County Sheriff's Office and, therefore, arms or agents of the state. Sheriff Johnson is the CEO

Consequently, as the Sheriff and his deputies are protected by Eleventh Amendment immunity,[11] summary judgment should be entered in their favor as to Amended Complaint Counts I through IV to the extent these Counts are alleged against them in their official capacities.

**D.    *Eleventh Amendment Immunity Has Not Been Waived***

In response to Defendants' previously filed motion for judgment on the pleadings, Plaintiffs, citing *Lapides v. Bd. of Regents of the Univ. Sys. of Ga.*, 535 U.S. 613 (2002), incorrectly attempted to characterize Defendants' removal as a waiver of Eleventh Amendment immunity.

This case was originally filed in Muscogee County Superior Court. The claims raised in the Complaint were substantially related to 42 U.S.C. § 1983 claims. Defendants removed the case to this court so that these federal claims and sovereign immunity defenses, could be adjudicated in federal court. Removal did not waive any immunities or defenses that would have existed in state court. Defendants also specifically preserved Eleventh Amendment immunity and all other immunities, including, but not limited to, sovereign immunity, in their Answer. *See* Defendant's Answer and Defenses, Sixth-Tenth Defenses.

In stark contrast, the *Lapides* defendant – characterized by the Court as the State – attempted to achieve what the Court called an "unfair tactical advantage" by removing from state to the federal court. 535 U.S. at 621. A University of Georgia professor had filed claims under

---

of Metro, which is comprised of Muscogee County Sheriff's officers and funded by forfeitures obtained through its own law enforcement activities. Sheriff Johnson also controls the SRT which is comprised exclusively of sheriff's deputies.

[11]    The Eleventh Circuit Court of Appeals has also noted that "[s]tates and their officials no longer need to rely exclusively on Eleventh Amendment immunity to avoid liability in their official capacities in section 1983 cases" because *Will v. Mich. Dep't of State Police*, 491 U.S. 58 (1989), "held that states and state officials acting in their official capacities are not 'persons' subject to liability under 42 U.S.C. §1983." *Carr v. City of Florence, Ala.*, 916 F.2d, 1521, 1525 n.3 (11th Cir. 1990).

the Georgia Tort Claims Act and 42 U.S.C. § 1983. *Id.* at 616. After removal, the State, while

conceding it had waived sovereign immunity from the state-law claims in state court via the Tort

Claims Act, asserted Eleventh Amendment immunity to suit in federal court. *Id.* at 616-17. In

other words, the State took the position that while it may not have sovereign immunity, the

Eleventh Amendment still protected it from suit in federal *jurisdiction*.

The Supreme Court held that by voluntarily submitting itself to the jurisdiction of the

federal court, the State could not then assert the Eleventh Amendment as a defense to federal

jurisdiction. *Id.* at 619-620. Importantly, the holding was limited to *"state law claims, in*

*respect to which the State has explicitly waived immunity from state-court proceedings."* *Id.* at

617 (emphasis added). The reason for this limitation is clear. The only federal claims against

the State in *Lapides* arose under 42 U.S.C. § 1983, and a state is not a "person" against whom a §

1983 action can be maintained. *Id.* at 617-18, *citing Will v. Mich. Dep't of State Police*, 491

U.S. 58, 66 (1989).[12] The Court also did not address the scope of Eleventh Amendment

immunity waiver where the underlying sovereign immunity was not waived by the state. Again,

the Georgia Tort Claims Act pled by the *Lapides* petitioner expressly waived sovereign

immunity for state law suits in state court.

*Lapides* is clear. Where a litigant has waived sovereign immunity in state court, it cannot

gain tactical advantage in federal court by removal and subsequent assertion of Eleventh

Amendment immunity. Unlike *Lapides*, here, there has been no waiver of sovereign immunity

for state laws claims in state court. On the contrary, the Sheriff and his deputies in their official

---

[12]     Again, as pointed out above, in accordance with *Will*, Defendants no longer need to rely
solely on Eleventh Amendment immunity to defeat § 1983 claims brought against the State. Because
Sheriff Johnson and his deputies are arms of the State of Georgia, all § 1983 claims must be dismissed
irrespective of Eleventh Amendment immunity or any alleged waiver thereof.

capacities and Muscogee County are entitled to sovereign immunity for any state law claims.
*Haber v. Fulton County*, 124 Ga. App. 789, 791, 186 S.E.2d 152, 153 (1971).

Significantly, the United States Court of Appeals for the Fourth Circuit has addressed a
nearly identical case in which the plaintiff asserted that the defendants waived sovereign
immunity by virtue of removal to federal court when the defendants would have been immune
from the same action in state court. In *Stewart v. State of N.C.*, 393 F.3d 484 (4th Cir. 2005), the
court held that the state, having not already consented to suit in its own courts, did not waive
sovereign immunity by removal. *Id.* at 490.

The court also explained the often confused concepts of Eleventh Amendment immunity
and state sovereign immunity as follows:

> [w]e have . . . sometimes referred to the States' immunity from suit
> as "*Eleventh Amendment* immunity." The phrase is convenient
> shorthand but something of a misnomer, for the sovereign
> immunity of the States neither derives from, nor is limited by, the
> terms of the *Eleventh Amendment*. Rather, as the Constitution's
> structure, its history, and the authoritative interpretations by this
> Court make clear, the States' immunity from suit is a fundamental
> aspect of the sovereignty which the States enjoyed before the
> ratification of the Constitution, and which they retain today (either
> literally or by virtue of their admission into the Union upon an
> equal footing with the other States) except as altered by the plan of
> the Convention or certain constitutional Amendments. *Alden v.*
> *Maine*, 527 U.S. 706, 713, 144 L. Ed. 2d 636, 119 S. Ct. 2240
> (1999).
>
> State sovereign immunity is "based on the logical and practical
> ground that there can be no legal right as against the authority that
> makes the law on which the right depends." *Nevada v. Hall*, 440
> U.S. 410, 416, 59 L. Ed. 2d 416, 99 S. Ct. 1182 (1979)(internal
> quotation marks omitted). In that sense, state sovereign immunity
> was not created by the *Eleventh Amendment*, but rather predated it.
> *See Alden*, 527 U.S. at 728-29 ("The *Eleventh Amendment*
> confirmed, rather than established, sovereign immunity as a
> constitutional principle."); *Hans v. Louisiana*, 134 U.S. 1, 16, 33 L.
> Ed. 842, 10 S. Ct. 504 (1890)("The suability of a state, without its
> consent, was a thing unknown to the law."). In contrast, by the

