IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

CHERYL N. WALKER, Administrator      *
Of KENNETH B. WALKER'S ESTATE,        *
CHERYL N. WALKER, Individually,       *
And CHERYL N. WALKER, Legal           *
Guardian of KAYLA WALKER, a           *
Dependent Minor,                      *
                                      *
        Plaintiffs,                   *      CIVIL ACTION FILE
                                      *      NO. 4:04-CV-161 (CDL)
SHERIFF RALPH JOHNSON,                *
Individually and in his               *
Official capacity as Sheriff of       *
Muscogee County, Georgia; et al.      *
                                      *
        Defendants.                   *

## PLAINTIFF CHERYL WALKER'S BRIEF IN SUPPORT OF MOTION TO STRIKE ANSWERS OF DEFENDANTS PRICE, STINSON AND ELLERBEE

COMES NOW CHERYL N. WALKER, plaintiff in the above-styled civil action, and hereby files this brief in support of Motion to Strike Answers of Defendants Price, Stinson and Ellerbee and shows the Court as follows:

This civil rights lawsuit arises out of a Muscogee County deputy unlawfully shooting Kenneth Walker after the vehicle in which Mr. Walker rode was the subject of an illegal vehicle assault/detention at the direction of defendants Price and Stinson. Realizing their sins, defendants Price and Stinson, with the assistance of defendant Ellerbee, orchestrated a cover-up to justify their illegal actions including (1) coercing and bribing a Confidential Informant ("CI") to lie to investigators;

(2) swearing out a false search warrant; (3) providing false information in an internal investigation; (4) providing false testimony in this federal civil rights lawsuit; and (5) using the process of this Court to deceptively conceal and limit access to the CI.[1]  These are not isolated incidents of fraud, but a purposeful pattern of fraud by these defendants.  In effect, from shortly after this shooting through this litigation, Defendants Price, Stinson and Ellerbee have perpetuated a continuing fraud upon this Honorable Court and against Kenneth Walker's surviving wife and five year-old child.  These defendants' actions have undermined the integrity of the judicial system to provide justice to plaintiff.  As a result of their contemptuous conduct, justice dictates that these defendants receive the ultimate sanction of the Court striking their answers.

I.   **FACTS**

Plaintiff incorporates as if fully set out herein her Statement of Material Facts filed contemporaneously with her motion and this brief.

---

[1] In asserting this motion, plaintiff and her counsel do NOT directly or indirectly claim or suggest that any defendants' counsel of record has been purposely involved in the events which are the basis of this motion.

## II.   THESE DEFENDANTS COERCED CI INTO PROVIDING FALSE INFORMATION ABOUT EVENTS LEADING TO SHOOTING

In an effort to justify their illegal behavior, these defendants immediately coerced the CI to tell a story which would justify the felony stop of the Yukon that Mr. Walker occupied.   Specifically, the CI testified that he was directed to:

> **tell investigators that I recognized a man from the SUV as the drug supplier from Miami. I also was told to say that the drug supplier and his boys were heavily armed.  Because I knew they could charge me for the drug possession, I did what they told me.**

(CI's Affidavit, Par. 6)(Emphasis added).  The CI's testimony is direct evidence of these defendants' contemptuous conduct.   In effect, the CI was told to say: (1) the Yukon occupants were "Bo Jack's" **known** drug dealers; and (2) the Yukon occupants were **armed and dangerous**.  These defendants, as experienced narcotics officers, believed that with such definitive information from the CI, the felony stop of the Yukon would suddenly appear legal.  Of course, their witness tampering does not create the legal justification they lacked at the time of their inexplicable decision to rely on uncorroborated information from an untested, unreliable informant.

Unlike these defendants' decision to seize the Yukon, where corroborating evidence was virtually non-existent, there is significant corroborating evidence to support the CI's affidavit

testimony of defendants' fraud.  To begin, the die was cast hours after this incident given Price specifically reported to Lt. Tew that

> [w]e wanted to do a traffic stop on the [Yukon]
>
> based on the **information the informant** gave . . . that
>
> it was the vehicle that... [the CI] knew as
>
> dropping off [drugs] to Bo Jack....

(Exhibit D, p. 2) (Emphasis added)  Hence, these defendants had decided to put the legal justification for the felony stop of the Yukon on the CI and so, the CI had to go on record as providing very definitive information to provide the justification for the stop.

