IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | | |
|---|---|---|
| CHERYL N. WALKER, ADMINISTRATOR | * | |
| OF KENNETH B. WALKER'S ESTATE, | * | |
| and CHERYL N. WALKER, Individually, | * | |
| and CHERYL N. WALKER, Legal Guardian of | * | |
| KAYLA WALKER, A DEPENDANT MINOR | * | |
| | * | |
|    Plaintiff, | * | |
| vs. | * | CIVIL ACTION FILE NO. |
| | • | 4:04-CV-161(CDL) |
| SHERIFF RALPH JOHNSON, individually and in | * | |
| in his official capacity as Sheriff | * | |
| of Muscogee County, Georgia; | * | |
| DEPUTY DAVID GLISSON, individually and in | * | |
| his official capacity as Sheriff's Deputy of | * | |
| Muscogee County; | * | |
| MUSCOGEE COUNTY, GEORGIA; | * | |
| CAPTIAN TROYCULPEPPER, individually; | * | |
| SERGEANT FELIX DAVILLA, individually; | * | |
| SERGEANT RICKY STINSON; individually and | * | |
| in his official capacity as Metro Narcotics Task | * | |
| Force Special Agent in Charge; | * | |
| SERGEANT JAMES PRICE III, individually and | * | |
| in his official capacity as an agent of the Metro | * | |
| Narcotics Task Force; SERGEANT JASON | * | |
| WHITTEN, individually and in his official | * | |
| capacity as an agent of the Metro Narcotics | * | |
| Task Force; JODY WILLIFORD, individually | * | |
| and in his official capacity as an agent of the Metro | * | |
| Narcotics Task Force; JONNIE ELLERBIE | * | |
| individually and in his official capacity as an | * | |
| agent of the Metro Narcotics Task Force; | * | |
| JONATHAN MEMMO, individually and in his | * | |
| official capacity as an agent of the Metro Narcotics | * | |
| Task Force; ROBERT TAYLOR, individually | * | |
| JEFF FERGREUS, individually; RUSSELL | * | |
| "RUSTY" BLAIR, individually; BRUCE | * | |
| WILLIAMS, individually; BRIAN MOORE, | * | |
| individually; and the CITY OF COLUMBUS, | * | |
| GEORGIA, a consolidated government, | * | |
| | * | |
|    Defendants. | * | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Defendant DAVID GLISSON, individually, and in his official capacity as Sheriffs Deputy of Muscogee County, by counsel, and pursuant to Fed.R. Civ. P. 56 and Local Rule 56, hereby respectfully move the Court for summary judgment in Defendant's favor as to all Counts in Plaintiffs' Complaint, as amended.  For grounds therefor, Defendant DAVID GLISSON states that there is no genuine issue of material fact to be tried with respect to any of the Complaint's allegations and that he is entitled to judgment as a matter of law.

For further grounds therefor,  Defendant DAVID GLISSON respectfully refers the Court to the accompanying Statement Of Material Facts As To Which There Is No Genuine Issue To Be Tried and Memorandum Of Law In Support Of Defendant's Motion For Summary Judgment.

This 10th  day of May, 2006.

Respectfully submitted,

s/ Richard C. Hagler
Richard C. Hagler
HAGLER & HYLES
P. O. Box 2055
927 Third Avenue
Columbus, Ga. 31902
706-324-0882
Fax: 706-324-0839
State Bar # 316850

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | | |
|---|---|---|
| CHERYL N. WALKER, ADMINISTRATOR | * | |
| OF KENNETH B. WALKER'S ESTATE, | * | |
| and CHERYL N. WALKER, Individually, | * | |
| and CHERYL N. WALKER, Legal Guardian of | * | |
| KAYLA WALKER, A DEPENDANT MINOR | * | |
| | * | |
| Plaintiff, | * | |
| vs. | * | CIVIL ACTION FILE NO. |
| | • | 4:04-CV-161(CDL) |
| SHERIFF RALPH JOHNSON, individually and in | * | |
| in his official capacity as Sheriff | * | |
| of Muscogee County, Georgia; | * | |
| DEPUTY DAVID GLISSON, individually and in | * | |
| his official capacity as Sheriff's Deputy of | * | |
| Muscogee County; | * | |
| MUSCOGEE COUNTY, GEORGIA; | * | |
| CAPTIAN TROYCULPEPPER, individually; | * | |
| SERGEANT FELIX DAVILLA, individually; | * | |
| SERGEANT RICKY STINSON; individually and | * | |
| in his official capacity as Metro Narcotics Task | * | |
| Force Special Agent in Charge; | * | |
| SERGEANT JAMES PRICE III, individually and | * | |
| in his official capacity as an agent of the Metro | * | |
| Narcotics Task Force; SERGEANT JASON | * | |
| WHITTEN, individually and in his official | * | |
| capacity as an agent of the Metro Narcotics | * | |
| Task Force; JODY WILLIFORD, individually | * | |
| and in his official capacity as an agent of the Metro | * | |
| Narcotics Task Force; JONNIE ELLERBIE | * | |
| individually and in his official capacity as an | * | |
| agent of the Metro Narcotics Task Force; | * | |
| JONATHAN MEMMO, individually and in his | * | |
| official capacity as an agent of the Metro Narcotics | * | |
| Task Force; ROBERT TAYLOR, individually | * | |
| JEFF FERGREUS, individually; RUSSELL | * | |
| "RUSTY" BLAIR, individually; BRUCE | * | |
| WILLIAMS, individually; BRIAN MOORE, | * | |
| individually; and the CITY OF COLUMBUS, | * | |
| GEORGIA, a consolidated government, | * | |
| | * | |
| | * | |
| Defendants. | * | |

## STATEMENT OF MATERIAL FACTS AS TO WHICH
## THERE IS NO GENUINE ISSUE TO BE TRIED

Defendant DAVID GLISSON, individually, and in his official capacity as Sheriffs Deputy of Muscogee County, by counsel, and pursuant to Fed.R. Civ. P. 56 and Local Rule 56, hereby file the following Statement Of Material Facts As To Which There Is No Genuine Issue To Be Tried ("Statement") as part of his summary judgment motion.

## I.   The Parties

1.   Plaintiff Cheryl N. Walker is the surviving spouse of Kenneth B. Walker ("Mr. Walker"), the administrator of his estate and legal guardian of their child Kayla Walker.

2.   Defendant Sheriff Ralph Johnson is, and has been at all relevant times, Sheriff of Muscogee County, Georgia.  He has been sued in his individual and offical capacities.

3.   Defendant Deputy David Glisson was, at the time of the event underlying this lawsuit, a Deputy with the Muscogee County Sheriff's Department.  Deputy Glisson has been sued in his individual and official capacities.

4.   Defendant Captian Troy Culpepper is, and has been at all relevant times, a Captain with the Muscogee County Sheriff's Department.  Captain Culpepper has been sued only in his individual capacity.

5.   Defendant Sergeant Felix Davila is, and was at all relevant times, a Sergeant with the Muscogee County Sheriff's Department.  Sergeant Davila has been sued only in his individual capacity.

6.   Defendant Sergeant Ricky Stinson is, and has been at all relevant times, a Muscogee County Sheriff's Deputy and, as part of those duties, an agent of the Metro Narcotics Task Force. Sergeant Stinson has been sued in his individual capacity and in his official capacity as Metro

Narcotics Task Force Special Agent in Charge.

7.  Defendant Sergeant James Price, III is, and has been at all relevant times, a Muscogee County Sheriff's Deputy and, as part of those duties, an agent of the Metro Narcotics Task Force. Sergeant Price has been sued in his individual capacity and in his official capacity as an agent of the Metro Narcotics Task Force.

8.  Defendant Sergeant Jason Whitten is, and has been at all relevant times, a Muscogee County Sheriff's Deputy and, as part of those duties, an agent of the Metro Narcotics Task Force. Sergeant Whitten has been sued in his individual capacity and in his official capacity as an agent of the Metro Narcotics Task Force.