11

> terms of the *Eleventh Amendment*, an unconsenting state is
> immune from suit filed in federal court by a citizen of another
> state. *See* U.S. Const. amend. XI. The purpose of the *Eleventh
> Amendment* was to overrule *Chisholm v. Georgia*, 2 U.S. (2 Dall.)
> 419, 1 L. Ed. 440, 2 Dall. 419 (1793), not to define the contours of
> state sovereign immunity generally. *See Alden*, 527 U.S. at 723
> ("The *Eleventh Amendment* did not redefine the federal judicial
> power but instead overruled the Court."). Thus, *Eleventh
> Amendment* immunity is but an example of state sovereign
> immunity as it applies to suits filed in federal court against
> unconsenting states by citizens of other states. *See Idaho v. Coeur
> d'Alene Tribe of Idaho*, 521 U.S. 261, 267-68, 138 L. Ed. 2d 438,
> 117 S. Ct. 2028 (1997) (discussing "the broader concept of
> immunity, implicit in the Constitution, which we have regarded the
> *Eleventh Amendment* as evidencing and exemplifying").

*Stewart*, 393 F.3d at 487-88 (emphasis in original; citations included). *Stewart* then held that

*Lapides* did not address whether a state that has not consented to suit in its own courts maintains

the broader concept of sovereign immunity as exemplified by Eleventh Amendment immunity.

*Id.* at 488. Accordingly, the court held that North Carolina, not having already consented to suit

in its own courts, did not waive sovereign immunity by removing to federal court. *Id* at 490.

Just as in *Stewart*, Georgia has not consented to suit in its own courts for any of the

claims brought in this lawsuit. As a result, the rationale for the *Lapides* finding does not exist,

and *Lapides* does not apply here. The law after *Lapides* is that whatever immunity would exist at

the state court level would likewise exist at the federal level after removal. The only thing

*Lapides* does is limit the unfair tactic – ***which is not present here*** – of regaining immunity in

federal court that was waived by state legislation. Since Georgia has not waived any of the

claims in this case, the long standing principle of sovereign immunity applies.

## II.   Muscogee County Is Entitled To Summary Judgment As It Does Not Control Sheriff's Office Policies Or Customs

Muscogee County is also entitled to summary judgment as to Plaintiffs' § 1983 claims.[13] Muscogee County is entitled to all the governmental immunities applicable to Georgia county governments. *Bowen v. City of Columbus*, 256 Ga. 462, 462-64, 349 S.E.2d 740, 741-42 (1986). A county or consolidated government like Muscogee County, is not responsible for the policies of a sheriff's department and cannot be liable therefor. *Grech v. Clayton County*, 335 F.3d 1326, 1347-48 (11th Cir. 2003).

In *Grech*, the Court held that because Georgia counties do not control or have authority over sheriffs, counties have no § 1983 liability for the sheriffs' law enforcement policies. *Id.* at 1348. The plaintiff alleged Clayton County was liable under § 1983 for the policies of the county sheriff with regard to its computer database for arrest warrants. *Id.* at 1327. The Court exhaustively examined federal and state case law in determining that counties have no control or authority over county sheriff departments. *Id.* at 1332-1344. Finding in favor of the county, the Court then noted that since counties have no control over the policies formulated by sheriff's departments, they have no corresponding § 1983 liability for such policies. *Id.* at 1348. Under § 1983, county liability may not be based on *respondeat superior*, but, rather, must be predicated on county authority over the policy at issue. *Grech*, 335 F.3d at 1329, *citing City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Monell v. Dep't. of Soc. Servs.*, 436 U.S. 658, 694 (1978). As stated in *Grech*, a county is "liable under section 1983 only for acts for which [the county] is actually responsible." 335 F.3d at 1329, *quoting Marsh v. Butler County*, 268 F.3d 1014, 1027 (11th Cir. 2001)(*en banc*).

---

[13]      As will be addressed later in this memorandum, Muscogee County is also entitled to summary judgment on Plaintiffs' remaining state law claims on the basis of sovereign immunity.

It is well settled that to establish liability for a county for under § 1983, a plaintiff must prove that an official policy caused a constitutional violation. *Monell*, 436 U.S. at 694. Under *Monell*, this can be accomplished by either showing an official county policy or an unofficial custom or practice of the county. *See id.* at 690-91, 694.

> Under either avenue, a plaintiff (1) must show that the local government entity, here the county, has authority and responsibility over the governmental function in issue and (2) must identify those officials who speak with final policymaking authority for that local governmental entity concerning the act alleged to have caused the particular constitutional violation in issue.

*Grech*, 355 F.3d at 1330. The focus here must be upon whether the Sheriff is in fact a policymaker for Muscogee County. As *Grech* explains, he is not.