Indeed, as a result of these defendants undue influence, the CI delivered.  His statement to Internal Affairs closely tracks Defendant Price and Stinson's language in the Supplemental Report using the same buzz words—knowing the men in the Yukon were the drug supplier and knowing they were armed and dangerous. (Exhibits E)

At first blush, this consistency in stories between these defendants and the CI ostensibly suggests truthfulness. However, Price and Stinson's stories dramatically changed later. Incredibly, defendants Price/Stinson went from a story where the CI "knew" (Exhibits D and E) the Yukon belonged to the drug supplier to a story that the CI was "confused" and

"speculating." (Price depo., pp. 117-118) As Price testified, "[The CI] couldn't tell with certainty that [the Yukon occupants] was the Miami boys." (Price depo., p. 156). Meanwhile, without a Metro agent bird dogging the CI, the CI similarly admits that he had no idea who was in the subject Yukon as well as the fact that he never met the drug suppliers and did not know if they carried weapons and. CI Affidavit, Par. 4) In effect, both Price/Stinson and the CI do a 180 degree turn on their stories. Perhaps they had to because other drug agents such as defendant Whitten (who sat in the surveillance car with Price, Stinson and the CI) refused to commit to Price and Stinson's original false story? (Whitten depo., p. 77) Whatever the reason, it is clear that the CI is now willing to tell the whole truth – He had no idea who was in the Yukon and he was pressured into lying. Unfortunately, defendants Price and Stinson are only willing to divulge half of the truth – The CI actually had no idea who was in the Yukon, but they will not explain why their stories changed.

Third, in yet another incredible coincidence, the CI was the only witness of the dozen or so witnesses interviewed as related to this shooting who was watched and questioned by another eyewitness to the investigation. (Tew depo., pp. 54-70) In effect, eyewitness defendant Ellerbee participated in Lt. Tew's interview of the CI. As Sheriff's Department Investigator

Allen Humphrey testified, he has never had another witness sit in on an interview as this practice would be "inappropriate." (Humphrey depo., p. 19)  Of course, one reason it is inappropriate is that it could allow defendant Ellerbee to unduly influence the CI who had a vested interest in the CI's statement and so, Ellerbee's presence prevented the CI from being open and honest with the investigator.  The CI's affidavit demonstrates that defendant Ellerbee was successful in intimidating the CI into lying in the internal affairs interviews.

Fourth, the CI testified that he was coerced to lie to investigators by these defendants who blackmailed him with the serious drug arrest from earlier that same day which likely would have led to immediate jail time for a probation violation.[2] (CI's Affidavit, Par. 6)  Consistent with this testimony, we know that Stinson decided **not** to charge the CI with these serious drug charges of marijuana and cocaine possession. (Stinson depo., p.167) Defendant Price, however, testified that it was not within Metro's authority to make deals with CIs on drug charges.  (Price depo., p. 70)  Further, Price stated it would be a "very unique" occurrence when a CI was outright

---

[2] The CI, while already on 12-months probation, pled guilty to a battery charge eight months before this incident which involved jail time. By outright failing to even charge the CI, Stinson very likely saved the CI from a probation violation and jail time.  (Exhibit J, Bates Stamp #MSC0004908-4911)

released from charges.  (Price depo., p. 70)  In this case, there was nothing unique about this CI.  Like other CIs, he tried to set up a small time drug dealer by claiming the drug dealer would front him (without paying) drugs.  [Of course, this did not happen as "Bo Jack" ultimately insisted on getting paid up front.]  (Exhibit C, Bates Stamp #MCS001158)  Rather, consistent with the CI's affidavit testimony, the only thing "unique" about this CI was his willingness to lie for these defendants.  In turn, they kept their promise and let him walk.

Fifth, plaintiff recently learned that Metro agents including Price and Ellerbee conducted a raid on the CI's house in January 2005.  In this raid, drug paraphernalia, including scales with cocaine residue; several partially smoked marijuana blunt cigars; marijuana seeds, stems and residue, etc., were discovered in the CI's house with him present. (Exhibit I)  Yet, it appears[3] that these drug agents did NOT arrest the CI for possession of these drugs.  Plaintiff submits that this must be another "unique" occurrence where these defendants overlooked their duty to enforce the law and declined to charge the CI for drug possession.