9.  Defendant Jody Williford is, and has been at all relevant times, a Muscogee County Sheriff's Deputy and, as part of those duties, an agent of the Metro Narcotics Task Force. Deputy Williford has been sued in his individual capacity and in his official capacity as an agent of the Metro Narcotics Task Force.

10. Defendant Jonnie Ellerbee is, and has been at all relevant times, a Muscogee County Sheriff's Deputy and, as part of those duties, an agent of the Metro Narcotics Task Force. Deputy Ellerbee has been sued in his individual capacity and in his official capacity as an agent of the Metro Narcotics Task Force.

11. Defendant Jonathan Memmo is, and has been at all relevant times, a Muscogee County Sheriff's Deputy and, as part of those duties, an agent of the Metro Narcotics Task Force. Deputy Memmo has been sued in his individual capacity and in his official capacity as an agent of the Metro Narcotics Task Force.

12. Defendant Robert Taylor is, and has been at all relevant times, a Muscogee County Sheriff's Deputy and, as part of those duties, an agent of the Metro Narcotics Task Force.

Deputy Taylor has been sued only in his individual capacity.

13. Defendant Jeff Fegreus is, and has been at all relevant times, a reserve Deputy for the Muscogee County Sheriff's Department. Deputy Fegreus has been sued only in his individual capacity.

14. Defendant Russell "Rusty" Blair is, and has been at all relevant times, a Muscogee County Sheriff's Investigator. Investigator Blair has been sued only in his individual capacity.

15. Defendant Bruce Williams is, and has been at all relevant times, a Muscogee County Sheriff's Deputy. Deputy Williams has been sued only in his individual capacity.

16. Defendant Brian Moore is, and has been at all relevant times, a Muscogee County Sheriff's Deputy. Deputy Moore has been sued only in his individual capacity.

17. The remaining defendants are Muscogee County and the City of Columbus, Georgia, a consolidated government. They are a consolidated government and should be treated as the same entity for purposes of this lawsuit and this motion. *Bowen v. City of Columbus,* 256 Ga. 462, 462-64, 349 S.E.2d. 740, 741-42 (1986).

18. All Defendants' involvement or lack thereof with the pertinent and indisputable facts underlying the event ("Event") upon which this case is based are set forth below.

## II    The Event

19. On December 10, 2003, Metro Narcotics Task Force ("Metro") members met with a confidential informant (the "CI") who stated that a Darren Jackson, known by the street name "Bo Jack,"was selling large quantities of cocaine out of his 5000 Armour Road, Columbus, Georgia, apartment (No. 3-G). *See* Metro Police Reports ("Police Reports"), copies of which were collectively attached as Exhibit 1 to the Defendants' Motion For Summary Judgment previously filed on behalf of Sheriff Ralph Johnson, Muscogee County, Georgia et. al.  and is

incorporated herein by reference, at Bates Stamp Nos. MCS00304 & MCS00309. Bo Jack's apartment is in Northwoods Apartment complex ("Northwoods"). Sergeants Stinson, Price and Whitten drove the CI to Northwoods and asked the CI to point out Bo Jack's apartment. *See id.* at MCS00309. Metro agents, including Sergeants Stinson, Price and Whitten and Deputies Williford and Ellerbee, positioned themselves to observe Bo Jack's apartment. *See id.* MCS00304 & MCS00309.

20. The CI told Sergeant Price that the CI could call Bo Jack and order up to four ounces of cocaine. *See id.* at MCS00309. The CI also stated that the CI had seen up to five kilos of cocaine at Bo Jack's apartment and that Bo Jack always had guns at the apartment. *See id.* The CI added that Bo Jack got his cocaine from the "Miami Boys" and that they drove a large SUV and all carried weapons. *See id.* at MCS00309-310.

21. Based on the CI's information about weapons being in the apartment, Sergeant Stinson notified Sergeant Davila to call in the Muscogee County Sheriff's Office Special Response Team ("SRT") to enter the apartment once a search warrant was obtained. *See id.* at MCS00310. Sergeant Davila had members of the SRT, including Deputy Glisson, set up in the parking lot of Logan's Steakhouse, which is also on Armour Road. *See id.*

22. The CI made a telephone call to Bo Jack, which was recorded. *See* Transcript of Recorded Conversation ("Transcript"), a copy of which was attached as Exhibit 3 to the Defendants' Motion For Summary Judgment previously filed on behalf of Sheriff Ralph Johnson, Muscogee County, Georgia et. al. and is incorporated herein by reference, at Bates Stamp Nos. MCS00329-338. Bo Jack told the CI that "al" his cocaine was leaving the apartment right then and that he only had two or three ounces of cocaine left. *See id.* at MCS00329-330. The CI said the CI would call Bo Jack back. *See id.* at MCS00330.

23. Around the same time as the recorded conversation between the CI and Bo Jack, a man exited Bo Jack's apartment and drove away. *See* Police Reports, Exhibit 1, at MCS00304-305.  The vehicle was followed by, never left the sight of and was stopped by Deputies Ellerbee and Williford at the Popeye's Chicken at 2340 Wynnton Road.  *See id.*   The driver, Michael Powell, was arrested, and Deputies Ellerbee and Williford found 63.7 grams of crack cocaine in the driver's possession. *See id.*

24.  Bo Jack was later seen leaving his apartment and was followed by Metro agents to the La Quinta motel on Macon Road where he entered an unknown room. *See id.* at MCS00310. A few minutes later, Bo Jack left the motel room, got into his car, turned West on Macon Road and was lost in traffic. *See id.*   While Bo Jack was away from his apartment, he had several additional recorded conversations with the CI. *See* Transcript, Exhibit 3 of aforementioned filed motion.  During these conversations, he told the CI he was picking up drugs for the CI. *See id.* at MCS00332-333.  They also discussed cooking the cocaine. *See id.*   Bo Jack also asked the CI if the CI had money. *See id.* at MCS00334.  They also discussed paying eight dollars a piece for the drugs. *See id.* at MCS00336.

25. Meanwhile, the Metro agents who had followed Bo Jack to the motel returned to Bo Jack's apartment complex and set up surveillance. *See* Police Reports, Exhibit 1 , at MCS00310 of aforementioned filed motion.   A sport utility vehicle (the "SUV") was then seen pulling into Northwoods and parking in the space previously vacated by Bo Jack. *See id.*

26. The SUV then left the space and was followed by Deputies Ellerbee and Williford to a night club on Sidney Simons Boulevard. *See id.*  The SUV circled the night club parking lot and returned to Bo Jack's parking space. *See id.*  Five minutes later Bo Jack pulled into the space next to the SUV. *See id.*   Bo Jack then walked into his apartment with a man from the SUV. *See*

*id.* at MCS00311.  The man from the SUV carried something under his arm into the apartment that appeared to be wrapped in plastic. *See id.*  The CI told the Metro agents that the person carrying the object looked like one of the "Miami Boys" and that the "Miami Boys" usually travel in groups of three or four when they drop off drugs or pick up money. *See id.*  After a couple of minutes, three more men got out of the SUV and entered Bo Jack's apartment. *See id.*

27. After being in Bo Jack's apartment for 10 to 15 minutes, all four of the men from the SUV left Bo Jack's apartment and drove away. *See id.*   They were stopped on Interstate 185. *See id.*  As stated above, Metro officers had previously called SRT to gain entry into the apartment once a search warrant was obtained. *See id.*  at MCS00310.  These SRT members and uniformed Sheriff's deputies stopped the SUV, and during that stop, Mr. Walker, one of the SUV passengers, was shot by Deputy Glisson after Deputy Glisson removed him from the SUV. A copy of a videotape of the traffic stop and shooting which was attached as Exhibit 4 to the Defendants' Motion For Summary Judgment previously filed on behalf of Sheriff Ralph Johnson, Muscogee County, Georgia et. al. and is incorporated herein by reference.