*Grech* sets forth in detail federal and state authority showing that sheriffs are not policymakers for counties.[14] Plaintiffs attempt to place liability on Muscogee County for the policies of the Muscogee County Sheriff Office with respect to the Sheriff's deputies' alleged misconduct, supervision and training. Muscogee County, as a matter of law, does not control such policies. Georgia's constitution provides that "the Governor shall take care that the laws are faithfully executed and shall be the conservator of the peace throughout the state." Ga. Const. Art. V, § 2, p. 2. In *McMillian v. Monroe County*, 520 U.S. 781 (1997), the Supreme Court pointed out that a sheriff "represented the State in fulfilling his duty to keep the peace." *Id.* at 794. "[I]n conserving the public peace, in vindicating the law, and in preserving the rights of the government, [the sheriff] represents the sovereignty of the State and he has no superior in

---

[14]     *Grech* analyzed numerous areas in arriving at the conclusion that sheriffs do not act on behalf of the county. Among other things, in determining that counties are not responsible for the acts of sheriffs or their deputies, the *Grech* court considered that the Georgia Constitution created independent sheriffs offices; that sheriffs perform law enforcement functions for the state; that the State controls the qualifications, salary, and training; that the State has the right to investigate and suspend sheriffs; that the county lacks control over the law enforcement function of sheriffs; and that sheriffs have the authority alone to hire and fire deputies. *Id.* at 1332-1344.

his county." *Grech*, 335 F.3d at 1334, *quoting* 1 W. Anderson, <u>A Treatise on the Law of</u>

<u>Sheriffs, Coroners and Constables</u> 5 (1941), *cited with approval in McMillian*, 520 U.S. at 794.

> *In contrast to the State, counties have no authority or control over, and no role in, Georgia sheriffs' law enforcement function. Counties do not grant sheriffs their law enforcement powers, and neither prescribe nor control their law enforcement duties and policies. Counties also have no role in the training and supervision of the sheriff's deputies. Instead, sheriffs exercise authority over their deputies independent from the county.*

*Grech*, 335 F.3d at 1336 (emphasis added).

Given the above binding Eleventh Circuit precedent, Muscogee County cannot be held

responsible under § 1983 for the policies of the Muscogee County Sheriff or his deputies'

actions. Muscogee County is, therefore, entitled to summary judgment on Plaintiffs' § 1983

claims.

**III.** **Even If Eleventh Amendment Immunity Were Inapplicable, Summary Judgment Would Be Appropriate In Accordance With The *Monell* Doctrine**

Even assuming *arguendo* that the Sheriff and his deputies were not arms of the state, but

rather Muscogee County, and were not entitled to Eleventh Amendment immunity, summary

judgment would still be appropriate in accordance with the *Monell* doctrine on Plaintiffs' § 1983

claims against Muscogee County and the Sheriff and his deputies in their official capacities.

**A.** ***The Monell Doctrine At Summary Judgment***

The Supreme Court has clearly defined the *Monell* doctrine – the standard for

establishing municipal liability[15] under § 1983:

---

[15] Again, it is well established that a suit against a defendant governmental officer in his official capacity is the same as a suit against the entity of which the officer is an agent. *Manders I*, 285 F.3d at 990. To the extent Plaintiffs have filed official capacity claims and argue that the Sheriff and his deputies are arms of Muscogee County, Plaintiffs' official capacity claims must be treated as claims against Muscogee County.

> [w]e have consistently refused to hold municipalities liable under a
> theory of *respondeat superior*. Instead, in *Monell* and subsequent
> cases, we have required a plaintiff seeking to impose liability on a
> municipality under § 1983 to identify a municipal 'policy' or
> 'custom' that caused the plaintiff's injury . . . As our § 1983
> municipal liability jurisprudence illustrates, however, ***it is not
> enough for a § 1983 plaintiff merely to identify conduct properly
> attributable to the municipality. The plaintiff must also
> demonstrate that, through its deliberate conduct, the municipality
> was the 'moving force' behind the injury alleged.*** That is, a
> plaintiff must show that the municipal action was taken with the
> requisite degree of culpability and must demonstrate a direct casual
> link between the municipal action and the deprivation of federal
> rights.

*Bd. of County Comm'rs of Bryan County, Okla. v. Brown*, 520 U.S. 397, 404 (1997)(emphasis

added), *citing* Monell, 436 U.S. at 694; *see also e.g.*, *Young v. City of Augusta, Ga.*, 59 F.3d

1160, 1171 (11th Cir. 1995). "Congress did not intend municipalities to be held liable unless

**deliberate** action attributable to the municipality directly caused a deprivation of federal rights."

*Brown*, 520 at 415 (emphasis in original).

Accordingly, to recover on their § 1983 claims against Muscogee County or the Sheriff

or his deputies in their official capacities, Plaintiffs must establish that Defendants violated Mr.

Walker's constitutional rights and that Muscogee County had an official policy or custom that

was the moving force behind the constitutional violation. On summary judgment, the first issue

to resolve is whether there is a genuine issue of material fact as to whether a constitutional

violation occurred. *See Rooney v. Watson*, 101 F.3d 1378, 1381 (11th Cir. 1996). If such a jury

question exists, the Court must then determine whether sufficient evidence has been submitted

from which a reasonable jury could conclude that execution of the government's policy or

custom caused the violation. *Monell*, 436 U.S. at 694.

**B.**    *The Alleged Constitutional Violations*

Plaintiffs' purport to allege two types of constitutional violations: that Defendants (1) deprived Mr. Walker of equal protection based on racially discriminatory intent in violation of the Fourteenth Amendment (Count I); and (2) committed an unlawful seizure and used excessive force under the Fourth Amendment (Counts II & III).[16]

(1)    Equal Protection

There is absolutely no evidence whatsoever that this unfortunate case has ever had anything to do with race. There is no evidence that the SUV was stopped on the basis of race, nor that any of the subsequent events were based on race. There is, therefore, no evidence of a Fourteenth Amendment equal protection violation. *E.g.*, *Draper v. Reynolds*, 369 F.3d 1270, 1278 n.14 (11th Cir. 2004)(summary judgment on Fourteenth Amendment equal protection claim affirmed where there was no evidence that white drivers were treated differently than black drivers or that officer was motivated by race).