---

[3] As outlined *supra*, the Sheriff and Metro refuse to produce documents related to this raid.  The CI's criminal history, however, reveals there is no record of an arrest in January 2005 (or after this search).  (Exhibit J)

Thus, there is overwhelming evidence that the CI's affidavit testimony of witness tampering by these defendants is true.  Frankly, it is these defendants' completely inconsistent versions of events which is the most damning evidence against them.  The CI's affidavit simply ties together this evidence to validate these defendants' acts of deception.

## III. NARCOTICS AGENTS PROVIDED FALSE TESTIMONY ON A SEARCH WARRANT AND SUPPORTING AFFIDAVIT

Having illegally directed SRT to conduct a tactical felony stop on the Yukon which resulted in Mr. Walker being fatally shot, these defendants also swiftly acted to try to justify their actions by creating legal cause to enter apartment 3G at Northwoods Apartments and prove the occupant was a drug dealer. In doing so, they conspired to allow a false swearing on a sworn search warrant.

### A.    No One Saw Powell Leave Apartment 3G, But Agent Swears to This Fact In Warrant

Based on statements provided by defendants Price and Stinson, Memmo (who was at the office preparing the warrant) swore under oath in an affidavit supporting the warrant that he had probable cause to believe that there were drugs in "Bo Jack's" apartment based on the following:

> The CI telephoned Bo Jack at the apartment and asked for a quantity of cocaine.  Bo Jack stated he would have it shortly, that he just gave most of his cocaine to someone who was just leaving.

> While still speaking to Bo Jack, Agents **observed**
> a BM, Michael Powell, **exit the apartment** and get
> into his vehicle and leave the area.  Agents
> never lost sight of the vehicle and stopped it.
> Agents recovered a quantity of cocaine from
> Powell.

(Sworn Affidavit to Search Warrant of 12/10/03, G) (Emphasis
added)

In his deposition, to support this false information,
defendant Price testified that Agents Ellerbee and Williford saw
a black male **"coming out of Bo Jack's apartment."** (Price depo.,
p. 96) When asked how Ellerbee and Williford could see the man
leave the apartment, Price testified that Ellerbee's vehicle **was
parked in front of Bo Jack's apartment building.** (Price's
deposition, p. 82 and Exhibit 9 attached thereto which is a
Diagram of Surveillance drawn by Price.)

Price's testimony in this regard is false.  Ellerbee and
Williford were not in a position to see apartment 3G.  They were
parked near the complex's pool — actually closer to Price's
vehicle than to building 3. (Exhibit A, GBI Diagram of
Surveillance; Exhibit B, photo "P2-H"; Ellerbee depo., pp. 19-
21; Stinson depo., p. 72)  Price provided this false testimony
because he needed to put Ellerbee and Williford in a position
where, as stated in the warrant, they could see Powell "coming
out of 'Bo Jack's' apartment."  The lie was necessary because
defendants Price and Stinson knew Ellerbee and Williford could
not see apartment 3G from their vantage point parked near the

pool.  (Stinson depo., p. 84; See Exhibits A and B)
Unfortunately for defendant Price, he clearly was not aware of
the GBI diagram.  Hence, when defendants Price and Stinson told
Memmo to put in the warrant that they swore to seeing Powell
"exit the apartment," this was knowingly false.  Price then
falsely testified in his deposition in an effort to cover his
tracks.  As a result, this is additional evidence of these
defendants' scheme to conceal the truth.

> **B.**   **Drug Agents Didn't Believe Drugs Were In "Bo Jack's"
> Apartment At Time Warrant Executed**

As stated above, Agent Memmo swore under oath in the search
warrant that drug agent defendants had "probable cause to
believe that a quantity of cocaine does exist at 5000 Armour. .
. Building 3 apt. G in the possession and control of 'Bo Jack'."
Meanwhile, Price and Stinson testified that they understood that
the black male alleged to be "Bo Jack" was out of drugs when
Powell left "Bo Jack's" apartment around 6:30 that evening.
Specifically, defendant Stinson testified that Metro did NOT
have a basis at that time to execute a search warrant for drugs
at "Bo Jack's" apartment since they did not believe he had any
more drugs in the apartment. (Stinson depo., p. 148-49)   As
Stinson stated, "We would not have asked for a search warrant
looking for drugs when we had good information from the bad guy
that dope didn't exist there."  (Id at 149)  Meanwhile, these

defendants conceded that they did not have credible evidence that "Bo Jack" ever got more drugs since they had no idea who was in the SUV. (Price depo., p. 135) Thus, it was a false swearing for these defendants to direct Memmo to swear that they believed that drugs were in the apartment.