28. Warren Beaulah, Darryl Ransom and Anthony Smith, the other three SUV passengers, were in handcuffs after the shooting with their backs to a guardrail for approximately between 20 minutes and one hour before being placed in separate vehicles. *See* Transcript of Deposition of Warren Beaulah ("Beaulah Tr."), dated January 24, 2006, copies of pertinent portions of which were attached as Exhibit 5, at 27.15-28.12;  to the Defendants' Motion For Summary Judgment previously filed on behalf of Sheriff Ralph Johnson, Muscogee County, Georgia et. al. and is incorporated herein by reference.  Transcript of Deposition of Anthony Smith ("Smith Tr"), dated January 23, 2006, copies of pertinent portions of which were attached as Exhibit 6, at 67.12-67.18;  to the Defendants' Motion For Summary Judgment previously filed on behalf of Sheriff

Ralph Johnson, Muscogee County, Georgia et. al. and is incorporated herein by reference. Transcript of Deposition of Darryl Ransom("Ransom Tr."), dated January 24, 2006, copies of pertinent portions of which were attached as Exhibit 7, at 38.12-38.15;  to the Defendants' Motion For Summary Judgment previously filed on behalf of Sheriff Ralph Johnson, Muscogee County, Georgia et. al. and is incorporated herein by reference.  They were moved to separate police cars for between 10 and 35 minutes and then were placed in a jail van together.  *See* Beaulah Tr., Exhibit 5, at 28.5-.12; Smith Tr., Exhibit 6, at 69.7-13; Ransom Tr., Exhibit 7, 40.1-.3 contained in the aforementioned filed motion.

29. After they were moved to the jail van, Captain Culpepper told them what had occurred, that no one would hurt them and that they were going to be detained as there was a possible drug investigation.  *See* Transcript of Deposition of Troy Culpepper ("Culpepper Tr."), dated January 23, 2006, copies of pertinent portions of which were attached as Exhibit 8, at 56.17.8-56.25.;  to the Defendants' Motion For Summary Judgment previously filed on behalf of Sheriff Ralph Johnson, Muscogee County, Georgia et. al. and is incorporated herein by reference.

30. The jail van left the scene between 10 to 20 minutes after Captain Culpepper spoke with Mr. Beulah, Mr. Ransom and Mr. Smith. *See id.* at 58.12-60.8; Beaulah Tr., Exhibit 5 at 29.25-30.5; Smith Tr., Exhibit 6, at 75.7-9; Ransom Tr., Exhibit 7, at 41.18-20 in the aforementioned filed motion.  They were to be transferred to a holding facility in the Government Center to keep the witnesses and deputies separate. *See* Culpepper Tr., Exhibit 8, at 58.12-60.8 in the aforementioned filed motion.

31. When Mr. Beulah, Mr. Ransom and Mr. Smith were taken to be interviewed in the jail van, they had not been placed under arrest at any point, but, rather, were only being investigated. *See id.* at 70.4-72.13.  The handcuffs were removed when they were placed in the

holding cells. *See* Beaulah Tr., Exhibit 5 at 30.6-.14; Smith Tr., Exhibit 6, at 76.17-76.19;

Ransom Tr., Exhibit 7, at 41.18-20 in the aforementioned filed motion.  They remained held in

the Government Center holding cell for between one-and-a-half-to two hours before being

interviewed and departing the Government Center. *See* Smith Tr.,  Exhibit 6, at 77.15-77.20;

Ransom Tr., Exhibit 7, at 47.21-24 in the aforementioned filed motion. While at the Government

Center, all three were interviewed by Sheriff's Office officials about the evening's events.

32. Mr. Beulah, Mr. Ransom and Mr. Smith could have been, but were not, charged with

violating Georgia's open container law as there were four cold Ice House beers in the SUV drink

holders. *See* Culperrer Tr.,  Exhibit 8, at 75.10-76.12  in the aforementioned filed motion.

### III.     Additional Facts Concerning Defendant David Glisson's Pertinent Actions

33. In addition to what is set forth above, Defendant David Glisson's pertinent actions

related to the stop were as follows.

34. Deputy Glisson was an SRT member who participated in making the stop. At the time

of the stop, Deputy Glisson was riding in Investigator Blair's undercover vehicle.  He approached

the SUV from the side and went to the right rear passenger door where Mr. Walker was sitting.

*See id.* He removed Mr. Walker from the vehicle, attempted to place him on the ground and,

during this process, Mr. Walker was fatally shot. *See id.*  Deputy Glisson has testified under oath

that he did not intend to shoot Mr. Walker and that the shooting was accidental. *See* Transcript of

Deposition of David Glisson ("Glisson Tr."), dated October 18, 2005, copies of pertinent

portions of which were attached as Exhibit 14, at 97.8-99.11 to the Defendants' Motion For

Summary Judgment previously filed on behalf of Sheriff Ralph Johnson, Muscogee County,

Georgia et. al. and is incorporated herein by reference.

IV    **Bo Jack's Arrest**

35. The search warrant on Bo Jack's apartment was obtained by Deputy Memmo and,
when later executed, cocaine and other drug dealing materials were found and Bo Jack was
arrested and charged with possession of cocaine with intent to distribute, possession of a firearm
by a convicted felon and possession of a firearm during the commission of a crime.  *See* Police
Reports, Exhibit 1, at MCS00311-321 attached to the aforementioned filed motion. At the time
of arrest, Bo Jack was within reach of a loaded Talon 9mm handgun. *See id.*  at MCS00317.
Several Western Union money grams were also seized showing thousands of dollars having been
sent to Miami and Jamaica. *See id.*

V.    **Metro**

36. Metro was created in 1989 to address the narcotics problem in Muscogee County,
Georgia, and Russell County, Alabama. *See* Metro Narcotics Task Force Plan ("Metro Plan"),
dated April 26, 1989, a copy of which was attached as Exhibit 25, at MCS00386 to the
Defendants' Motion For Summary Judgment previously filed on behalf of Sheriff Ralph Johnson,
Muscogee County, Georgia et. al. and is incorporated herein by reference.  Metro's objective is to
have a multi-jurisdictional network of intelligence that targets narcotic traffickers above the
"street level;" to have a network that leads to and supports the arrest of as many of those
traffickers as possible as well as disrupt their lines of traffic; and to deny criminals the assets
accumulated unlawfully by enhancing the recovery of those through civil remedies. *See id.*

37. As demonstrated above, the Sheriff of Muscogee County, Georgia, is the Chief
Executive Officer of Metro and all Metro officers are sworn Muscogee County Deputy Sheriffs.
*See* Johnson Tr., Exhibit 9, at 6.8-22, 10.17-22 & 19.11-21; *ss also* Muscogee County Sheriff's
Office credentials, Exhibit 10 copies of both Exhibits of which were attached to the Defendants'

Motion For Summary Judgment previously filed on behalf of Sheriff Ralph Johnson, Muscogee County, Georgia et. al. and is incorporated herein by reference.   Metro is also governed by a Chief Executive Committee, known as the C.E.O. Board, which is headed by the Sheriff of Muscogee County. *See* Columbus Police Department General Order re Metro Narcotics and Organized Crime Control, dated July 2001, a copy of which was attached as Exhibit 26, at MCS00529 to the Defendants' Motion For Summary Judgment previously filed on behalf of Sheriff Ralph Johnson, Muscogee County, Georgia et. al. and is incorporated herein by reference. The C.E.O. Board also consist of the Chief of the Columbus Police Department, the Sheriff of Russell County, the Chief of the Phenix City Police Department and the Sheriff of Harris County. *See id.*

37. Metro operations are funded by forfeitures that Metro generates through a Forfeiture Analyst. *See id.*  Metro is responsible to establish an accountability of funds apportioned and used.  *See id.*