(2)    Unlawful Seizure And Excessive Force

The Fourth Amendment unlawful seizure and excessive force claims warrant more discussion, but are still deficient. "An officer may, consistent with the Fourth Amendment, conduct a brief, investigatory stop when the officer has reasonable, articulable suspicion that criminal activity is afoot."[17] *Wardlow*, 120 S. Ct. at 675. "[R]easonable suspicion is a less

---

[16]    Plaintiffs also allege that Defendants showed a deliberate indifference to Mr. Walker's rights in the failure to train and supervise under the Fourth and Fourteenth Amendments (Count IV). This Count, however, will be dealt with below in the causation section of this memorandum because the Count is appropriately addressed not as a constitutional violation in an of itself, but, rather, as an alleged causal link between the alleged constitutional violations and Muscogee County policy or custom.

[17]    Defendants' investigatory traffic stop is governed by the Fourth Amendment providing that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV; *Terry v. Ohio*, 392 U.S. 1, 8-9 (1968). "[A] brief encounter between a citizen and a police officer on a public street, is governed by the analysis ... first applied in *Terry*." *Illinois v. Wardlow*, 528 U.S. 119, 120 S. Ct. 673, 675 (2000). While

demanding standard than probable cause and requires a showing considerably less than

preponderance of the evidence."[18]  *Id.* at 675-76.  When determining whether reasonable

suspicion exists, the courts must review the "totality of the circumstances."  *United States v.*

*Bentley*, 151 Fed. Appx. 824, 829 (11th Cir. 2005), *quoting United States v. Arvizu*, 534 U.S. 266,

273 (2002).  Also, a "'reviewing court must give due weight to the officer's experience' when

examining the totality of the circumstances."  "'None of the suspect's actions, [however], need be

criminal on their face."  *United States v. Lee*, 68 F.3d 1267, 1271 (11th Cir. 1995).  The Fourth

Amendment requires "at least a minimal level of objective justification for making the stop."

*Wardlow*, 120 S. Ct. at 675-76.  "The rule is not concerned with 'hard certainties, but with

probabilities' and, thus, law enforcement officials may rely on 'common sense conclusions.'"

*Bentley*, 151 Fed. Appx. at 829, *quoting United States v. Cortez*, 449 U.S. 411, 418 (1981).

Here, there are no fewer than 12 separate pieces of indisputable evidence demonstrating

reasonable suspicion far exceeding a minimal level of objective justification:

(1)    Bo Jack confirmed during conversations – heard contemporaneously by Sergeants Stinson, Price and Whitten – with the CI that extensive drug related activity was taking place out of his apartment and that Bo Jack was in the process of acquiring more cocaine.

(2)    Michael Powell was arrested shortly before the stop exiting the apartment with over 67 grams of cocaine.

---

there are circumstances under which a person may be briefly detained without probable cause to arrest him, "any curtailment of a person's liberty by the police must be supported at least by a reasonable and articulable suspicion that the person seized is engaged in criminal activity." *Reid v. Ga.*, 448 U.S. 438, 440 (1980).

[18]      Defendants' drawing their guns and forcing the passengers out of the SUV did not convert this investigatory stop into an arrest requiring analysis of probable cause principles. *Jackson v. Sauls*, 206 F.3d 1156, 1166 n.13 (11th Cir. 2000), *citing Courson v. McMillian*, 939 F.2d 1479, 1493 (11th Cir. 1991), and *United States v. Roper*, 702 F.2d 984, 987 (11th Cir. 1983)(an officer's drawing his weapon and ordering two unarmed occupants to exit a vehicle did not convert the investigatory stop into an arrest), *accord United States v. Pantoja-Soto*, 768 F.2d 1235, 1236 (11th Cir. 1985).

(3)    Bo Jack was seen driving to the La Quinta motel while representing that he was acquiring more cocaine. The La Quinta is a motel where Metro has handled other drug cases. Bo Jack spent only 10 to 15 minutes in a room at La Quinta.

(4)    The CI described the SUV as similar to one driven by the Miami Boys, who he claimed were Bo Jack's suppliers.

(5)    The SUV pulled in and out of Northwoods the first time in a suspicious manner.

(6)    Bo Jack and the SUV arrived nearly simultaneously to the apartment.

(7)    The CI described the Miami Boys as traveling in groups of four to five and being armed. There were four passengers in the SUV.

(8)    The CI described the main supplier as a large black male. The SUV driver, Mr. Beaulah, is in fact a large black male.

(9)    One of the SUV passengers carried a package that appeared to be wrapped in plastic under his arm into Bo Jack's apartment.

(10)    Bo Jack did not answer his telephone – as the CI said he would not while conducting drug deals – while the SUV passengers were in the apartment.

(11)    The SUV passengers remained in the apartment for only 10 to 15 minutes.

**AND**

(12)    The CI said the apartment was a drug "trap."

Given the above, there was no unlawful seizure or constitutional violation in making the stop as it was appropriately based on objective justification.[19],[20]

---

[19]    Plaintiffs' own expert Mr. Robinette agrees that, assuming the truth of Sergeant Price's police report, there was reasonable suspicion to stop the SUV. Plaintiffs have sought to avoid this testimony and the facts with an affidavit from the CI. The affidavit was allegedly signed on March 15, 2006, more than two years after the Event. Anticipating that Plaintiffs may offer the affidavit in opposition to this motion, Defendants point out that in the affidavit, the CI now claims that he never met or saw Bo Jack's supplier; that he never said the supplier was dangerous or who he traveled with; that he never mentioned the color or make of the supplier's SUV; that he did not know or recognize any of the SUV passengers; and that he did not tell the Metro agents that the supplier was in the SUV. He also now claims "a narcotics agent" told him to say that he recognized a man from the SUV as the supplier from Miami and that the supplier and his "boys" were heavily armed. He claims he made these statements because he knew he could be charged with drug possession.