More importantly, what is omitted from the warrant is even further evidence that these defendants fabricated the story that the Yukon was the drug supplier. In the search warrant which was finalized within an hour or so after the Yukon left Northwoods Apartments, conspicuously absent is any fact that the CI observed a Yukon enter the apartment complex which the CI "knew" was dropping off drugs to "Bo Jack." If indeed the CI stated this fact, as Price and Stinson initially claimed, then certainly this would be material information for probable cause purposes to prove "Bo Jack" had drugs on the premises. The fact there is no mention in the warrant of the Yukon whatsoever proves these defendants did not think the Yukon belonged to "Bo Jack's" supplier. Indeed, as Price ultimately conceded, he wanted to stop the Yukon to merely figure out who was in it— which amounted to a violation of plaintiff's constitutional rights. (Price depo., p. 133)

## IV.  DRUG AGENTS EMPLOYED SAME UNLAWFUL "COWBOY" TACTICS TO ILLEGALLY SEARCH POWELL'S CAR

These defendants' actions prior to Mr. Walker's shooting demonstrate Metro's pattern of ignoring citizens' Fourth Amendment rights.  Indeed, these defendants base many of their actions on the credibility the untested CI allegedly gained when drugs were found in Mr. Powell's car.  This credibility was completely unfounded, however, because there was no evidence that the drugs found in Powell's car came from "Bo Jack." Further, Powell's vehicle search was an illegal search and any drugs seized were fruit from the poisonous tree.

In summary, Price and Stinson authorized a search of Powell's vehicle for two reasons: (1) "Bo Jack" told the CI that the drugs were "walking out the **door**;" and (2) soon thereafter, Ellerbee saw a black male "coming out of 'Bo Jack's' **apartment**." (Price depo., pp. 95-96)  (Emphasis added) Notwithstanding the fact that it is completely inaccurate, this scant "evidence" did not create a legal basis to suggest the drugs came from "Bo Jack," let alone to justify a search of Powell's car.

First, as noted above, none of the drug agents could see Powell exit "Bo Jack's" apartment. Hence, when an unknown black male walked down the stairs of building 3, the drug agents had no idea which one of the four apartments this man had exited. (Ellerbee depo., p. 29; Williford depo., p. 48)

Second, "Bo Jack" did not say the drugs were "walking out the door" as defendant Price claims (another falsehood).  Rather "Bo Jack" simply said "it's leaving right now."  (Exhibit C, Bates Stamp #MCS001151)  So, there is no evidence drugs were leaving "Bo Jack's" "apartment" as these defendants assert.

Third, the drug agents disingenuously claim significance in the fact that an unknown man walked down some stairs at Building 3 about one to two minutes after a drug dealer said his drugs were leaving.  Yet, the drug agents did not know if "Bo Jack" was even in apartment 3G at the Northwoods Apartment complex. Indeed, "Bo Jack" told the CI several times that he was not at his place and would be there in 20 minutes.  (Exhibit C, at Bates Stamp #MCS001151-53)  So, when Bo Jack stated the drugs are "leaving now," these defendants had no idea **from where** they were leaving.

Fourth, defendants had no idea at all whether this first time, untested and unreliable CI was even talking to "Bo Jack" as he alleged, because the name "Bo Jack" was never mentioned in any telephone conversation.  All these defendants really knew was that this CI was talking to a guy he continuously referred to as "boss" and "boss man."  (Exhibit C)

Fifth, contrary to Metro standards and training, these defendants acted without any corroborating evidence.  (Price

depo., p. 43)  Again, they did not know who the CI was talking to; where "Bo Jack" was located; and from which apartment the unknown black male came.  They also failed to follow policy and conduct a drug buy before conducting a search.  They did not even search Powell's car beforehand to confirm he did not arrive with drugs.  Rather, these defendants exclusively relied on the mere word of an untested CI who, by policy, was not to be trusted.