**VI.   SRT**

38. SRT was created to support the Muscogee County Sheriff's Office and any other requesting law enforcement agency with a tactical response to critical incidents.  *See* Muscogee County Sheriff's Office General Order re Special Response Team, dated June, 2001, attached as Exhibit 27, at MCS00549 to the Defendants' Motion For Summary Judgment previously filed on behalf of Sheriff Ralph Johnson, Muscogee County, Georgia et. al. and is incorporated herein by reference.   SRT is established under the authority of the Muscogee County Sheriff. *See id.* at MCS00550. Oversight and management of SRT is maintained by the Sheriff, Chief Deputy, Criminal Division Commander and SRT Commander. *See id.* SRT consists of Sheriff's deputies meeting the tactical skills and standards established by SRT oversight and management

personnel. *See id.*

## VII.   <u>**The Amended Complaint**</u>

39. Plaintiff's Amended Complaint purports to allege substantive counts against all

Defendants as follows:

| | |
|---|---|
| <u>Count I</u>: | Violation of 42 U.S.C.§ 1983: Deprivation of Equal Protection Based On Racially Discriminatory Intent In Violation Of The Fourteenth Amendment |
| <u>Count II</u>: | 42 U.S.C. § 1983: Unlawful Seizure Under The Fourth Amendment |
| <u>Count III</u>: | 42 U.S.C. § 1983: Excessive Use Of Force Under The Fourth Amendment |
| <u>Count IV</u>: | 42 U.S.C. § 1983: Deliberate Indifference In The Failure To Train And Supervise Under The Fourth And Fourteenth Amendments |
| <u>Count V</u>: | Violation of 42 U.S.C. § 1985: Conspiracy |
| <u>Count VII</u>: | State Law Claims - False Arrest, False Imprisonment, Assault And Battery, Failure To Provide Medical Care |

None of these Counts specify whether they are brought against the Defendant law enforcement

officers in the official or individual capacities or both.

40. Plaintiffs' Amended Complaint purports to allege another substantive count, Count

VI (State Law Claim - Wrongful Death Of Kenneth Walker By Glisson) only against Deputy

Glisson . This Count does not specify whether it is brought against Deputy Glisson in his official

or individual capacities or both.

41. The final count of the Amended Complaint, Count VIII, is a damages claim common

to all counts seeking $100,000,000.00. In their prayers for relief, Plaints reiterate this amount for

compensatory and punitive damages.

**VIII.    Plaintiff's Expert's Testimony And Opinions**

42. Despite the above allegations, Plaintiffs' own expert, Fred Robinette, a copy attached as Exhibit 28, to the Defendants' Motion For Summary Judgment previously filed on behalf of Sheriff Ralph Johnson, Muscogee County, Georgia et. al. and is incorporated herein by reference, has rendered the following testimony and opinions.

43. Despite the above allegations, Plaintiffs' own expert, Fred Robinette, fails to allege that David Glisson's actions were intentional or that any of his actions were outside the scope of his employment in his official duties as a Deputy Sheriff of Muscogee County.

44. Based on the above undisputed facts, Defendant Davis Glisson is entitled to summary judgment on all Counts in the Amended Complaint.

This the 10th  day of May, 2006.

Respectfully submitted,

s/ Richard C. Hagler
Richard C. Hagler
HAGLER & HYLES
P. O. Box 2055
927 Third Avenue
Columbus, Ga. 31902
706-324-0882
Fax: 706-324-0839
State Bar # 316850

IN THE UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION

| | | |
|---|---|---|
| CHERYL N. WALKER, ADMINISTRATOR | * | |
| OF KENNETH B. WALKER'S ESTATE, | * | |
| and CHERYL N. WALKER, Individually, | * | |
| and CHERYL N. WALKER, Legal Guardian of | * | |
| KAYLA WALKER, A DEPENDANT MINOR | * | |
| | * | |
|    Plaintiff, | * | |
| vs. | * | CIVIL ACTION FILE NO. |
| | • | 4:04-CV-161(CDL) |
| SHERIFF RALPH JOHNSON, individually and in | * | |
| in his official capacity as Sheriff | * | |
| of Muscogee County, Georgia; | * | |
| DEPUTY DAVID GLISSON, individually and in | * | |
| his official capacity as Sheriff's Deputy of | * | |
| Muscogee County; | * | |
| MUSCOGEE COUNTY, GEORGIA; | * | |
| CAPTIAN  TROY CULPEPPER, individually; | * | |
| SERGEANT FELIX DAVILLA, individually; | * | |
| SERGEANT RICKY STINSON; individually and | * | |
| in his official capacity as Metro Narcotics Task | * | |
| Force Special Agent in Charge; | * | |
| SERGEANT JAMES PRICE III, individually and | * | |
| in his official capacity as an agent of the Metro | * | |
| Narcotics Task Force; SERGEANT JASON | * | |
| WHITTEN, individually and in his official | * | |
| capacity as a agent of the Metro Narcotics | * | |
| Task Force; JODY WILLIFORD, individually | * | |
| and in his official capacity as an agent of the Metro | * | |
| Narcotics Task Force; JONNIE ELLERBIE | * | |
| individually and in his official capacity as an | * | |
| agent of the Metro Narcotics Task Force; | * | |
| JONATHAN MEMMO, individually and in his | * | |
| official capacity as an agent of the Metro Narcotics | * | |
| Task Force; ROBERT TAYLOR, individually | * | |
| JEFF FERGREUS, individually; RUSSELL | * | |
| "RUSTY" BLAIR, individually; BRUCE | * | |
| WILLIAMS, individually; BRIAN MOORE, | * | |
| individually; and the CITY OF COLUMBUS, | * | |
| GEORGIA, a consolidated government, | * | |
| | * | |
|    Defendants. | * | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Plaintiffs' amended, nine count Complaint is based on the highly publicized, December 10, 2003 incident involving Mr. Kenneth Walker and three other passengers in a SUV that was stopped by Muscogee County Sheriff's deputies for suspected criminal drug related activity. During the stop, Mr. Walker was fatally shot by Deputy David Glisson.

Plaintiffs have sued the Muscogee County Sheriff, 14 of his deputies, including Deputy Glisson, and Muscogee County and the City of Columbus, Georgia, a consolidated government (collectively "Muscogee County"). The Amended Complaint purports to allege 42 U.S.C.§ 1983 claims against all named Defendants for deprivation of equal protection based on racially discriminatory intent, unlawful seizure, excessive force and deliberate indifference in the failure to train and supervise (Counts I-IV). The Amended Complaint also purports to allege a 42 U.S.C.§ 1985 conspiracy claim (Count V) against all named Defendants. The Amended Complaint then purports to allege a state law wrongful death claim (Count VI) only against Deputy Glisson and additional state law claims for false arrest, false imprisonment, assault and battery and failure to provide medical care against all named Defendants (Count VII).

All these claims fail as a matter of law based on numerous, important and well established reasons, including Eleventh Amendment immunity, the *Monell* doctrine, qualified immunity, sovereign immunity and official state law immunity.

First, the § 1983 claims against the Sheriff and his deputies in their official capacities and against Muscogee County relate to allege Muscogee County Sheriff's Office policies, procedures and customs and to Plaintiffs' claim that those policies, procedures and customs are causally

linked to Mr. Walker's death.  The Sheriff and his deputies, however, **are state, not municipal,**

actors.  Muscogee County has no control over their office or policies,  procedures or customs.

The Sheriff and his deputies are, therefore, entitled to Eleventh Amendment immunity for the

§ 1983  official capacity claims.  Nor can Muscogee County be liable for these claims.  It does

not control and is not responsible for the Sheriff or his deputies.