    Putting aside the obvious fact that the CI's affidavit comes more than two years after the Event and contradicts portions of what he told Sergeant Price and portions of the statement he gave to Lieutenant Tew and others on December 11, 2003, nothing in the affidavit changes the fact that

19

The next question then becomes whether Defendants used excessive force during the stop. The right to make an "investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 395 (1989). The use of force must be "reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight." *Mladek*, 293 F. Supp. 2d at 1302, *quoting McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1244 (11th Cir. 2003). Whether the use of force was reasonable must be determined on "'on a case-by-case basis from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.'" *McCormick*, 333 F.2d at 1244, *quoting Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97.

In accordance with this standard, and excluding for the moment the shooting, there is no evidence of excessive force by any officer. Given the objective evidence known about the SUV

---

reasonable suspicion existed. This reasonable suspicion was based not on a positive identification of the supplier or the Miami Boys, but rather on the numerous factors listed by Sergeants Price and Stinson.

Defendants would also ask that the affidavit be disregarded in any event given its conflict with the CI's prior testimony. *Cf., Van T. Junkins & Assoc., Inc. v. U.S. Industries, Inc.*, 736 F.2d 656, 657 (11th Cir, 1984)("[w]hen a party has given clear answers to unambiguous questions which negate the existence of any genuine issue of material fact, the party cannot thereafter create such an issue with an affidavit that merely contradicts, without explanation, previously given clear testimony"). The CI's affidavit and his explanation for the change in testimony are a complete sham.

[20]    Defendants also note that the CI's affidavit or information as to its content was not provided to undersigned counsel until April 13, 2006. A review of the transcript from Sergeant Stinson's February 24, 2006 deposition suggests that Plaintiffs had been in contact with the CI as of that date. Plaintiffs' counsel asked hypotheticals about whether Sergeant Stinson would have handled the stop differently if there were no information from the CI that the SUV passengers were armed and dangerous. Defendants point this out not because they see any credibility in the affidavit, but rather to dispel any suggestion by Plaintiffs that they were denied access to the CI. Defendants also point out that Plaintiffs, in keeping with their discovery obligations, should have informed Defendants of the CI's "new" testimony and affidavit before Sergeant Stinson's deposition and certainly should not have taken a month to produce the affidavit.

and its previous activities in the context of a narcotics investigation, the officers were reasonably justified in stopping the SUV, utilizing SRT members and removing the SUV passengers with their weapons drawn.[21] A finding to the contrary would endanger the lives of officers in all future narcotics operations. By definition, narcotics interdiction is dangerous. Officers are frequently confronted with armed, impaired, violent and extremely dangerous individuals. Plaintiffs' version of law would require officers to make stops in the hope that narcotics suspects are not armed as opposed to with the appropriate assumption that they are armed. *United States v. Jacob*, 377 F.3d 573, 579-80 (6th Cir. 2004)("officers who stop a person who is 'reasonably suspected of carrying drugs' are 'entitled to rely on their experience and training in concluding that weapons are frequently used in drug transactions,' and to take reasonable measures to protect themselves"); *United States v. Heath*, 259 F.3d 522, 530 (6th Cir. 2001)(finding it reasonable for agents, after stopping a person suspected of drug trafficking, to draw their weapons to order a suspect out of his car and to frisk and handcuff the suspect). Officers must be allowed to use overwhelming numbers and surprise, such as was used here, for their own safety as well as for that of the suspects.[22] *See Michigan v. Summers*, 452 U.S. 692, 702-03 (1981)("[t]he risk of harm to both the police and the occupants is minimized if the officers

---

[21] *E.g., Courson*, 939 F.2d at 1496 (a deputy did not use excessive force during an investigatory stop in requiring a female companion, who was never arrested, and two males, who were later arrested, to lie face down on the ground with a shotgun pointed at them); *Jackson*, 206 F.3d at 1171-72 (no excessive force to draw weapons and order the plaintiffs to lie on the ground); *McCoy v. City of Monticello*, 342 F.3d 842, 848-49 (8th Cir. 2003)(officer drawing gun objectively reasonable where officer had reason to believe driver was intoxicated and attempting to avoid arrest); *Maryland v. Wilson*, 519 U.S. 408, 414 (1997)("danger to an officer from a traffic stop is likely to be greater when there are passengers in addition to the driver").

[22] Again, Plaintiffs may attempt to rely on the CI's affidavit to argue that excessive force was applied if you assume the deputies were not told the SUV passengers were armed and dangerous. This, however, would not meaningfully change the "calculus of reasonableness." Even assuming there were not such CI statement, there does not appear to be any authority suggesting the amount of force used was excessive. The deputies' right to approach the SUV with weapons drawn was not dependent on the belief that the passengers were armed and dangerous. *Courson*, 939 F.2d at 1494-95. The use of guns in connection with a stop is permissible where the police reasonably believe they are necessary for their protection. *Id.* at 1494.

routinely exercise unquestioned command of the situation"). "To require an officer to risk his life in order to make an investigatory stop would run contrary to the intent of *Terry v. Ohio*." *Courson*, 939 F.2d at 1496, *quoting Roper*, 702 F.2d at 987.

Defendants have not lost sight of the fact that Mr. Walker was tragically shot during the stop and that Plaintiffs argue that shooting an unarmed man is excessive force.[23] Defendants submit, however, that the evidence demonstrates that the shooting was accidental and, therefore, not excessive force.[24] The reasonableness inquiry must therefore focus on all the deputies' actions, including Deputy Glisson's, to the exclusion of the shooting. That analysis demonstrates, again, that the deputies responded appropriately to what they deemed a highly dangerous narcotics investigation and stop. Any other conclusion could only be based on the 20/20 vision of hindsight, which is impermissible.