Sixth, the drugs found in Powell's vehicle pursuant to the illegal search were hidden in Powell's back seat.  None of the drug agents observed Powell access the back seat of his car even though he was under surveillance continuously until he was stopped.  Again, this would not link the drugs to "Bo Jack."[4]

In summary, these defendants' search of Powell's vehicle was based on an **unknown man**, leaving an **unknown apartment**, after an **unknown man** who was located in an **unknown place** told the CI his drugs were "leaving."  While there certainly are many unknowns here, the one "**known**" a complete lack of corroboration before arresting and searching Powell is another example of

---

[4] Defendant Stinson even coached one of his co-defendants on this issue.  After his deposition, Stinson met with defendant Williford and told Williford about questions that would be asked in his deposition.  Stinson specifically "discussed" probable cause on the Powell stop and clearly planted the seed that Powell could reach the back seat console from the front seat. (Williford depo., pp. 14-16)

these defendants effectively fabricating evidence to justify an illegal search.

**V.    DEFENDANTS PRICE AND STINSON'S PATTERN OF FRAUD CONTINUED WHEN THEY FALSELY CREATED JUSTIFICATION IN HINDSIGHT AFTER THIS INCIDENT**

In another effort to bolster their justification to stop the Yukon using the tactical unit armed with machine guns, defendants Price and Stinson, as seasoned narcotics agents, have created additional facts to support their determination. Indeed, even their narcotic agent colleagues deny that many facts asserted by these defendants actually occurred. Below are **just** two examples of these Defendants creating legal cause after the fact.

**A.    Price and Stinson Falsely Claim that the CI Described "Bo Jack's" Supplier As A Heavy Black Males**

In their depositions, Price and Stinson both testified that the CI described "Bo Jack's" supplier as a "heavy, black male"—which was one of the individuals who exited the Yukon at "Bo Jack's" apartment.  Yet, while these defendants admit that details such as these were material to the CI's credibility, these facts where not disclosed during the investigation into this matter. Specifically, Price and Stinson omitted this important information in the "true," "accurate" and "thorough" Supplemental Report on this incident. (Exhibit E) Likewise,

Price did not provide this information to Lt. Tew during the
Internal Affairs interview. (Exhibit F) Meanwhile, there is no
mention of Stinson providing this description to the GBI when he
was interviewed several days after this incident.(Exhibit H, pp.
8-10) (Stinson's interview with the GBI several days post
incident is a great fictional read full of other "material
facts" somehow omitted from the Supplemental Report and not
corroborated by any of the other eyewitnesses.)

Additionally, Agent Whitten, who was in the car with Price,
Stinson and the CI, refutes Price/Stinson's testimony.  Whitten
explicitly testified that the CI did not know the supplier and
could not describe the supplier. (Whitten depo., p. 77) Whitten
reiterated this testimony, stating that when the men got out of
the SUV, the CI did not offer any additional information since
he did not know the drug supplier.  (Whitten depo., p. 86)[5]
Consistent with Whitten's testimony is that of the CI, who also
stated he did not know the supplier and could not identify the
supplier.  (CI Affidavit, Par. 4)

---

[5] Later in his deposition, Whitten changed his testimony and
stated that the CI indicated the drug supplier was a black male.
Whitten conceded that he may not have stated this important
detail to the GBI 2 years ago. (Whitten depo., pp. 87-90)
Indeed, in the GBI interview summary, Whitten stated, "The CI
went on to say he does not know who [Bo Jack's] supplier is,
only that he is from Florida and armed." (Exhibit K, at p. 028)

### B.   Stinson Falsely Claims CI Explained Why SUV Had A Georgia Tag

When confronted with the issue that the Yukon in question had a Georgia tag, but "Bo Jack's" suppliers were from Florida, defendant Stinson creatively fabricated an explanation to give the CI more credibility.  Specifically, Stinson stated that the CI indicated that "sometimes the drug suppliers use someone's car from Georgia." (Stinson depo., p. 126)

This is another statement under oath made by Stinson that Price, Whitten and the CI refute. Indeed, Price testified that the CI became "more confused" when he learned the Yukon had a Georgia tag. (Price depo., p. 119)  Meanwhile, Whitten testified that he could not recall the CI offering an explanation as to the significant issue of why the Yukon had Georgia tags. (Whitten depo., p. 79) This is because, as the CI testified, he did not know anything the supplier other than the fact that he was from Florida. (CI Affidavit, Par. 4)

### VI.   THESE DEFENDANTS PERPETRATED A FRAUD ON THE COURT TO CONCEAL IDENTITY OF CI AND LIMIT PLAINTIFF'S ACCESS TO CI

### A.   These Defendants Mislead Court in Attempt to Conceal CI's identity

In this litigation, the defendants have strenuously fought to conceal the identity of the CI and even requested court intervention to protect the CI's identity and plaintiff's access to the CI.  The defendants did offer, like Ellerbee bird-dogging

the CI in the IA interview, to allow plaintiff to interview or depose via telephone an unidentified CI, but only if in the defendants' presence.