Second, even if the Sheriff and his deputies were not state actors - but instead, were

municipal actors - they would still be entitled to summary judgment on the § 1983 official

capacity claims.  These claims would have to be treated as claims against Muscogee County.  In

accordance with the *Monell* doctrine, Muscogee County could not be liable for such claims

because there is absolutely no evidence of county policies or customs being the moving force

behind or in any way causally linked to the legal injuries alleged.

Third, the Sheriff and his deputies are entitled to qualified immunity for the § 1983

claims against them in their individual capacities.  There is no evidence demonstrating that the

Sheriff or his deputies violated clearly established statutory or constitutional rights of which a

reasonable person would have known.

Fourth, in the absence of any viable §1983 claims, Plaintiffs' 42 U.S.C. § 1985

conspiracy claim necessarily fails.

Finally, fifth, Plaintiffs' state law claims fail because the Sheriff and his deputies - to the

extent named in their official capacities - and Muscogee County are entitled to sovereign

immunity.  At the same time, state law official immunity applies to the claims against the Sheriff

and his deputies in their individual capacities because there is no evidence that the Sheriff or his

deputies performed the discretionary functions at issue here with actual malice or with actual

intent to cause injury.

Consequently, Defendant's Motion for Summary Judgment should , respectfully, be granted, and judgment should be entered in Defendant's favor as to all claims in Plaintiffs' Complaint, as amended.

## INDISPUTABLE FACTS

Given the number or pertinent indisputable facts, Defendant has elected not to restate them, but, rather, to incorporate herein by reference his Statement of Material Facts As To Which There Is No Genuine Issue To Be Tried.

## SUMMARY JUDGMENT STANDARD

Federal Rule of Civil Procedure 56(c) provides that summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."

An issue of fact is "material" if, under the applicable substantive law, it might affect the outcome of the case. *Allen v. Tyson Foods,* 121 F.3d 642, 646 (11th Cir. 1997). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact for the non-moving party. *Id.* A court must decide "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law. *Anderson v. liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).

The moving party bears "the initial responsibility of informing the .... court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986).  Where the non-moving party bears the burden of proof at trial, the moving

party may discharge this "initial responsibility" by showing that there is an absence of evidence to support the non-moving party's case or by showing that the non-moving party will be unable to prove its case at trial.  *United States v. Four Parcels of real Prop.*, 941 F.2d 1428, 1437-38 (11th Cir. 1991).  To survive summary judgment, the non-moving party bearing the ultimate burden of proof at trial must come forward with evidence sufficient to withstand a directed verdict motion. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993).

On summary judgment, "the evidence of the non-movant is to be believed." *Anderson*, 477 U.S. at 255.   The Court must view all the evidence and all factual inferences drawn therefrom in the light most favorable to the non-moving party and determine whether that evidence could reasonably sustain a jury verdict.  *Celotex*, 477 U.S. at 322-23; *Allen*, 121 F.3d at 646.

Applying this standard, summary judgment is warranted for Defendant David Glisson.

## ARGUMENT AND CITATION OF AUTHORITY

In accordance with the indisputable facts and standard of review, Defendant David Glisson is entitled to summary judgment.

## I.  ELEVENTH AMENDMENT IMMUNITY

### A.  In General

The Eleventh Amendment to the United States Constitution provides immunity by restricting federal judicial power:

> [t]he Judicial power of the United States shall not be
> construed to extend to any suit in law or equity,
> commenced or prosecuted against one of the United States
> by Citizens of another State, or by Citizens or Subjects of
> any Foreign State.

It protects a state from being sued in federal court without the state's consent.  As a result, parties

with claims against a non-consenting state must resort to the state's own courts.  *Manders II*, 338 F.3d at 1308.   The Eleventh Amendment is "a recognition that states, though part of a union, retain attributes of sovereignty, including immunity from being compelled to appear in the courts of another sovereign against their will." *Id., quoting McClendon v. Georgia Dep't of Cmty. Health*, 261 F.3d 1252, 1256 (11th Cir.2001).

Eleventh Amendment immunity also bars suits brought in federal court when an "arm of the state" is sued.  *Manders II*, 338 F.3d at 1308.  To receive Eleventh Amendment immunity, a defendant need not be labeled a "state officer" or "state official," but need only be acting as an "arm of the state," which includes agents and instrumentalities of the state.  Whether a defendant is an "arm of the state" must be assessed in light of the particular function in which the defendant was engaged when taking the actions out of which liability is asserted to arise.  *Manders II*, 338 F.3d at 1308.   Four factors are considered in such an assessment: (1) how state law defines the entity; (2) what degree of control the state maintains over the entity; (3) where the entity derives its funds; and (4) who os responsible for judgments against the entity. *Id* at 1309.

B.  **Eleventh Amendment Immunity For Official Capacity Claims Related To Formulating Use Of Force Policy And Training And Arresting And Detaining Suspects**

Applying the four factor test set forth above, and examining Georgia law governing sheriffs, *Manders II*  held that a sheriff is an "arm of the law" in establishing jail use of force policy and in deputy training and discipline and that a sheriff is entitled to Eleventh Amendment immunity for those functions.  338 F.3d at 1328.  Subsequently, in *Mladek v. Day*, 293 F. Supp. 2d 1297 (M.D. Ga. 2003), this Court stated that the  *Manders II* doctrine with respect to the sheriff being an arm of the state and being entitled to Eleventh Amendment immunity was not limited to just a sheriff's operation of county jails, but rather, also encompassed sheriffs and their

deputies for actions during an arrest and subsequent detention. *Id*. at 1304

As this Court found the *Manders II* holding:

> **is clearly not limited to the operating of jails.** Based upon
> an exhaustive review of Georgia law, the Eleventh Circuit
> found that Georgia sheriffs act as "state officers" in a
> Variety of functions and when they "wear these state hats,"
> They are entitled to official immunity.  The Eleventh Circuit
> explained that the proper inquiry is whether the Sheriff (or
> his deputy) acted for the state in the particular function at
> issue in the case.  **Although the precise function at issue in
> Manders was the implementation of a force policy in the
> Operation of a county jail, the Eleventh Circuit made it
> clear that it found no distinction between that function
> and the law enforcement function performed by sheriffs
> when they arrest citizens for violations of the law.**

*Id.* at 1304 (emphasis added) (citations omitted). Consequently, *Manders II* and *Mladek* squarely

hold that Georgia sheriffs and their deputies are acting for the State of Georgia and entitled to

Eleventh Amendment immunity when arresting and detaining suspects and when formulating

policies related to use of force and related training.  This also means that Georgia sheriffs and

their deputies are entitled to Eleventh Amendment immunity for official capacity claims brought

against them as a result of arresting and detaining suspects and/or formulating policies related to

use of force. E.g., *Mladek*, at 293 F. Supp. 2d at 1304.

C.      **The Sheriff And His Deputies Have Eleventh Amendment
        Immunity From 42 U.S.C. § 1983 Official Capacity Claims**

Here, in accordance with the above, Sheriff Johnson and his deputies are entitled to

Eleventh Amendment immunity for Plaintiffs' § 1983 official capacity claims set forth in

Amended Complaint Counts I through IV.  The law enforcement functions at issue were the same

type covered by *Manders II* and *Mladek*.  They involved detaining suspects and use of force.

There is no reason to even apply in detail the four factors  *Manders II* analysis.  The Eleventh

Circuit and this Court have already ruled that Eleventh Amendment immunity applies to official capacity claims in this setting.

Consequently, as the Sheriff and his deputies are protected by Eleventh Amendment immunity, summary judgment should be entered in their favor as to Amended Complaint Counts I through IV to the extent these Counts are alleged against them in their official capacities.

**D.    Eleventh Amendment Immunity Has Not Been Waived**

In response to Defendants' previously filed motion for judgment on the pleadings, Plaints', citing *Lapides v. Bd. of Regents of the Univ. Sys. Of Ga.,* 535 U.S. 613 (2002), incorrectly attempted to characterize Defendants' removal as a waiver of Eleventh Amendment immunity.