> We must avoid substituting our personal notions of proper police procedure for the instantaneous decision of the officer at the scene. We must never allow the theoretical sanitized world or our imagination to replace the dangerous and complex world that policemen face every day. What constitutes "reasonable" action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure.

*Dickerson v. McClellan*, 101 F.3d 1151, 1162 (6th Cir. 1996).

In summary, therefore, there is no evidence that the stop was anything other than completely justified as based on reasonable suspicion. At the same time, there is no evidence of excessive force. Even if, however, that the stop were inappropriate and excessive force were

---

[23]     Plaintiffs' expert Mr. Robinette has not criticized the use of force by any deputy other than Deputy Glisson.

[24]     *Leber v. Smith*, 773 F.2d 101, 105 (6th Cir. 1985)(where is was undisputed that the police officer accidentally discharged his weapon, the question becomes whether he acted reasonably in drawing his gun); *Tallman v. Elizabethtown Police Dep't*, No. 06a0061n.06, 2006 U.S. App. LEXIS 1710, at *12 (6th Cir. Jan. 23, 2006)(where there was no evidence from which jury could conclude the police officer intentionally discharged his weapon, the reasonableness inquiry shifts to whether he acted reasonably in drawing his gun); *cf.*, *County of Sacramento v. Lewis*, 523 U.S. 833, 844 (1998)(no seizure based on accidental police car collision).

applied, summary judgment would still be appropriate because there is no evidence of a

Muscogee County policy or custom as the driving force behind any unlawful seizure or excessive

force.

**C.     *Causal Connection Between The Alleged Constitutional
        Violations And Muscogee County's Policy Or Custom***

The Amended Complaint does not cite to a single specific Muscogee County policy or

custom that was the driving force behind any unlawful seizure or excessive force. This is

because there is no such policy or custom. Nevertheless, Amended Complaint Count IV does

purport to allege deliberate indifference to Mr. Walker's rights in the failure to train and

supervise under the Fourth and Fourteenth Amendments. While a failure to train and supervise

can support a finding of a causal link between a municipal policy or custom and an alleged

constitutional violation, *see City of Canton*, 489 U.S. at 387, the circumstances under which a

failure to train and supervise can support § 1983 liability are limited. As explained by the

Supreme Court:

> [T]he inadequacy of police training may serve as the basis for §
> 1983 liability only where the failure to train amounts to deliberate
> indifference to the rights of persons with whom the police come
> into contact . . . Only where a municipality's failure to train its
> employees in a relevant respect evidences a "deliberate
> indifference" to the rights of its inhabitants can such a shortcoming
> be properly thought of a city "policy or custom" that is actionable
> under § 1983 . . . . Only where a failure to train reflects a
> "deliberate" or "conscious" choice by a municipality – a "policy"
> as defined by our prior cases – can a city be liable for such a
> failure under § 1983.

*Id.* at 388-89.

Failure to train or supervise only becomes "deliberate" where "in light of the duties

assigned to specific officers or employees the need for more or different training is so obvious,

and the inadequacy so likely to result in the violation of constitutional rights, that the policy

23

makers of the city can reasonably be said to have been deliberately indifferent to the need." *Id.*
at 390. Furthermore, the Court continued:

> [i]n resolving the issue of a city's liability, the focus must be on the
> adequacy of the training program in relation to the tasks the
> particular officers must perform. That a particular officer may be
> unsatisfactorily trained will not alone suffice to fasten liability on
> the city, for the officer's shortcomings may have resulted from
> factors other than a faulty training program.

*Id.* at 390-91. The key question to ask therefore is: "[w]ould the injury have been avoided had
the employee been trained under a program that was not deficient in the identified respect?" *Id.*
at 391.

When evaluating whether a municipality made a "deliberate choice" when enacting a
policy, courts must evaluate whether the policymakers had "actual of constructive notice that the
particular omission is substantially certain to result in the violation of constitutional rights of
their citizens." *Id.* As the Eleventh Circuit, in *Young v. City of Augusta, Ga.*, clarified, based on
the *City of Canton* opinion, this may be done in one of two ways. First, where the government
officials "face clear constitutional duties in recurrent situations," the need for given type of
training may be obvious. *Young*, 59 F.3d at 1172. Second, "the need for more or better training
may be obvious where a pattern of constitutional violations exists such that the municipality
knows or should know that corrective measures are needed." *Id.*

There is not sufficient evidence for Plaintiffs to show a deliberate indifference under
either of the two *Young* methods. Taking them in reverse order, there is absolutely no evidence
of a pattern of shootings, much less a pattern of unlawful seizures or excessive force claims.
Moreover, there is no evidence of a need for a particular type of training in a setting where the
deputies face clear constitutional duties in recurrent situations. This type of event has never

happened before in Muscogee County. As such, there is no evidence of a need for a particular type of training.[25]

It should also be recognized that the evidence in this case demonstrates that Deputy Glisson was, in fact, trained against exactly what he did wrong. He was actually terminated for not following this training. It would be illogical to find a failure to train where there has actually been training. This is particularly so given the fact that Plaintiffs' own expert witness, Mr. Robinette, has opined that Deputy Glisson had appropriate training that he simply did not follow.

Plaintiffs apparently allege that there was a failure to train and supervise (1) Deputy Glisson in the use of firearms; (2) all the defendant deputies in the seizure and apprehension of Mr. Walker without violence, firearms and excessive force; and (3) Metro and SRT on the use of confidential information and probable cause issues as well as in lawful seizures and proper use of force. *See* Amended Complaint at ¶¶69-71. Again, there is no evidence, in the form of expert testimony or otherwise, of a lack of training or a need to train in any of these areas.

Consequently, in the absence of any evidence of a failure to train or supervise or of any other custom or policy causing the legal injuries alleged, summary judgment under *Monell* is appropriate. *E.g., Snow v. City of Citronelle*, 420 F.3d 1262, 1270 (11th Cir. 2005).