When plaintiff rejected this proposal and demanded unfettered access to the CI, the defendants asserted as a shield the "informer's privilege." Ironically, this privilege is based on "the furtherance and protection of the public interest in effective law enforcement." *Roviero v. United States,* 353 U.S. 53, 59 (1957). (See, Defendants' Brief in Opposition to Emergency Motion to Compel Informant's Identity, p. 2, hereinafter called "defendant's brief")

In asserting the informer's privilege, these defendants filed a brief presenting the following completely false facts to the Court:[6]

> 1.   "Metro met with the CI who stated that a
>
> subject, **Darren Jackson**, known by the street name
>
> "Bo Jack," was selling [drugs]." (Emphasis
>
> added) (Defendants' brief, p. 3) [CI never
>
> identified "Bo Jack" as Darren Jackson.
>
> (Exhibits C, D, and E)]

---

[6] As noted early by plaintiff, she again states that she is not asserting these defendants' counsel of record intentionally misled the Court.  Rather, it appears thatcounsel simply asserted facts their clients told them.

2.   "Bo Jack told the CI that 'all his cocaine was leaving the **apartment** right then . . . .'" (Defendants' brief, p. 4)  [Actual transcript provides that drugs were "leaving right now." – there was no mention of "apartment."  [Exhibit C, at Bates Stamp MCS001151)

3.   "Around the same time of the recorded conversations between CI and "Bo Jack," a man exited Bo Jack's **apartment**...."  (Defendants' brief, p. 4) (Emphasis added)  [None of the defendants could see Mr. Powell exit apartment 3G.  (Ellerbee depo., p. 29; Williford depo., p. 48; Stinson depo., p. 89)

4.   "The CI stated he had seen the SUV before at Bo Jack's apartment and it belonged to the "Miami Boys."  Defendants' brief, p. 5) [As outlined above, the CI had no idea who was in the SUV/Yukon; Price, etc. now concede this point. (Price depo., p. 156; Whitten depo., p. 86; CI Affidavit, ¶4-6]

In sum, in the "name of justice," these defendants made at least four material misrepresentations to this Court in attempt

to persuade this Court to prevent the plaintiff from obtaining unfettered access to the CI.  As indicated by the CI's affidavit and all of the false testimony provided by these defendants, they obviously could not afford the truth to come out and so, they needed to control access to the CI so someone like Ellerbee could again bird-dog the CI when the plaintiff interviewed/ deposed the CI.  Fortunately for plaintiff Cheryl Walker, this devious scheme failed.

**B.**  **Stinson and These Defendants Continued to Conceal CI Even After Court Allows Deposition**

Per an order dated December 23, 2005, this Court allowed the defendants to protect the identity of the CI, but directed them to subpoena the CI for a limited-access deposition. (Order, p. 9)  The parties agreed in an Amendment to the Scheduling Order entered on January 19, 2006, that the CI's deposition would go forward on February 22, 2006. On or about February 21, 2006, defendants Price and Stinson's counsel Jim Clark contacted plaintiff's counsel to inform counsel that his law enforcement clients could not find the CI to produce him for a deposition. Defendant Stinson testified that he personally looked for the CI to subpoena him for a deposition. Stinson indicated that the CI had "moved" and Stinson could not find him. (Stinson depo., p. 169) Further, Stinson testified in his February 2006 deposition

that he had not had any contact with the CI since within days after this December 2003 incident. (Stinson depo., p. 168)

Plaintiff recently learned that the narcotics unit, including defendants Price, Whitten, Memmo, Ellerbee, and Williford, obtained a warrant and conducted a drug raid on the CI's house on January 7, 2005. (Exhibit I)  According to the CI, this raid occurred at his present residence where plaintiff found him.  Interestingly, Metro's report on this search at the CI's premises disclosed that drug paraphernalia was located in the house, yet, the CI was not arrested!  (Exhibit J)