This case was originally filed in Muscogee County Superior Court.  The claims raised in the Complaint were substantially related to 42 U.S.C. § 1983 claims.  Defendants removed the case so that these federal claims and sovereign immunity defenses, could be adjudicated in federal court.  Removal did not waive any immunities or defenses that would have existed in state court.  Defendants also specifically preserved Eleventh Amendment immunity and all other immunities, including, but not limited to, sovereign immunity, in their Answer. *See* Defendant's Answer and Defenses, Sixth-Tenth Defenses.

In stark contras , the *Lapides* defendant - characterized by the Court as the State-attempted to achieve what the Court called an " unfair tactical advantage" by removing from state to the federal court.  535 U.S. at 621.  A University of Georgia professer had filed claims under the Georgia Tort Claims Act and 42 U.S.C. § 1983. *Id.* at 616.  After removal, the State, while conceding it had waived sovereign immunity from the state-law claims in state court via the Tort Claims Act, asserted Eleventh Amendment immunity to suit in federal court. *Id.* at 616-17.  In

other words, the State took the position that while it may not have sovereign immunity, the

Eleventh Amendment still protected it from suit in federal **jurisdiction.**

The Supreme Court held that by voluntarily submitting itself to the jurisdiction of the

federal court, the State could not then assert the Eleventh Amendment as a defense to federal

jurisdiction. *Id.* at 617 (emphasis added).  The reason for this limition is clear.  The only federal

claims against the State in *Lapodes* arose under 42 U.S.C. § 1983, and a state is not a "person"

against whom a § 1983 action can be maintained. *Id.* at 617-18, *citing Will v. Mich. Dep't of*

*State Police,* 491 U.S. 58, 66 (1989).  The Court also did not address the scope of Eleventh

Amendment immunity waiver where the underlying sovereign immunity was not waived by the

state.   Again, the Georgia Tort Claims Act pled by the *Lapides* petitioner expressly waived

sovereign immunity for state law suits in state court.

*Lapides* is clear.  Where a litigant has waived sovereign immunity in state court, it cannot

gain tactical advantage in federal court by removal and subsequent assertion of Eleventh

Amendment immunity.   Unlike *Lapides*, here, there has been no waiver of sovereign immunity

for state laws claims in state court.  On the contrary, the Sheriff and his deputies in their official

capacities and Muscogee County are entitled to sovereign immunity for any state law claims.

*Haber v. Fulton County,* 124 Ga. App. 789,791, 186 S.E.2d 152, 153 (1971).

Significantly, the United States Court of Appeals for the Fourth Circuit has addressed a

nearly identical case in which the plaintiff asserted that the defendants waived sovereign

immunity by virtue of removal to federal court when the defendants would have been immune

from the same action in state court. In *Stewart v. State of N.C.,* 393 F.3d 484 (4th Cir. 2005), the

court held that the state, having not already consented to suit in its own courts, did not waive

sovereign immunity by removal. *Id.* at 490.

The court also explained the often confused concepts of Eleventh Amendment immunity and state sovereign immunity as follows:

> [w]e have ... sometimes referred to the States' immunity from suit as "*Eleventh Amendment* immunity." The phrase is convenient shorthand but something of a misnomer, for the sovereign immunity of the States neither derives from, no is limited by, the terms of the *Eleventh Amendment.* Rather, as the Constitution's structure, its history, and the authoritative interpretations by this Court make clear, the States' immunity from suit is a fundamental aspect of the Sovereignty which the State enjoyed before the ratification of the Constitution, and which they retain today (either literally or by virtue of their admission into the Union upon an equal footing with the other States) except as altered by the plan of the Convention or certain constitutional Amendments. *Alden v. Main*, 527 U.S. 706, 713, 144 L. Ed. 2d 636, 119S. Ct. 2240 (1999)

> State sovereign immunity is "based on the logical and practical ground that there can be no legal right as against the authority that makes the law on which the right depends." *Nevada v. Hall*, 440 U.S. 410, 416, 59 L. Ed. 2d 416, 99 S. Ct. 1182 (1979) (internal quotation marks Omitted). In that sense, state sovereign immunity was not created by the *Eleventh Amendment,* but rather predated it. *See Alden,* 527 U.S. at 728-29 ("The *Eleventh Amendment* Confirmed, rather than established, sovereign immunity as a constitutional principle."); *Hans v. Louisiana*, 134 U.S. 1, 16, 33 L. Ed. 842, 10 S. Ct. 504 (1890) ("The suability of a state, without its consent, was a thing unknown to the law.") In contrast, by the terms of the *Eleventh Amendment*, an unconsenting state is immune from suit filed in federal court by a citizen of another state. *See U.S. Const. amend. XI.* The purpose of the *Eleventh Amendment* was to overrule *Chisholm v. Georgia,* 2 U.S. (2 Dall.) 419, 1 L. Ed. 440, 2 Dall. 419 (1973), not to define the contours of state sovereign immunity generally. *See Alden*, 527 U.S. at 723 ("The *Eleventh Amendment* did not redefine the federal judicial power but instead overruled the Court."). Thus, *Eleventh Amendment* immunity is but an example of state sovereign immunity as it applies to suits filed in federal court against unconsenting states by citizens of other states. *See Idaho v. Coeur d'Alene Tribe of Idaho*,

> 521 U.S. 261, 267-68. 138 L. Ed. 2d 438, 117 S. Ct. 2028
> (1997) (discussing "the broader concept of immunity,
> Implicit in the Constitution, which we have regarded the
> *Eleventh Amendment* as evidencing and exemplifying").

*Stewart,* 393 F. 3d at 487-88 (emphasis in original; citations included). *Stewart* then held that

*Lapides* did not address whether a state that has not consented to suit in its own courts maintains

the broader concept of sovereign immunity as exemplified by Eleventh Amendment immunity.

*Id.* at 488.  Accordingly, the court held that North Carolina, not having already consented to suit

in its own courts, did not waive sovereign immunity by removing to federal court. *Id.* at 490.

Just as in *Stewart*, Georgia has not consented to suite in its own courts for any of the

claims brought in this lawsuit.  As a result, the rationale for the *Lapides* finding does not apply

here.  The law after *Lapides* is that whatever immunity would exist at the state court level would

likewise exist at the federal level after removal.  The only thing *Lapides*  does is limit the unfair

tactic - **which is not present here -** of regaining immunity in federal court that was waived by

state legislation.  Since Georgia has not waived any of the claims in this case, the long standing

principle of sovereign immunity applies.


II.  **Even If Eleventh Amendment Immunity Were Inapplicable,
     Summary Judgment Would Be Appropriate In Accordance
     With The *Monell* Doctrine**

Even assuming *arguendo* that the Sheriff and his deputies were not arms of the state, but

rather Muscogee County, a municipality, and were not entitled to Eleventh Amendment

immunity, summary judgment would still be appropriate in accordance with the *Monell* doctrine

on Plaintiffs' § 1983 claims against Muscogee County and the Sheriff and his deputies in their

official capacities.

A.      The Monell Doctrine At Summary Judgment

The Supreme Court has clearly defined the *Monell* doctrine - the standard for establishing

municipal liability under § 1983:

> [w]e have consistently refused to hold municipalities liable
> under a theory of *respondeat superior*.  Instead, in *Monell*
> and subsequent cases, we have required a plaintiff seeking
> to impose liability on a municipality under § 1983 to
> identify a municipal 'policy' or 'custom' that caused the
> plaintiff's injury ... As our § 1983 municipal liability
> jurisprudence illustrates, however, **it is not enough for a §
> 1983 plaintiff merely to identify conduct properly
> attributable to the municipality.  The plaintiff must also
> demonstrate that, through its deliberate conduct, the
> municipality was the 'moving force' behind the injury
> alleged.**  That is, a plaintiff must show that the municipal
> Action was taken with the requisite degree of culpability and
> must demonstrate a direct casual link between the
> municipal action and the deprivation of federal rights.