---

[25]     Plaintiffs may attempt to argue that evidence of prior incidents is not required to establish a policy or custom. This is clearly not the case. The Eleventh Circuit recognized in *Gold v. City of Miami*, 151 F.3d 1346 (11th Cir. 1998), that the Supreme Court has only *"hypothesized,"* in *dicta*, one type of incident – the failure to train in the use of deadly force where firearms are provided to police officers – that would show an obvious need to train without a pattern of prior constitutional violations. *Id.* at 1351-52, *citing City of Canton*, 489 U.S. at 390, and *quoting Brown*, 117 S. Ct. at 1391. There is no similar failure to train alleged here.

IV.     **The Sheriff And His Deputies Are Entitled To Qualified Immunity**
        **For Plaintiffs' § 1983 Claims Against Them In Their Individual**
        **Capacities**

Sheriff Johnson and his deputies are also entitled to summary judgment on Plaintiffs' §

1983 claims against them in their individual capacities.  The Sheriff and his deputies have

qualified immunity for these claims.[26]

"Qualified immunity provides protection for governmental officials performing

discretionary functions and sued in their individual capacities as long as their conduct violates no

clearly established statutory or constitutional rights of which a reasonable person would have

known." *Storck v. City of Coral Springs*, 354 F.3d 1307, 1313 (11th Cir. 2003); *Thomas v.*

*Roberts*, 261 F.3d 1160, 1170 (11th Cir. 2001).  For an asserted right to be clearly established for

purposes of qualified immunity, "the law must have been developed in such a concrete and

factually defined context to make it obvious to all reasonable government actors, in the

defendant's place, that 'what he is doing' violates federal law.'" *Jackson*, 206 F.3d at 1164-65,

*quoting Lassiter v. Alabama A&M Univ. Bd. of Trustees*, 28 F.2d 1146, 1149 (11th Cir. 1994).  If

reasonable public officials could differ on the lawfulness of a defendant's actions, the defendant

is entitled to qualified immunity.  *Storck*, 354 F.3d at 1314.  The standard is an objective one and

does not include inquiry into the officer's subjective intent or beliefs.  *Jackson*, 206 F.3d at 1165.

The purpose of this immunity is to allow government officials to carry out their

discretionary duties without the fear of personal liability or harassing litigation, protecting from

suit "all but the plainly incompetent or one who is knowingly violating the federal law." *Lee v.*

*Farraro*, 284 F.3d 1188, 1194 (11th Cir. 2002); *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

Because qualified immunity is a defense not only from liability, but also from suit, it is

---

[26]     Again, this portion of the motion is not filed on behalf of Deputy Glisson because he is
represented by separate counsel in his individual capacity.

"important for a court to ascertain the validity of a qualified immunity defense as early in the lawsuit as possible." *Lee*, 284 F.3d at 1194, *quoting GJR Invs., Inc. v. County of Escambia*, 132 F.3d 1359, 1370 (11th Cir. 1998)(citation omitted).

Under qualified immunity analysis, the public official must first prove they were acting within the scope of their discretionary authority when the allegedly unconstitutional acts took place. *Lee*, 284 F.3d at 1194. ***The burden then shifts to the plaintiff to establish that qualified immunity does not apply.*** *Id.* A plaintiff's citation of general rules or abstract rights is insufficient to strip a § 1983 defendant of qualified immunity. *Jackson*, 206 F.3d at 1165. To determine if the plaintiff has met this burden, the Court must make the following two part evaluation: (1) taken in the light most favorable to the party asserting the injury, do the facts alleged show the official's conduct violated a constitutional right; and (2) if a constitutional right would have been violated under the plaintiff's version of the facts, was the right clearly established? *Id.*, *quoting Saucier v. Katz*, 533 U.S. 194, 201 (2001). Thus, if no constitutional violation is established, then the official prevails, and there is no necessity for further inquiries concerning qualified immunity. *Storck*, 354 F.3d at 1314. On the other hand, if the facts establish a constitutional violation, the Court must determine whether at the time of the violation, the right was clearly established, which is an inquiry that must be undertaken in light of the specific context of the case and not as a broad general proposition. *Id.*

Applying the above standard, there is no way Plaintiffs could circumvent the Sheriff's and his deputies' qualified immunity. First, the conduct complained of was clearly within their discretionary authority. A public official is acting within their discretionary authority if they are (a) performing a legitimate job-related function (that is, pursuing a job-related goal); (b) through means that were within their power to utilize. *Holloman v. Harland*, 370 F.3d 1252, 1265 (11th

Cir. 2004); *Hill v. Dekalb Reg'l Youth Det. Ctr.*, 40 F.3d 1176, 1185 n.17 (11th Cir. 1994)("[a] government official acts within his or her discretionary authority if objective circumstances compel the conclusion that challenged actions occurred in the performance of the official's duties and within the scope of this authority"). The Sheriffs' and his deputies' complained of conduct falls within this definition.[27]

With discretionary authority indisputable, Plaintiffs have the burden of showing violation of a clearly established constitutional right by the Sheriff and his deputies. They cannot. As set forth above, the Sheriff and his deputies did not commit an unlawful seizure or use excessive force.[28]

The stop was clearly and appropriately based on reasonable suspicion. Moreover, a "law enforcement official who reasonably but mistakenly believes that reasonable suspicion is present is still entitled to qualified immunity." *Jackson*, 206 F.3d at 1165-66. The "issue is not whether reasonable suspicion existed in fact, but whether the officer had 'arguable' reasonable suspicion to support the investigatory stop." *Id.* at 1166. Again, the evidence supporting reasonable suspicion was overwhelming. At a minimum, it created "arguable" reasonable suspicion. Similarly, a "reasonable officer's awareness of the existence of an abstract right, such as a right to be free from excessive force or an investigatory stop without reasonable suspicion, does not equate to knowledge that his conduct infringes on the right. *Jackson*, 206 F.3d at 1165. ***"If case***

---

[27]     It was their job and responsibility to carry out narcotics interdiction investigations and stops. All of Plaintiffs' allegations address the Sheriffs' and his deputies' regular performance of these job functions utilizing the regular means for that performance.