Further, when plaintiff sought more information on this drug raid on plaintiff's house, defendants prevented plaintiff from accessing public records on same.  Specifically, plaintiff served the Sheriff, Metro and City of Columbus, through counsel of record James Clark, an Open Records Act request to produce the warrant and other documents pertinent to this drug raid at the CI's house.  (Exhibit L)  The Sheriff and City (and Metro) have objected to providing the public records, arguing that because Ms. Walker has sued the Sheriff and City, she is somehow stripped of her rights under Georgia's Open Records Act to obtain these public records.  (Exhibits M)  Plaintiff set out her position in writing, but the defendants refuse to budge on the issue.  Additionally, these defendants refuse to supplement discovery in this case with these clearly relevant documents.

Thus, Ms. Walker likely will be forced to seek judicial intervention on this matter as well.

In summary, these defendants, who are in the business of finding people and have the resources of an entire sheriff's department, police department and multi-jurisdictional drug task force, claim they could not locate the CI. Meanwhile, Metro conducted a drug raid on the CI's house where he still resided within a year of plaintiff seeking to depose the CI. Yet, plaintiff, with a scintilla of the resources of the defendants (e.g. one investigator), was able to track down the CI. While a perplexing issue, the explanation is very simple. The party with limited resources needed to find the CI, while the parties with unlimited resources could not afford for the CI to be found. Based on the CI's affidavit, these defendants' quagmire in finding the CI is apparent.

## VII. CITATION OF LEGAL AUTHORITY

### A.   Court Has Authority to Strike Answer for These Defendants' Actions

Fed.R.Civ.P. 37(b)(2)(C) permits a district court to strike a party's pleading if the party "fails to obey an order to provide or permit discovery." The power to punish willful attempts to provide false and misleading evidence to the Court

also exists outside of the context of a discovery order issued under Rule 37.

"'In addition to the power to sanction under Rule 37, this [C]ourt has the inherent power to protect the integrity of the judicial system, and prevent abuses of the Judicial process'." *Chemtall, Inc. v. Citi-Chem, Inc.*, 992 F.Supp. 1390, 1408 (S.D. Ga. 1998) (Edenfield, T.), quoting *Shepherd v. American Broadcasting Companies,* 62 F.3d 1469, 1474 (D.C. Cir. 1995). The destruction of evidence, providing false testimony, or failure to tell the whole truth, undermines the ability of the Court system to provide justice in the case:

> Our adversarial system of civil justice rests upon access of all parties to all evidence bearing on the controversy between them, including that in the control of adverse parties... destruction or concealment by a party of relevant documents in its files threatens the viability and public acceptance of the system.

*Litton Systems, Inc. v. American Tel. & Telco.* 91 FRD 574, 576 (S.D. N.Y. 1981).

The default sanction is a proper remedy even when not preceded by lesser sanctions. *Malautea v. Suzuki Motor Co.*, 987 F.2d 1536, 1544-46 (11th Cir. 1993). This is because:

> Use of the 'ultimate sanction' addresses not only prejudice suffered by the opposing litigants, but also vindicates the judicial system as a whole, for such misconduct threatens the very integrity of courts, which otherwise "cannot command respect if they cannot maintain a level playing field amongst participants.

*Chemtall,* 992 F.Supp at 1409, citing *Derzack v. County of Allegheny, Pa.,* 173 F.R.D. 400, 414 (W.D. Pa. 1996). *See Jaffe v. Grant*, 793 F.2d 1182 (11th Cir. 1986) [upholding district court's order striking defendant's answer as sanction for continued discovery abuses]; *Properties Int'l Ltd. v. Turner*, 706 F.2d 308 (11th Cir. 1983)[same]; *Emerick v. Fenick Industries, Inc.*, 539 F.2d 1379 (5th Cir. 1976) [affirming dismissal of defendant's answer for failure to produce documents as ordered by court]. Other circuits also wield this sword for such discovery abuses. *See also Shearson Loeb Rhoades, Inc. v. Quinard,* 751 F.2d 1102, 1103 (9th Cir. 1985) [striking answer for deliberate disobedience of a discovery order and concealment of evidence]; *McGuire v. Acufex Microsurgical, Inc.,* 175 F.R.D. 149, 154- 57 (D. Mass. 1997) [answer stricken due to evidence that defendant destroyed and altered documents]; *TeleVideo Systems Inc. v. Heidenthal,* 826 F.2d 915, 917-18 (9th Cir. 1987) [answer stricken when defendant lied during deposition and filed false pleadings].