*Bd. of County Comm'rs of Bryan County, Okla. v. Brown,* 520 U.S. 397, 404 (1997)

(emphasis added), *citing Monell*, 436 U.S. at 694; *see also e.g., Young v. City of Augusta,* Ga., 59

F.3d 1160, 1171 (11th Cir. 1995). "Congress did not intend municipalities to be held liable unless

**deliberate** action attributable to the municipality directly caused a deprivation of federal rights."

*Brown*, 520 at 415 (emphasis in original).

Accordingly, to recover on their § 1983 official capacity claims against the Sheriff, his

deputies or Muscogee County, Plaintiffs must establish that Defendants violated Mr. Walker's

constitutional rights and that Muscogee County had an official policy or custom that was the

moving force behind the constitutional violation.  On summary judgment, the first issue to

resolve is whether there is a genuine issue of material fact as to whether a constitutional violation

occurred. *See Rooney v. Watson,* 101 F. 3d 1378,1381 (11th Cir. 1996).  If such a jury question

exists, the Court must then determine whether sufficient evidence has been submitted from

which a reasonable jury could conclude that execution of the government's policy or custom

caused the violation. *Monell,* 436 U.S. at 694.

   **B.** ***The Alleged Constitutional Violations***

   Plaintiffs' purports to allege two types of constitutional violation: that Defendants (1)

deprived Mr. Walker of equal protection based on racially discriminatory intent in violation of

the Fourteenth Amendment (Count I); and (2) committed an unlawful seizure and used excessive

force under the Fourth Amendment (Counts II & III).

      (1)   <u>Equal Protection</u>

   There is absolutely no evidence whatsoever that this unfortunate case has ever had

anything to do with race. There is no evidence that the SUV was stopped on the basis of race, nor

that any of the subsequent events were based on race.  There is, therefore, no evidence of a

Fourteenth Amendment equal protection violation.

      (2)   <u>Unlawful Seizure And Excessive Force</u>

   The Fourth Amendment unlawful seizure and excessive force claims warrant more

discussion, but are still deficient. "An officer may, consistent with the Fourth Amendment,

conduct a brief,, investigatory stop when the officer has reasonable, articulable suspicion that

criminal activity is afoot." *Wardlow*, 120 S. Ct. at 675. "[R]easonable suspicion is a less

demanding standard than probable cause and requires a showing considerably less than

preponderance of the evidence." *Id*. at 675-76. The Fourth Amendment requires "at least a

minimal level of objective justification for making the stop." *Id.* Here, there are no fewer than 12

separate pieces of indisputable evidence demonstrating reasonable suspicion far exceeding a

minimal level of objective justification.

   (1) Bo Jack confirmed during conversations - heard contemporaneously by

Sergeants Stinson, Price and Whitten _ with the CI that extensive drug related activity was taking place out of his apartment and that Bo Jack was in the process of acquiring more cocaine.

(2) Michael Powell was arrested shortly before the stop exiting the apartment with over 67 grams of cocaine.

(3) Bo Jack was seen driving to the LaQuinta motel while representing that he was acquiring more cocaine.  The LaQuinta is a motel where Metro has handled other drug cases.  Bo Jack spent only 10 to 15 minutes in a room At LaQuinta.

(4) The CI described the SUV as similar to one driven by the Miami Boys, who he Claimed were Bo Jack's suppliers.

(5) The SUV pulled in and out of Northwoods the first time in a suspicious manner.

(6) Bo Jack and the SUV arrived nearly simultaneously to the apartment.

(7) The CI described the Miami Boys as traveling in groups of four to five and Being armed.  There were four passengers in the SUV.

(8) The CI described the main supplier as a large black male.  The SUV driver, Mr. Beaulah, is in fact a large black male.

(9) One of the SUV passengers carried a package that appeared to br wrapped in plastic under his arm into Bo Jack's apartment.

(10) Bo Jack did not answer his telephone - as the CI said he would not while conducting drug deals - while the SUV passengers were in the apartment.

(11) The SUV passengers remained in the apartment for only 10 to 15 minutes.

**AND**

(12) The CI said the apartment was a drug "trap."

Given the above, there was no unlawful seizure or constitutional violation in making the stop as it was appropriately based on objective justification.

The next question then becomes whether Defendants used excessive force during the stop.  The right to make an "investigatory stop necessarily carries with it the right to use some

degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386,395

(1989). The use of force must be "reasonably proportionate to the need for that force, which is

measured by the severity of the crime, the danger to the officer, and the risk of flight." *Mladek,*

293 F. Supp. 2d at 1302, *quoting McCormick v. City of Fort Lauderdale,* 333 F. 3d 1234, 1244

(11th Cir. 2003).  Whether the use of force was reasonable must be determined on '"on a case- by-

case basis from the perspective of a reasonable officer on the scene, rather than with the 20/20

vision of hindsight.'" *McCormick,* 333 F. 2d at 1244, *quoting Vinyard v. Wilson,* 311 F. 3d 1340,

1347 (11th Cir. 2002). "The calculus of reasonableness must embody allowance for the fact that

police officers are often forced to make split-second judgments - in circumstances that are tense,

uncertain, and rapidly evolving - about the amount of force that is necessary in a particular

situation." *Graham*, 490 U.S. at 396-97.

In accordance with this standard, and excluding for the moment the shooting, there is no

evidence of excessive force by any officer.  Given the objective evidence known about the SUV

and its previous activities in the context of a narcotics investigation, the officers were reasonably

justified in stopping the SUV, utilizing SRT members and removing the SUV passengers with

their weapons drawn.   A finding to the contrary would endanger the lives of officers in all future

narcotics operations.  By definition, narcotics interdiction is dangerous.  Officers are frequently

confronted with armed, impaired, violent and extremely dangerous individuals.  Plaintiffs'

version of law would require officers to make stops in the hope that narcotics suspects are not

armed as opposed to with the appropriate assumption that they are armed.  Officers must be

allowed to use overwhelming numbers and surprise, such as was used here, for their own safety

as well as for that of the suspects. " To require an officer to risk his life in order to make as

investigatory stop would run contrary to the intent of *Terry v. Ohio.*" *Courson,* 939 F.2d at 1496,

*quoting Roper,* 702 F.2d at 987.

Defendants have not lost sight of the fact that Mr. Walker was tragically shot during the stop and that Plaintiffs argue that shooting an unarmed man is excessive force. Defendants submit , however, that the evidence demonstrates that the shooting was accidental and, therefore, not excessive force. The reasonableness inquiry must therefore focus on all the deputies' actions, including Deputy Glisson's, to the exclusion of the shooting. That analysis demonstrates, again, that the deputies responded appropriately to what they deemed a highly dangerous narcotics investigation and stop. Any other conclusion could only be based on the 20/20 vision of hindsight, which is impermissible.

> We must avoid substituting our personal notions of proper police procedure for the instantaneous decision of the officer on the scene. We must never allow the theoretical sanitized world or our imagination to replace the dangerous and complex world that policemen face every day. What constitutes "reasonable" action may seem quite different to someone facing a possible assailant than to someone analyzing the question at leisure.

*Dickerson v. McClellan*, 101 F.3d 1151, 1162 (6th Cir. 1996).

In summary, therefor, there is no evidence that the stop was anything other than completely justified as based on reasonable suspicion. At the same time, there is no evidence of excessive force.

**III.   Deputy David Glisson Is Entitled To Qualified Immunity For All Plaintiff's § 1983 Claims Against Him In His Individual Capacity**

Deputy David Glisson is also entitled to summary judgment on all Plaintiffs' constitutional claims against him in his individual capacity. Deputy Glisson has qualified immunity for those claims.