[28]     As much is proven by the strength of the summary judgment argument made above. Defendants adamantly believe that they are entitled to summary judgment irrespective of qualified immunity because Plaintiffs cannot establish the necessary elements of a constitutional violation. Even if Plaintiffs could somehow establish these elements, it would be a close call and such a close call that a reasonable person could not have known that the alleged malfeasance violated the law.

*law, in factual terms, has not staked out a bright line, qualified immunity almost always*

*protects the defendant."* *Id.* (Emphasis added).

With more particular respect to excessive force Deputy Ellerbee was the only other

deputy who had contact with Mr. Walker during the stop. There is no evidence that his contact

with Mr. Walker after he was removed from the vehicle was excessive, nor is there any evidence

that any of the techniques use by the deputies amounted to excessive force as a matter of law so

clear that the deputies would have been aware of their mistake.

The Sheriff and his deputies are, therefore, entitled to qualified immunity and summary

judgment on Plaintiffs' § 1983 claims filed against them in their individual capacities. All that

remains are Plaintiffs' state law claims.[29]

## V.     The Sheriff And His Deputies, To The Extent Sued In Their Official Capacities, And Muscogee County Are Entitled To Sovereign Immunity For Plaintiffs' State Law Claims

The Sheriff and his deputies, to the extent sued in their official capacities, and Muscogee

County are also entitled to summary judgment with respect to Plaintiffs' state law claims. *See*

Amended Complaint Counts VI and VII. The official capacity claims are suits against the State.

"[T]he Supreme Court of this State, and doubtless that of many other States and of the United

States, have so often affirmed and acknowledged that the doctrine of sovereign immunity

prevents a suit by a citizen against the State, or a political subdivision thereof, until it is hardly

---

[29]     Given that Defendants have demonstrated that they are entitled to summary judgment on Plaintiffs' § 1983 claims, they would also be entitled to summary judgment on Plaintiffs' 42 U.S.C. § 1985 conspiracy claim (Amended Complaint Count V) because in the absence of an underlying § 1983 claim, there can be no conspiracy. The elements of a § 1985 conspiracy action are (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; and (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States. *Denney v. City of Albany*, 247 F.3d 1172, 1190 (11th Cir. 2001). Where the substantive claims alleging deprivation of rights and privileges and serving as the basis for a conspiracy claim fail, however, so must the conspiracy claim because the plaintiff "would not have been 'deprived of any rights or privilege' by" the defendant's "allegedly wrongful acts." *Id*

necessary to again formally assert this rule." *Haber*, 124 Ga. App. at 791, 186 S.E.2d at 153.

Moreover, to the extent Plaintiffs argue the Sheriff and his deputies are arms of Muscogee

County, suits against them in their official capacities would be the same as a suit against

Muscogee County.  Muscogee County is entitled to sovereign immunity as to any state law

action brought against it except those specifically authorized by statute.[30]

## VI.   The Sheriff And His Deputies, To The Extent Sued In Their Individual Capacities, Are Entitled To Official Immunity For Plaintiffs' State Law Claims

Additionally, the Sheriff and his deputies are entitled to summary judgment on Plaintiffs'

state law claims to the extent filed against them in their individual capacities because they

maintain official immunity for such claims.[31]

Under the Georgia Constitution, state and local government employees are subject to suit

for performing discretionary functions "only if they act with actual malice or with actual intent to

cause injury in the performance of their official functions." Ga. Const. Of 1983, art. I, § II,

¶IX(d); *see also Gilbert*, 264 Ga. at 753, 452 S.E.2d at 483.  As recognized in *Gilbert*, official

immunity generally shields law enforcement officers who, like the Sheriff and his deputies, are

performing official law enforcement functions, such as investigatory stops.  There is clearly no

evidence that the Sheriff or his deputies acted with actual malice or actual intent to cause legal

injury to Mr. Walker.

---

[30]    *Bowen*, 256 Ga. at 462-64, 349 S.E.2d at 741-42; O.C.G.A. § 36-1-4 ("[a] county is not liable to suit for any cause of action unless made so by statute"); *see also Swan v. Johnson*, 219 Ga. App. 450, 452, 465 S.E.2d 684, 686 (1995)(noting unified governments are treated the same as counties for purposes of sovereign immunity).

[31]    Again, this portion of the motion is not filed on behalf of Deputy Glisson because he is represented by separate counsel in his individual capacity.  This portion of the motion, therefore, also only addresses Amended Complaint Count VII and these state law claims are filed against all the deputies in their individual capacities whereas Count VI is targeted only at Deputy Glisson in his individual and official capacities.

## CONCLUSION

For the foregoing reasons, Defendants respectfully submit that they are entitled to summary judgment as to all allegations in Plaintiffs' Complaint, as amended.

This the _1st_ day of _May_, 2006.

PAGE, SCRANTOM, SPROUSE,
TUCKER & FORD, P.C.

By: _James C. Clark_ (TFG w/ express permission)
James C. Clark, Jr.
Georgia Bar No.: 127145

By: _Thomas F. Gristina_
Thomas F. Gristina
Georgia Bar No.: 452454

1111 Bay Avenue, Third Floor
Columbus, Georgia 31901
(706) 324-0251

_Clifton C. Fay_ (TFG w/ express permission)
Clifton C. Fay
Georgia Bar No.: 256460

_Jaimie B. DeLoach_ (TFG w/ express permission)
Jaimie B. DeLoach
Georgia Bar No.: 081638

P.O. Box 1340
Columbus, Georgia 31902

Attorneys for Defendants