In the case at bar, these defendants have employed several tactics to propagate a fraud upon this Court and against plaintiff. Most egregious is the fact that these defendants tampered with the CI coercing him to lie so they had a legal basis to stop the vehicle in which Mr. Walker rode. The facts

support the CI's assertion given (1) CI and Price/Stinson originally tell the same incredible story about Yukon being "known" drug supplier; (2) Defendant Ellerbee participated in the CI's interview with IA obviously to unduly influence him which Investigator Humphrey stated was "inappropriate practice;" (3) Stinson, without authority, outright released the CI from his serious drug charges (and Metro did not arrest CI after the January 2005 drug raid); and (4) Defendants Price and Stinson now concede, like the CI, that the CI had no idea who was in the Yukon.  All of these facts taken together establish that the CI's charges of tampering are indeed valid.

Also, further proof of these defendants' pattern of fraud as related to this shooting incident is the search warrant and affidavit supporting the search warrant on "Bo Jack's" apartment.  This sworn to affidavit and search warrant include key material misrepresentations by these defendants.

Likewise, these defendants made material misrepresentations to the Court in their brief opposing plaintiff's request for unfettered access to the CI.  As outlined above, these defendants asserted 4 material facts in support of said brief which were outright false based on their own testimony under oath in this case.

At the end of the day, at every turn in this case –from minutes after Mr. Walker was shot in December 2005 through

plaintiffs trying to identify and depose the CI in January 2006 -- these defendants have manipulated the process in an effort to conceal the truth. Their contemptuous conduct compromises the integrity of this Court as well as law enforcement.

What these defendants tried to keep in the dark has now come to light. As a result, these defendants should face the ultimate sanction for their disgraceful actions, especially for employing the power of this Honorable Court under false pretenses as a shield to protect their lies. Plaintiff respectfully submits that this very power should now be used as a sword to pierce defendants' answers.

Respectfully submitted, this 1st day of May, 2006.

GARY, WILLIAMS, PARENTI, FINNEY,
LEWIS, MCMANUS, WATSON & SPERANDO, P.L.

221 E. Osceola St.
Stuart, FL 34994
TEL: 772-283-8260
FAX: 770-463-4319        _s/Willie Gary_____
                        Willie Gary
                        3500 Parkway Lane
Suite 750
Norcross, GA 30092
TEL: 404-881-2622
FAX: 404-881-2630        _s/William T. Mitchell_____
                        William T. Mitchell
                        Georgia Bar No. 513810
                        Karen E. Woodward
                        Georgia Bar No. 775260

                        Attorneys for Plaintiff

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that I have this day electronically filed

**PLAINTIFF CHERYL WALKER'S BRIEF IN SUPPORT OF MOTION TO STRIKE**

**ANSWERS OF DEFENDANTS PRICE, STINSON AND ELLERBEE,** with the

Clerk of Court using the CM/ECF system which will automatically

send e-mail notification of such filing to the following

attorney of record:

James C. Clark, Jr., Esq.     Clifton C. Fay, Esq.
Thomas F. Gristina          Jaimie B. DeLoach, Esq.
Page, Scranton, Sprouse, Tucker  P. O. Box 1340
& Ford, P.C.              Columbus, GA 31902
1111 Bay Avenue, Third Floor    Attorneys for Defendants
Columbus, GA 31901         Sheriff Johnson and Muscogee
                      County

Richard C. Hagler, Esq.      Terry E. Williams, Esq.
927 3rd Avenue             205 Culver Street
Columbus, GA 31901         Lawrenceville, GA 30045
Attorney for Defendant Glisson  Attorney for Defendant James
                      Price, III.


This 1st day of May, 2006.

                    Cruser & Mitchell, LLP

Cruser & Mitchell, LLP
Peachtree Ridge, Suite 750
3500 Parkway Lane
Norcross, Georgia 30092      _s/William T. Mitchell_____
                    William T. Mitchell
                    Georgia Bar No. 513810