"Qualified immunity provides protection for governmental officials performing discretionary functions and sued in their individual capacities as long as their conduct violates no clearly established statutory or constitutional rights of which a reasonable person would have known." *Storck v. City of Coral Springs,* 354 F.3d 1307, 1313 (11th Cir. 2003); *Thomas v. Roberts,* 261 F.3d 1160, 1170 (11th Cir. 2001).  For an asserted right to be clearly established for purposes of qualified immunity, "the law must have been developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that ' what he is doing' violates federal law.'" *Jackson*, 206 F.3d at 1164-65, *quoting Lassiter v. Alabama A & M Univ. Bd. of Trustees*, 28 F.2d 1146,1149 (11th Cir. 1994).  If reasonable public officials could differ on the lawfulness of a defendant's actions, the defendant is entitled to qualified immunity.  *Storck,* 354 F.3d at 1314.  The standard is an objective one and does not include inquiry into the officer's subjective intent or beliefs. *Jackson,* 206 F.3d at 1165.

The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation, protecting from suit "all but the plainly incompetent or one who is knowingly violating the federal law."  *Lee v. Farraro,* 284 F.3d 1188, 1194 (11th Cir. 2002); *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  Because qualified immunity is a defense not only from liability, but also from suit, it is "important for a court to ascertain the validity of a qualified immunity defense as early in the lawsuit as possible." *Lee*, 284 F.3d at 1194, *quoting GJR Invs., Inc. v. County of Escambia,* 132 F.3d 1359, 1370 (11th Cir. 1998) (citation omitted).

Under qualified immunity analysis, the public official must first prove they were acting within the scope of their discretionary authority when the allegedly unconstitutional acts took place.  *Lee*, 284 F.3d at 1194.  The burden then shifts to the plaintiff to establish that qualified

immunity does not apply. *Id.* A plaintiff's citation of general rules or abstract rights is insufficient to strip a § 1983 defendant of qualified immunity. *Jackson*, 206 F.3d at 1165. To determine if the plaintiff has met this burden, the Court must make the following two part evaluation: (1) taken in the light most favorable to the party asserting the injury, do the facts alleged show the official's conduct violated a constitutional right; and (2) if a constitutional right would have been violated under the plaintiff's version of the facts, was the right clearly established? *Id., quoting Saucier v. Katz,*194, 201 (2001). Thus, if no constitutional violation is established, then the official prevails, and there is no necessity for further inquiries concerning qualified immunity. *Storck*, 354 F.3d at 1314. On the other hand, if the facts establish a constitutional violation, the Court must determine whether at the time of the violation, the right was clearly established, which is an inquiry that must be undertaken in light of the specific context of the case and not as a broad general proposition. *Id.*

Applying the above standard, there is no way Plaintiffs could circumvent Deputy Glisson's qualified immunity. First, the conduct complained of was clearly within his discretionary authority. A public official is acting within their discretionary authority if they are (a) performing a legitimate job-related function (that is, pursuing a job-related goal); (b) through means that were within their power to utilize. *Holloman v. Harland,* 370 F.3d 1252, 1265 (11th Cir. 2004); *Hill v. Dekalb Reg'l Youth Det. Ctr.,* 40 F.3d 1176, 1185 n.17 (11th Cir. 1994) ("[a] government official acts within his or her discretionary authority if objective circumstances compel the conclusion that challenged actions occurred in the performance of the official's duties and within the scope of this authority"). Deputy Glisson's complained of conduct falls within this definition.

With discretionary authority indisputable, Plaintiffs have the burden of showing violation

of a clearly established constitutional right by Deputy Glisson.  They cannot.  As set forth above, Deputy Glisson did not commit an unlawful seizure or use excessive force.

The stop was clearly and appropriately based on reasonable suspicion.  Moreover, a "law enforcement official who reasonably but mistakenly believes that reasonable suspicion is present is still entitled to qualified immunity." *Jackson,* 206 F.3d at 1165-66.  The "issue is not whether reasonable suspicion existed in fact, but whether the officer had 'arguable' reasonable suspicion to support the investigatory stop." *Id.* at 1166. Again, the evidence supporting reasonable suspicion was overwhelming.  At a minimum, it created "arguable" reasonable suspicion. Similarly, a "reasonable officer's awareness of the existence of an abstract right, such as a right to be free from excessive force or an investigatory stop without reasonable suspicion, does not equate to knowledge that his conduct infringes on the right. *Jackson*, 206 F.3d at 1165. **"If case law, in factual terms, has not staked out a bright line, qualified immunity almost always protects the defendant."** *Id.* (Emphasis added)

## IV.   Deputy David Glisson, To The Extent Sued In His Official Capacity Is Entitled To Sovereign Immunity For Plaintiffs' State Law Claims

Deputy David Glisson, to the extent sued in his official capacity, is entitled to summary judgment with respect to all Plaintiffs' state law claims.  *See* Amended Complaint Counts VI and VII. Again, to the extent Plaintiffs argue that Deputy Glisson is an arm of Muscogee County, suits against him in his official capacity would be the same as a suit against Muscogee County. Muscogee County is entitled to sovereign immunity as to any state law action brought against it except those specially authorized by statute. "[T]he Supreme Court of this State, and doubtless that of many other States and of the United States, have so often affirmed and acknowledged that the doctrine of sovereign immunity prevents a suit by a citizen against the State, or a political

subdivision thereof, until it is hardly necessary to again formally assert this rule." *Haber*, 124

Ga. App. at 791, 186 S.E.2d at 153.

**V.    Deputy David Glisson, To The Extent Sued In His
Individual Capacity Is Entitled To Sovereign Immunity
For Plaintiffs' State Law Claims**

Additionally, Deputy David Glisson is entitled to summary judgment on Plaintiffs' state

law claims. to the extent filed against him in his individual capacity because he maintains official

immunity for such claims.

Under the Georgia Constitution, state and local government employees are subject to suit

for performing discretionary functions  "only if they with **actual malice or with actual intent** to

cause injury in the performance of their official functions."  Ga. Const. Of 1983, art. I, § II,

¶ IX(d); *See also gilbert*, 264 Ga. at 753, 452 S.E.2d at 483.  As recognized in *Gilbert,* official

immunity generally shields law enforcement officers who, like Deputy Glisson, are performing

official law enforcement functions, such as investigatory stops.  There is clearly no evidence that

Deputy Glisson acted with actual malice or actual intent to cause legal injury to Mr. Walker.

**CONCLUSION**

For the foregoing reasons, Defendant David Glisson respectfully submit that he is entitled

to summary judgment as to all allegations in Plaintiffs' Complaint, as amended.

This 10th day of May, 2006.

Respectfully submitted,

s/ Richard C. Hagler
Richard C. Hagler
HAGLER & HYLES
P. O. Box 2055
927 Third Avenue
Columbus, Ga. 31902
706-324-0882
Fax: 706-324-0839
State Bar # 316850

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 10, 2006, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system which will send notification of such filing to the following: _____.  I also certify that I have mailed by United States Postal Service the document and a copy of the Notice of Electronic Filing to the following non-CM/ECF participants:

James C. Clark, Jr.
1111 Bay Avenue
Third Floor
Columbus, Georgia 31901

Clifton C. Fay
Post Office Box 1340
Columbus, Georgia 31902

Jaimie B. DeLoach
Post Office Box 1340
Columbus, Georgia 31901

William C. Campbell
Gary, Williams, Parenti, Finney, Lewis
McManus, Watson & Sperando, P.L.
221 E. Osceola Street
Stuart, FL 34994

William S. Mitchell
Cruser & Mitchell, LLP
Peachtree Ridge, Suite 750
3500 Parkway Lane
Norcross, Georgia 30092

Respectfully submitted,

s/ Richard C. Hagler
Richard C. Hagler
HAGLER & HYLES
P. O. Box 2055
927 Third Avenue
Columbus, Ga. 31902
706-324-0882
Fax: 706-324-0839
State Bar # 316850