IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION


WARREN BEAULAH, ANTHONY SMITH,      *
and DARYL RANSOM
                                    *
          Plaintiffs,
                                    *
vs.
                                    *      CASE NO. 4:04-CV-155(CDL)
MUSCOGEE COUNTY SHERIFF'S
DEPUTIES, et al.,                   *

          Defendants.               *
_____     *

CHERYL N. WALKER, Administrator     *
of Kenneth B. Walker's Estate,
and CHERYL N. WALKER,               *
Individually, and CHERYL N.         *
WALKER, Legal Guardian of Kayla
Walker, a Dependent Minor,          *

          Plaintiffs,               *

vs.                                 *
                                           CASE NO. 4:04-CV-161(CDL)
SHERIFF RALPH JOHNSON, et al.,      *

          Defendants.               *


O R D E R


     The Defendants in the above captioned cases have filed motions

for summary judgment seeking to have this Court rule as a matter of

law that they have no liability to the Plaintiffs in these two cases.

The Court previously consolidated these cases for the purpose of

discovery.   Because  the  two  cases  involve  the  same  factual

background, many of the same Defendants, and several of the same

legal issues, the Court will address all of the pending summary

judgment motions together in this Order.

INTRODUCTION

These lawsuits arise from events that took place on December 10, 2003, when agents of the Metro Narcotics Task Force stopped a GMC Yukon on Interstate 185 in Columbus, Georgia.   During the stop, Kenneth Walker, one of the Yukon's passengers, was shot and killed by Defendant Glisson, a Muscogee County Sheriff's Deputy.   The other occupants of the Yukon—Plaintiffs Beaulah, Smith, and Ransom—were detained by the Metro agents.   Plaintiffs contend that the Metro agents' stop of the Yukon and their subsequent actions violated the United States Constitution and Georgia law.

The Court finds that under the well-established federal law of this circuit and applicable Georgia law, Sheriff Johnson and his deputies, in their official capacities, are entitled to immunity. Therefore, summary judgment is granted in their favor as to Plaintiffs' official capacity claims.  (For a detailed explanation of the Court's rationale, see *infra* §§ 1(a), 1(c).)

The Court further finds that under well-established federal law the City of Columbus/Muscogee County cannot be held liable for the actions of a duly elected Sheriff under the circumstances presented here.   Furthermore, under well-established Georgia law, the City of Columbus/Muscogee County is immune from suit for Plaintiffs' state law claims.   Therefore, summary judgment is granted in favor of the City of Columbus/Muscogee County as to all of Plaintiffs' claims. (For a detailed explanation of the Court's rationale, see *infra* § 1(b).)

Regarding the claims against Sheriff Ralph Johnson and his deputies in their individual capacities, the Court finds that the Sheriff and all of his deputies/Metro Narcotics Task Force Agents

2

named as Defendants, except for  Glisson, Price, and Stinson, are entitled to qualified immunity under federal law and official immunity under Georgia law.  Therefore, summary judgment is granted in their favor.  (See *infra* §§ 2-3.)

With regard to the claim against Deputy Glisson in his individual capacity for the shooting of Kenneth Walker, the Court finds that genuine issues of material fact exist to be tried, and therefore Defendant Glisson's Motion for Summary Judgment is denied as to this claim.  (*See infra* §§ 2(a)(ii), 2(c).)

With regard to the claims against Price and Stinson in their individual capacities, the Court finds that they are entitled to summary judgment as to the claim for the death of Kenneth Walker. Stinson and Price cannot be held liable for the death of Kenneth Walker under federal and Georgia law because Glisson's shooting of Walker was not reasonably foreseeable from the perspective of Price and Stinson.  However, as to the claim that Plaintiffs suffered damages by virtue of being detained, the Court finds that genuine issues of material fact exist to be tried as to whether Stinson and Price may be liable for any foreseeable injuries that may have been suffered as a result of the detention, excluding the unforeseeable shooting of Kenneth Walker.  (*See infra* §§ 2(a)(i), 3(a)(i)-(ii).)

In light of the Court's rulings, the only claims remaining for trial are the claims in the Walker case against Deputy Glisson in his individual capacity for his shooting of Kenneth Walker and the claims against Stinson and Price in their individual capacities for the detention of Walker prior to the shooting.  In the Beaulah case, the only claims that remain pending for trial are the claims against

Stinson in his individual capacity for the detention of the Plaintiffs.[1]

SUMMARY OF THE COURT'S SPECIFIC RULINGS

1.   *The Walker Case*

The Court grants in part and denies in part the Defendants' motions for summary judgment in the Walker case (4:04-CV-161). Before the Court in the Walker case are the following motions:  the Motion for Summary Judgment filed by all Defendants except Defendants Glisson and Price in their individual capacities (Doc. 49), Defendant Price's Motion for Summary Judgment (Doc. 52), and Defendant Glisson's Motion for Summary Judgment (Doc. 71).  The Court grants Defendants' summary judgment motions as to the Walker Plaintiffs' official capacity claims under 42 U.S.C. § 1983 ("§ 1983").  *See infra* § 1(a).  The Court grants Defendants' summary judgment motions as to the Walker Plaintiffs' § 1983 claims against the City of Columbus.  *See infra* § 1(b).  The Court grants Defendants' summary judgment motions as to the Walker Plaintiffs' Georgia law claims against Columbus and the individual Defendants in their official capacities.  *See infra* § 1(c).  The Court finds that the Walker Plaintiffs abandoned their individual capacity claims against Johnson, Davila, Whitten, Williford, and Memmo, and those defendants are thus entitled to summary judgment.  *See infra* § 2.  The Court finds that Stinson and Price are not entitled to qualified immunity on the Walker Plaintiffs' individual capacity unlawful seizure claim, so their summary judgment motions on this claim are denied.  *See infra* § 2(a)(i).  The Court finds that Ellerbee and Glisson are

---

[1]Price was not named as a Defendant in the Beaulah case.

entitled to qualified immunity on the Walker Plaintiffs' individual capacity unlawful seizure claims and therefore grants their motions for summary judgment as to this claim. *See infra* § 2(a)(i). The Court finds that Ellerbee, Stinson, and Price are entitled to qualified immunity on the Walker Plaintiffs' individual capacity excessive force claims, but Glisson is not. *See infra* § 2(a)(ii). Therefore, the summary judgment motions of Ellerbee, Stinson, and Price on this claim are granted, and Glisson's Motion for Summary Judgment on this claim is denied. The Court grants Defendants' motions for summary judgment as to the Walker Plaintiffs' § 1983 equal protection claim, § 1983 failure to train claim, and 42 U.S.C. § 1985 conspiracy claim. *See infra* §§ 2(a)(iii), 2(a)(iv), 2(b). As for the Walker Plaintiffs' state law claims, the Court finds that Ellerbee, Price, and Stinson are entitled to official immunity, and their motions for summary judgment on this claim are therefore granted. *See infra* § 2(c). The Court finds that Glisson is not entitled to official immunity as to the Walker Plaintiffs' wrongful death claim against him, and his summary judgment motion on this claim is therefore denied. *See infra* § 2(c).

　2.　*The Beaulah Case*

　　The Court grants in part and denies in part Defendants' Motion for Summary Judgment (Doc. 30) in the Beaulah case (4:04-CV-155). The Court grants Defendants' summary judgment motion as to the Beaulah Plaintiffs' official capacity claims under § 1983. *See infra* § 1(a). The Court grants Defendants' summary judgment motion as to the Beaulah Plaintiffs' § 1983 claims against the City of Columbus. *See infra* § 1(b). The Court grants Defendants' summary judgment motion as to the Beaulah Plaintiffs' Georgia law claims against

Columbus and the individual Defendants in their official capacities. *See infra* § 1(c).  The Court finds that Moore, Williams, Fegreus, Ellerbee, Taylor, Blair, Davila, Glisson, Williford, and Johnson are entitled to qualified immunity and therefore grants their Motion for Summary Judgment as to the Beaulah Plaintiffs' individual capacity § 1983 claims against them.  *See infra* §§ 3(a)(i), 3(a)(ii), 3(a)(iii).  The Court finds that Stinson is *not* entitled to qualified immunity with regard to the Beaulah Plaintiffs' § 1983 unlawful seizure claims and excessive force claims based upon the unlawful seizure, and his summary judgment motion regarding these claims is therefore denied.  *See infra* §§ 3(a)(i), 3(a)(ii).  With regard to the Beaulah Plaintiffs' state law claims, the Court finds that Moore, Williams, Fegreus, Ellerbee, Taylor, Blair, Davila, Glisson, Stinson, and Williford are entitled to official immunity, so their Motion for Summary Judgment is granted.  *See infra* § 3(b).

## SUMMARY JUDGMENT STANDARD

In evaluating the pending motions for summary judgment, the Court must determine whether there is any genuine issue of material fact for trial.  Fed. R. Civ. P. 56(c).  Summary judgment may be granted only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." *Id.* In this case, Defendants have the burden to show that there is no genuine issue of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986).  If Defendants meet this burden, then the burden shifts and Plaintiffs must produce evidence to show that there

*is* a genuine issue of material fact. *Celotex Corp.*, 477 U.S. at 324. When the combined body of evidence is presented, Defendants may be granted summary judgment only if the evidence, viewed in the light most favorable to Plaintiffs, would not permit a reasonable jury to find for Plaintiffs. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986). In evaluating the evidence to determine whether there is a genuine issue of material fact, the Court may not make credibility determinations or weigh conflicting evidence—such decisions are for a finder of fact and not a court deciding summary judgment. *See Stewart v. Booker T. Washington Ins.*, 232 F.3d 844, 850 (11th Cir. 2000). Viewing the evidence in the light most favorable to Plaintiffs reveals the following.

FACTUAL BACKGROUND

*1. The Defendants*

Defendant Johnson is, and has been at all times relevant to this lawsuit, Sheriff of Muscogee County, Georgia. As Sheriff, Johnson is the Chief Executive Officer of the Metro Narcotics Task Force ("Metro"), a multi-jurisdictional team of law enforcement officers that works to address major criminal activity—particularly drug-related crime—in the metro Columbus area. Metro is made up of law enforcement officers from Columbus, Georgia; Muscogee County, Georgia; Phenix City, Alabama; Russell County, Alabama; and Harris County, Georgia. Metro is governed by a Chief Executive Committee, which is headed by the Muscogee County Sheriff and also includes the Columbus Police Chief, Russell County Sheriff, Phenix City Police Chief, and Harris County Sheriff. All of Metro's law enforcement

officers are sworn in as deputy sheriffs in Muscogee County, Georgia. Metro operations are funded by forfeitures that Metro generates.

At the time of the events giving rise to this lawsuit, Defendants Glisson and Ellerbee were Muscogee County deputy sheriffs and members of Metro.   Defendant Davila was a sergeant in the Muscogee County Sheriff's Department and a member of Metro. Defendants Fegreus, Moore, Taylor, and Williams were Muscogee County deputy sheriffs not assigned to Metro.   Defendant Blair was an investigator in the Muscogee County Sheriff's Department not assigned to Metro.   Defendant Stinson was a sergeant in the City of Columbus Police Department and was a Metro Special Agent in Charge.   Defendant Memmo was a City of Columbus police officer and a member of Metro. Defendant Price was a sergeant in the Harris County Sheriff's Department and a member of Metro.   Defendant Whitten was a sergeant in the Phenix City Police Department and a member of Metro. Defendant Williford was a Russell County deputy sheriff and a member of Metro.   Defendants Stinson, Memmo, Price, Whitten, and Williford were also deputized as Muscogee County deputy sheriffs.

*2. The Events Giving Rise to These Lawsuits*

On December 10, 2003, Metro agents arrested an individual on drug charges.   That individual agreed to become a confidential informant ("CI") and turn in a drug dealer he knew as "Bo Jack." There is evidence that the CI had not worked with Metro agents prior to December 10, 2003.   The CI told Metro agents that Bo Jack was selling large quantities of cocaine out of his apartment in the

Northwoods apartment complex on Armour Road in Columbus, Georgia.[2]
Stinson, Price, and Whitten decided to have the CI attempt a
controlled drug buy from Bo Jack:  the CI would go to Bo Jack's
apartment to purchase drugs, and then Metro agents would get a search
warrant for the apartment based on the controlled buy.  Stinson,
Price, and Whitten drove the CI to the Northwoods apartment complex
and asked the CI to point out Bo Jack's apartment.  The CI pointed
the agents to apartment 3-G, an apartment on the second floor of
Building 3.  The CI told agents that the apartment was a "trap,"
meaning that it was a location for selling drugs where no one
actually lived.  The agents were unable to do a utilities check on
the apartment to determine who occupied it.

Metro agents—Stinson, Price, and Whitten in one car with the CI
and Williford and Ellerbee in another car—positioned themselves in
the parking lot to observe Bo Jack's apartment building.  From their
positions, the Metro agents could not see apartment 3-G, and they
could not see the door of apartment 3-G or the door of any of the
other three apartments on the second floor of Building 3.  Therefore,
any time a person went to or from Building 3, the officers could not
see exactly which apartment they were visiting or leaving.

The CI told the Metro agents that he could call Bo Jack and
order up to four ounces of cocaine.  The CI also stated that he had
seen several kilograms of cocaine in Bo Jack's apartment and that Bo
Jack always had guns in his apartment.  The CI made a telephone call,
representing to Stinson, Price, and Whitten that he was calling Bo
Jack's cell phone.  That call, along with the CI's other calls to Bo

---

[2]To the Metro agents, the Northwoods apartment complex was not known
as an area for drug activity.

Jack that evening, was recorded, and Stinson, Price, and Whitten were able to listen to the conversations as they took place.[3]  During the calls, the CI never called the other party "Bo Jack"—he referred to the other party as "Boss" or "Boss Man."[4]

During the CI's initial conversation with Bo Jack, Bo Jack told the CI that "all" of his cocaine was "leaving right now" and that he only had two or three ounces of cocaine left.  Within minutes of this conversation, a man exited Building 3, went to his car, and immediately drove away.  Price and Stinson instructed Ellerbee and Williford to follow the vehicle, stop it, and search it.[5]  Ellerbee and Williford stopped the car, searched the driver, Michael Powell, and searched the car.  They found 63.7 grams of crack cocaine in an armrest console in the center of the back seat.  After Ellerbee and Williford arrested Powell and took him to a holding cell in the Sheriff's office, they returned to their position observing Bo Jack's apartment building.  They also informed Price and Stinson of the search results and the arrest.

Meanwhile, another man exited Building 3, got into a black Acura and drove away.  The CI identified the man as Bo Jack, and Stinson, Price, and Whitten followed him to the La Quinta Inn on Macon Road in

---

[3]Although a transcript of the calls has been provided to the Court, it does not contain the time of each call, and the evidence does not always clearly establish the timing of each phone call in relation to the timing of other events.

[4]There is no evidence that the Metro agents attempted to corroborate that the phone number the CI dialed was associated with Bo Jack.

[5]During the surveillance operation, Ellerbee and Williford communicated with Price, Stinson, and Whitten via walkie-talkies. Ellerbee and Williford could not hear the conversations between the CI and Price, Stinson, and Whitten, and Ellerbee and Williford could not hear the telephone conversations between the CI and Bo Jack.

Columbus.  Bo Jack went into a motel room for a few minutes and then left the room and returned to his car.  The Metro agents lost Bo Jack in traffic and returned to their position observing Bo Jack's apartment building.  During this time frame, the CI had several recorded conversations with Bo Jack, who told the CI that he was picking up drugs for the CI, asked if the CI had money, and discussed details of the anticipated transaction with the CI.

During the surveillance, while the CI was in the car with Stinson, Price, and Whitten, the CI told those agents about Bo Jack's supplier.  There is a factual dispute regarding what the CI told the agents about the supplier.  According to the CI, he told agents that he "heard somewhere" that the supplier was "a guy from Florida who brings the drugs up in an SUV [sport utility vehicle]."  The CI said that he had never met or seen the supplier and did not know what he looked like, so he could not provide a description of the supplier or his vehicle.  According to the Metro agents, the CI provided more detailed information about the supplier, stating that the supplier was a large black man from Miami who was armed and traveled with three or four other people.  However, Whitten testified that the CI could not describe the supplier, and the CI stated in his affidavit that he never said that the supplier was dangerous or that he traveled in a group because the CI did not know that information.  Furthermore, the CI stated in his affidavit that after the shooting of Kenneth Walker, Metro agents told the CI to tell investigators that the supplier and his associates were heavily armed.  The CI claims that he complied with the agents request because he was concerned that if he did not, they would charge him with drug possession.

11

Before Bo Jack returned to the Northwoods apartment complex, the Metro agents observed a GMC Yukon (a large SUV) enter the Northwoods parking lot and pull into the parking space where Bo Jack's vehicle had been.  The Yukon had a Georgia license tag, and Metro agents checked the tag and learned that the Yukon belonged to Plaintiff Beaulah, a Georgia resident.  Neither the CI nor the Metro agents knew Beaulah.  There is a dispute regarding whether the CI recognized the Yukon.  Metro agents contend that the CI stated that the Yukon looked like a vehicle driven by Bo Jack's supplier, the "Miami Boys." However, the Metro agents also testified that the CI was "confused" and "uncertain" regarding the Yukon.[6]  Furthermore, the CI stated in his affidavit that he did not make any comments regarding the Yukon because he had never seen Bo Jack's supplier and did not know what his vehicle looked like.

The Yukon left the parking lot, and Ellerbee and Williford were told to follow it.  The Yukon turned out of the Northwoods Apartments parking lot, drove to a night club a few hundred yards away from the apartment complex, then turned around in the night club's parking lot and returned to the Northwoods parking lot and parked near Building 3.  Around the same time, Bo Jack arrived in his Acura and

---

[6]In his initial report and statement to the internal investigator, Price stated that he told Ellerbee to do a traffic stop of the Yukon based on the CI's information that the Yukon was the vehicle that the CI "knew as dropping off [drugs] to Bo Jack."  He also stated that the Special Response Team ("SRT") was asked to participate in the stop based on the CI's information that the Yukon "was the vehicle [the CI] knew as be'en [sic] the drop off vehicle for Bo Jack."  Price later stated in his deposition that the CI "went back and forth" on the issue of whether the Yukon belonged to Bo Jack's drug supplier: "[H]e was confused.  He couldn't tell me with certainty that that was the Miami Boys."

parked next to the Yukon.[7]  Bo Jack got out of his car and met with a man (Ransom) who got out of the Yukon.  The man from the Yukon was carrying something under his arm that appeared to be a box wrapped in plastic.  The two men walked into Building 3.  Metro agents contend that the CI told them that the man from the Yukon looked like Bo Jack's supplier.  However, the CI in his affidavit stated that he did not recognize the man and did not tell Metro agents that he recognized the man.  The CI further stated in his affidavit that after Kenneth Walker was shot, he was told by Metro agents to tell investigators that he recognized the man from the Yukon as Bo Jack's supplier from Florida.

A few minutes after Bo Jack and the man from the Yukon went into Building 3, three more men (Beaulah, Smith, and Kenneth Walker) got out of the Yukon and walked into Building 3.  Approximately fifteen minutes later, the four men who had arrived in the Yukon returned to the Yukon—without the package that Ransom had carried into Building 3—and drove away.[8]  Price and Stinson discussed the situation and determined that the Yukon should be stopped and that the Sheriff's Department's Special Response Team ("SRT") should take part in the stop.  Price and Stinson directed Ellerbee and Williford to follow the Yukon and stop it.  They also told Ellerbee and Williford that

_____

[7]Just before Bo Jack (the man in the black Acura) returned to the Northwoods apartment complex, the person speaking with the CI on the telephone told the CI that he was in Oakland Park, which is about 20 minutes from Northwoods Apartments.

[8]While the four men were in Building 3, Bo Jack did not answer his phone when the CI tried to call him.  The CI told the Metro agents that Bo Jack would not answer his phone during a drug deal.  The evidence shows that Bo Jack did not answer his phone on several other occasions when the CI attempted to call him.

the men in the Yukon were drug suppliers and that they were armed and dangerous.  Ellerbee coordinated with Moore and Williams, both uniformed Sheriff's deputies driving marked Sheriff's vehicles, to assist in the stop.  In addition, Stinson and Price contacted Davila, the commander of the SRT, to instruct him to assist Ellerbee and Williford with the Yukon.  Based on the information they received from Stinson and Price, the SRT members—Blair, Davila, Fegreus, Glisson, and Taylor—believed that there was a high probability that the men in the Yukon were armed.  Based on the information Stinson and Price gave to Davila and Ellerbee regarding the Yukon's occupants, Stinson believed that the agents would conduct a "felony stop" of the Yukon.

Ellerbee determined where to stop the Yukon and instructed the marked patrol vehicles to initiate the stop.[9]  Based on Ellerbee's order, a marked patrol car signaled for the Yukon to stop after it turned onto Interstate 185.  The Yukon pulled over and stopped in the emergency lane of the expressway, next to a retaining wall.  The officers blocked in the Yukon with their vehicles.  The SRT members, along with Ellerbee and Williford, conducted a "tactical deployment" on the Yukon.[10]  Each member of the team approached the Yukon with a weapon drawn.  The officers removed the occupants of the Yukon at gunpoint and made them lie, face down, on the ground.  Specifically, Fegreus and Blair removed Beaulah from the driver's seat of the

---

[9]At some point before the stop and after the Yukon left Northwoods Apartments, the Yukon stopped at a gas station so that the passengers could purchase beer.

[10]There is evidence that the SRT would not have done a tactical deployment on the Yukon if SRT members had not been told that the Yukon's occupants were armed drug dealers.

Yukon; Davila, Fegreus, and Blair removed Ransom from the left side rear seat; Taylor removed Smith from the right side front seat; and Glisson, assisted by Ellerbee, removed Kenneth Walker from the right side rear seat.  While he was attempting to remove Walker from the Yukon and place him on the ground, Glisson jabbed Walker with his Heckler & Koch Mp5 submachine gun to make Walker aware of the gun. As Glisson, still holding the HK Mp5, attempted to handcuff Walker and place him on the ground, he shot Walker twice in the head. Glisson shot Walker although the agents on the scene did not see a weapon on Walker, Walker did not physically accost any agent, and Walker did not threaten any of the agents.[11]  Glisson now contends that the shooting was accidental.  Walker died from the gunshot wounds.

Beaulah, Ransom, and Smith were handcuffed and placed with their backs to the retaining wall.  They were searched, and none of them had weapons or drugs on their person.  After twenty minutes to one hour against the retaining wall, Beaulah, Ransom, and Smith were placed in separate police cars, where they waited for between ten and thirty-five minutes before they were placed in a jail van together. At that point, Captain Troy Culpepper told Beaulah, Ransom, and Smith that Walker had been shot and that they were going to be detained as

---

[11]There is evidence that Glisson's conduct during the stop, particularly his handling of the Mp5 firearm, was inconsistent with Muscogee County Sheriff's Office training and procedures in several respects.  First, there is evidence that Glisson should have provided cover with the Mp5 rather than using a "hands-on" approach.  Second, there is evidence that the "bayonet thrust" maneuver Glisson used was not warranted under the circumstances.  Third, there is evidence that Glisson's weapon "should have been slung and carried in a 'combat mode.'"  Fourth, there is evidence that the Sheriff's Department does not train to let a suspect "feel" the barrel of a firearm as Glisson did with Kenneth Walker.

part of a drug investigation.  Ten to twenty minutes after Culpepper spoke with Beaulah, Ransom, and Smith, they were transported to the Columbus Government Center.[12]  At the Government Center, the handcuffs were removed, and Beaulah, Ransom, and Smith were detained in holding cells for between one and a half and two hours before they were interviewed and then released.  None of these men was ever charged with a crime.  Officers searched Beaulah's Yukon and found no drugs or weapons.  There is a fact question as to whether there were open containers of beer in the Yukon:  according to officers, there were open containers of beer; according to Smith, there were cans of beer in the Yukon, but they had not been opened.

*3. The Claims*

Beaulah, Ransom, and Smith ("Beaulah Plaintiffs") sued the City of Columbus, Johnson in his individual capacity and in his official capacity as Sheriff of Muscogee County, and the following Defendants, individually and in their official capacities as agents of Metro: Moore, Williams, Fegreus, Ellerbee, Taylor, Blair, Davila, Glisson, Stinson, and Williford.[13]  The Beaulah Plaintiffs' claims are as follows:  1) 42 U.S.C. § 1983 ("§ 1983") claims against the individual Defendants for "violation of [Plaintiffs'] constitutional rights;" 2) claims under Georgia law against the individual

---

[12]There is evidence that Culpepper directed a deputy to bring the jail van and transport Beaulah, Ransom, and Smith to the Columbus Government Center.  At the time, Culpepper understood from Stinson that Beaulah, Ransom, and Smith were the subject of a drug investigation and that drug charges might be brought against them.

[13]The Beaulah Plaintiffs did not bring claims against Price.  Although the Beaulah Plaintiffs refer to Price as "Defendant Agent Price" in their brief opposing summary judgment, they never listed Price as a Defendant in their Complaint or Amended Complaint.

Defendants for false arrest and false imprisonment; 3) § 1983 failure-to-train and failure-to-supervise claims against Johnson; and 4) § 1983 claims against the City of Columbus.

Cheryl Walker, the widow of Kenneth Walker, made claims individually, as administrator of Kenneth Walker's estate, and as the legal guardian of Kayla Walker, daughter of Kenneth and Cheryl Walker (The Court refers to Ms. Walker in her various capacities as "the Walker Plaintiffs."). The Walker Plaintiffs brought claims against the City of Columbus, Muscogee County, and Johnson in his individual capacity and in his official capacity as Sheriff of Muscogee County. They also brought claims against Culpepper, Davila, Taylor, Fegreus, Blair, Williams, and Moore in their individual capacities only[14] and against the following Defendants, individually and in their official capacity as agents of Metro: Glisson, Stinson, Price, Whitten, Williford, Ellerbee, and Memmo. The Walker Plaintiffs make the following claims: 1) § 1983 claim for deprivation of equal protection in violation of the Fourteenth Amendment; 2) § 1983 claim for unlawful seizure in violation of the Fourth Amendment; 3) § 1983 claim for excessive use of force in violation of the Fourth Amendment; 4) § 1983 claim for failure to train and supervise; 5) conspiracy claim under 42 U.S.C. § 1985; 6) Georgia law wrongful death claim (against Glisson only); and 7) claims under Georgia law for false arrest, false imprisonment, assault and battery, and failure to provide medical care.

---

[14]The Walker Plaintiffs have stipulated to the dismissal of Defendants Blair, Culpepper, Fegreus, Moore, Taylor, and Williams.

DISCUSSION

*1. Plaintiffs' Claims Against the City of Columbus, Muscogee County, and the Sheriff and his Deputies in their Official Capacities*

*a. Official Capacity § 1983 Claims Against Sheriff and Deputies*

Both the Walker Plaintiffs and the Beaulah Plaintiffs assert § 1983 claims against Johnson in his official capacity as Sheriff of Muscogee County.  The Beaulah Plaintiffs make § 1983 claims against the following Defendants in their official capacities as "agent[s] of the Metro Narcotics Task Force": Moore, Williams, Fegreus, Ellerbee, Taylor, Blair, Davila, Glisson, Stinson, and Williford.[15]  The Walker Plaintiffs also allege § 1983 claims against the following Defendants, individually and in their official capacities as agents of Metro: Glisson, Stinson, Price, Whitten, Williford, Ellerbee, and Memmo.  Defendants moved for summary judgment on these official capacity claims, contending that they are entitled to Eleventh Amendment immunity.  The Beaulah Plaintiffs opposed Defendants' summary judgment motion regarding the official capacity § 1983 claims.  As discussed below, the Court finds that the Beaulah Plaintiffs' official capacity § 1983 claims are barred by Eleventh Amendment immunity.  The Walker Plaintiffs did *not* oppose Defendants' summary judgment motion on the official immunity claims and affirmatively acknowledged at the summary judgment hearing that they abandoned these claims.  Based upon the Walker Plaintiffs' abandonment and for the same reasons summary judgment is appropriate as to the Beaulah Plaintiffs' claims, the Court grants Defendants'

---

[15]The evidence shows that only Ellerbee, Davila, Glisson, Stinson, and Williford were actually Metro agents.  Moore, Williams, Fegreus, Taylor, and Blair were Muscogee County deputy sheriffs not assigned to Metro.

Motion for Summary Judgment on the Walker Plaintiffs' official capacity § 1983 claims.

When a plaintiff makes a § 1983 claim against an officer in his official capacity, that is "another way of pleading an action against an entity of which an officer is an agent." *Abusaid v. Hillsborough County Bd. of County Comm'rs*, 405 F.3d 1298, 1302 n.3 (11th Cir. 2005). Based on the record in this case, the Court finds that all of the Plaintiffs' claims against the individual Defendants in their official capacities are properly construed as claims against the Sheriff of Muscogee County.[16]

Defendants contend that the Muscogee County Sheriff is an arm of the State and is thus entitled to Eleventh Amendment immunity. "The Eleventh Amendment is 'a recognition that states, though part of a union, retain attributes of sovereignty, including immunity from being compelled to appear in the courts of another sovereign against their will.'" *Manders v. Lee*, 338 F.3d 1304, 1308 (11th Cir. 2003) (en banc) (quoting *McClendon v. Georgia Dep't of Cmty. Health*, 261 F.3d 1252, 1256 (11th Cir. 2001)). The Eleventh Amendment bars suits

---

[16]The Court notes that all of the officers who participated in the surveillance and stop were deputized as Muscogee County deputy sheriffs. Although some of the officers were assigned to the Metro Narcotics Task Force from other law enforcement agencies, the evidence establishes that at the time of the activities relevant to the present litigation, all of those officers were also deputized as Muscogee County sheriff deputies. Furthermore, at the time of the surveillance and stop, they were acting as Muscogee County deputy sheriffs under the direction of the Muscogee County Sheriff. Plaintiffs have pointed to no evidence to show that these officers were *not* acting as Muscogee County deputy sheriffs when they participated in the events leading up to this lawsuit. Plaintiffs argue that because some of the officers were members of Metro, they were not working in their "traditional roles as sheriffs per se." However, Plaintiffs have pointed to no evidence to show that the Metro agents ceased to be subject to the Sheriff's direction simply because they were also under the cooperative umbrella of Metro when they performed their sheriff's deputy law enforcement duties.

brought in federal court when an "arm of the State" is sued, unless the arm of the State consents or waives its immunity.[17] *Manders,* 338 F.3d 1304 at 1308; *see also Abusaid*, 405 F.3d at 1303.  To receive Eleventh Amendment immunity, "a defendant need not be labeled a 'state officer' or 'state official,' but instead need only be acting as an 'arm of the State.'" *Manders*, 338 F.3d at 1308.  Whether a defendant is an "arm of the State" is assessed in light of the particular function he was performing when taking the challenged action.  *Id.* at 1308.  To determine whether an entity is an "arm of the State" in carrying out a particular function, the following four factors are considered: "(1) how state law defines the entity; (2) what degree of control the State maintains over the entity; (3) where the entity derives its funds; and (4) who is responsible for judgments against the entity."  *Id.* at 1309.

In *Manders*, the Eleventh Circuit found that a Georgia county sheriff was an "arm of the State" when establishing his use of force policy in county jails because his duties and functions were "derived directly from the State, performed for the State, and controlled by the State."  *Id.* at 1328.  The Eleventh Circuit further found that the State "exercised its managerial prerogative" to control a number of aspects of the sheriff's office—incarcerating state offenders in county jails under the sheriff's charge; controlling the sheriff's

---

[17]There is no evidence of waiver in the Beaulah case.  The Court does not address the question whether waiver occurred in the Walker case because the Walker Plaintiffs abandoned their official capacity § 1983 claims and did not address the issue of waiver in their opposition to Defendants' summary judgment motion.  *See Resolution Trust Corp. v. Dunmar Corp.,* 43 F.3d 587, 599 (11th Cir. 1995) ("[T]he onus is upon the parties to formulate arguments; grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned.").

duties and training the sheriff in those duties; precluding county control over sheriffs; and paying for the sheriff's training and discipline. *Id.* The Eleventh Circuit also found that both county and state funds were indirectly implicated by an adverse judgment against the sheriff but determined that this factor did not defeat immunity. *Id.* at 1329.

Like *Manders*, the instant case involves a Georgia county sheriff. The particular functions at issue here are the law enforcement functions performed by sheriff's deputies when they decide to detain a person for criminal activity and when they use force against a person during a detention or arrest. In *Mladek v. Day*, this Court, applying the *Manders* factors, found that a Georgia sheriff is an arm of the State when exercising his law enforcement function of arresting and detaining criminal suspects. *Mladek*, 293 F. Supp. 2d 1297, 1304 (M.D. Ga. 2003), *aff'd without opinion*, 125 Fed. Appx. 978 (11th Cir. 2004) (unpublished table decision). As this Court noted in *Mladek*, the Eleventh Circuit made it clear in *Manders* that it found no distinction between the function of implementing a use of force policy in a county jail and the law enforcement function of arresting citizens for violating the law. *Id.* Specifically, the Eleventh Circuit found that "counties exercise no authority or control over the sheriff's force policy, whether in making arrests on the streets or in quelling disruptive inmates at the jail." *Manders*, 338 F.3d at 1310. *See also id.* at 1313 ("[S]heriffs in Georgia derive their power and duties from the State, are controlled by the State, and counties cannot, and do not, delegate any law enforcement power or duties to sheriffs.").

21

Plaintiffs contend that this case is distinguishable from *Mladek* and *Manders* because some of the officers involved in the stop of the Yukon and the detention of its occupants were assigned to Metro. This assignment, Plaintiffs argue, compels a conclusion that the sheriff's deputies were wearing a "county hat" rather than a "state hat" when they stopped the Yukon and detained its occupants. The Court is unpersuaded by this argument. The officers were acting as Muscogee County deputy sheriffs under the direction of the Muscogee County Sheriff when they participated in the events leading up to this lawsuit. Plaintiffs have pointed to no evidence suggesting that the sheriff's law enforcement power is controlled by the Columbus Consolidated Government—or any entity other than the State—simply because the sheriff entered into an agreement to participate in a multi-jurisdictional task force or because some of his deputies were assigned to work on that task force. Moreover, there is no evidence that, in joining Metro, the sheriff was delegated law enforcement powers or duties beyond those delegated to him by the State. Rather, the record establishes that Metro provides a framework for exercising the sheriff's State-delegated law enforcement powers and duties in cooperation with law enforcement officers from other jurisdictions, who are deputized as Muscogee County deputy sheriffs. For these reasons, there is nothing in the record to distinguish this case from *Manders* and *Mladek*. Based upon the rationale of *Manders* and *Mladek*, the Court finds the Muscogee County sheriff's deputies were wearing a "state hat" when they stopped the Yukon and detained its occupants. Therefore, the sheriff and his deputies are considered to be arms of the state and are thus entitled to Eleventh Amendment immunity in

22

this case.[18]   Accordingly, the Court grants Defendants' summary judgment motion as to the Plaintiffs' § 1983 claims against all of the individual Defendants in their official capacities.

   *b. § 1983 Claims Against Columbus and Muscogee County*

   In addition to their § 1983 official capacity claims, Plaintiffs made § 1983 claims against the City of Columbus and Muscogee County.[19] In 1971, the City of Columbus and Muscogee County were consolidated into a single local government entity.  1971 Ga. Laws Extraordinary Sess. 2007, 2010-11.  For purposes of this Order, the Court refers to this single local government entity as "Columbus."

   When a plaintiff sues a local government under § 1983, the local government may not be held liable solely for the acts of its employees—§ 1983 liability must be predicated on the acts of the *local government*.  *Pembaur v. City of Cincinnati*, 475 U.S. 469, 479 (1986); *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978).  Therefore, for a local government to be held liable under § 1983, the deprivation at issue must have taken place pursuant to local government policy or custom.  *Monell*, 436 U.S. at 694.  A plaintiff has two avenues for establishing a local government's policy: "identify either (1) an officially promulgated [local government] policy or (2) an unofficial custom or practice of the [local government] shown through the repeated acts of a final

_____

   [18]For the reasons explained previously, the Metro Narcotics Task Force Agents are considered sheriff deputies for immunity purposes under the record presently before the Court.  *See supra, n.* 16.

   [19]The Walker Plaintiffs abandoned their § 1983 claims against Muscogee County and the City of Columbus.  Even if the Walker Plaintiffs had not abandoned their claims against Muscogee County and the City of Columbus, the Court would grant them summary judgment because they cannot be held liable under § 1983 for the acts and policies of the sheriff.

policymaker *for the* [*local government*]." *Grech v. Clayton County, Georgia*, 335 F.3d 1326, 1329 (11th Cir. 2003) (en banc) (emphasis added). Under either avenue, the plaintiff must show that the local governmental entity has authority and responsibility over the governmental function in issue. *Id.* at 1330. The plaintiff must also identify the local government's final policymaker concerning the act alleged to have caused the constitutional violation. *Id.*

Here, it is not seriously disputed that the Muscogee County Sheriff acts as a final policymaker with regard to the law enforcement practices of his deputies. The dispute in this case is over whether Columbus controls the sheriff and his deputies when they perform law enforcement duties while working with Metro. In *Grech*, the Eleventh Circuit found that a Georgia county has "no authority and control over the sheriff's law enforcement function." *Id.* at 1348. Therefore, the court concluded that a Georgia county sheriff is not a county policymaker under § 1983 for his law enforcement conduct, so counties cannot be held liable under § 1983 for the acts and policies of the sheriff and his deputies. *Id.* Plaintiffs contend that this case is distinguishable from *Grech* and that Columbus *does* have control over the sheriff's law enforcement policies with regard to Metro operations. However, Plaintiffs have pointed to no evidence that Columbus controls the sheriff's law enforcement policymaking or that the sheriff ceded any of his law enforcement policymaking authority to Columbus (or any other entity) when he agreed to participate in Metro. Plaintiffs contend that there is sufficient evidence of control because Columbus made a one-time funding resolution in 1989 to provide up to $20,000 to Metro. There is no evidence that Columbus dictated (or was permitted to

dictate) how these funds were used.  *Cf. Manders*, 338 F.3d at 1323 (noting that, under Georgia law, a county must provide funding to the sheriff but may not dictate how that funding will be spent in the exercise of the sheriff's duties).  Even if the Court did consider funding to be an indicia of control in this case, there is no evidence that Columbus has provided funding for Metro since that one-time allocation in 1989.  Rather, Metro's operations are funded by the forfeitures Metro generates.[20]  Because there is no evidence that Columbus controls sheriff's law enforcement policies with regard to Metro operations, the Court cannot find that the sheriff acts as a policymaker for Columbus.  Therefore, Columbus cannot be held liable under § 1983 for the acts and policies of the sheriff and his deputies, and Columbus is entitled to summary judgment on Plaintiffs' § 1983 claims.

   *c. Official Capacity State Law Claims*

   In addition to their § 1983 claims against Columbus and the individual Defendants in their official capacities, both the Walker Plaintiffs and the Beaulah Plaintiffs assert claims under Georgia law against Columbus and the individual Defendants in their official

---

[20]In their response brief, the Beaulah Plaintiffs contend that Columbus "equipped Metro's agents with weapons and other necessary tools to carry out their duties," but they have pointed to no evidence regarding this matter.  Specifically, Plaintiffs have pointed the Court to no evidence regarding the procurement of equipment used in Metro operations— whether it is paid for out of the sheriff's budget, the Metro-generated forfeitures, or a combination of both sources.  Either way, there is no evidence that Columbus controls how these funds are spent.

capacities.[21]  Defendants moved for summary judgment on these claims, contending that these claims are barred by sovereign immunity.

Under the Georgia Constitution, sovereign immunity is extended to "the state and all of its departments and agencies."  Ga. Const. art. I § II ¶ IX(e).  This sovereign immunity extends to Georgia counties.  *Gilbert v. Richardson*, 264 Ga. 744, 747, 452 S.E.2d 476, 479 (1994).  Under Georgia law, the tort liability of the consolidated government of Columbus is the same as the tort liability applicable to counties.  *Bowen v. Columbus*, 256 Ga. 462, 349 S.E.2d 740, 741 (1986) (upholding amendment to Columbus charter providing that tort liability of Columbus "shall be the tort liability applicable to counties").  A county sheriff sued in his official capacity "may raise any defense available to the county, including sovereign immunity."  *Gilbert*, 264 Ga. at 746 n.4, 452 S.E.2d 479 n.4.  Although a county's sovereign immunity may be waived under certain circumstances, *see, e.g.,* O.C.G.A. § 33-24-51 (providing that a county waives its governmental immunity to the extent of the amount of liability insurance covering injury arising from the use of a motor vehicle), there is nothing in the record to show that immunity has been waived in this case.  Therefore, Columbus and Johnson are entitled to sovereign immunity.  Accordingly, the Court grants Defendants' motions for summary judgment as to all state law claims against Columbus and the individual Defendants in their official capacities.

---

[21]The Walker Plaintiffs abandoned their official capacity state claims. Even if they had not done so, these claims would fail for the reasons discussed in this section.

26

*2. Walker Plaintiffs' Claims Against Sheriff and His Deputies
   in Their Individual Capacities*

The Walker Plaintiffs previously stipulated to the dismissal of Defendants Blair, Culpepper, Fegreus, Moore, Taylor, and Williams. At the hearing on the summary judgment motion, the Walker Plaintiffs confirmed that they have abandoned all of their claims except their claims against Defendants Glisson, Price, Stinson, and Ellerbee in their individual capacities. Therefore, the Court grants Defendants' summary judgment motion as to Defendants Johnson, Davila, Whitten, Williford, and Memmo in their individual capacities.[22] Accordingly, the only remaining claims to be analyzed in the Walker case are the claims against Defendants Glisson, Price, Stinson, and Ellerbee in their individual capacities.

*a. § 1983 Claims*

The Walker Plaintiffs make several claims under § 1983, asserting that Kenneth Walker suffered constitutional deprivations at

---

[22]Even if the Walker Plaintiffs had not abandoned their claims against these Defendants in their individual capacities, the Court would grant them summary judgment because Plaintiffs have pointed to no evidence that they deprived Kenneth Walker of his constitutional rights in violation of clearly established law. First, there is no evidence that Memmo participated in the stop or otherwise acted to deprive Kenneth Walker of his constitutional rights. Second, Plaintiffs have pointed to no evidence sufficient to hold Johnson liable under a supervisor liability theory or a failure to train theory. *See infra* § 3(a)(iii). Finally, as with Ellerbee and Glisson, Defendants Davila, Whitten, and Williford are entitled to qualified immunity as to any unlawful seizure claims because they had arguable reasonable suspicion to conduct the stop of the Yukon. *See infra* § 2(a)(i). Like Ellerbee, Defendants Davila, Whitten, and Williford are entitled to qualified immunity as to any excessive force claims because the Court cannot find that their participation in the tactical deployment violated clearly established law. *See infra* § 2(a)(ii). And like Ellerbee, Price, and Stinson, Defendants Davila, Whitten, and Williford are entitled to official immunity as to the Walker Plaintiffs' state law claims because there is no evidence to show that they acted with actual malice or intent to cause injury. *See infra* § 2(c).

the hands of Ellerbee, Glisson, Price, and Stinson.  To make a case under § 1983, the Walker Plaintiffs must prove that these Defendants, acting under color of state law, deprived Walker of a right, privilege, or immunity secured by the Constitution or a federal law. *See* 42 U.S.C. § 1983.  It is undisputed in this case that Ellerbee, Glisson, Price, and Stinson were acting under color of state law when they participated in the Metro operation on December 10, 2003.  The Walker Plaintiffs claim that Ellerbee, Glisson, Price, and Stinson violated Walker's right to be free from unreasonable search and seizure, his right to be free from the use of excessive force, and his right to equal protection of the laws.

Ellerbee, Glisson, Stinson, and Price contend that they are entitled to qualified immunity for their actions.  Qualified immunity shields public officers acting within the scope of their discretionary authority from liability so long as their acts do not violate clearly established law. *See Hope v. Pelzer*, 536 U.S. 730, 739 (2002); *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  "The purpose of this immunity is to allow government officials to carry out their discretionary duties without the fear of personal liability or harassing litigation . . . protecting from suit 'all but the plainly incompetent or one who is knowingly violating the federal law.'" *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002) (quoting *Willingham v. Loughnon*, 261 F.3d 1178, 1187 (11th Cir. 2001)).  To receive qualified immunity, an officer must show that "he was acting within the scope of his discretionary authority when the allegedly wrongful acts occurred." *Lee*, 284 F.3d at 1194.  Here, it is undisputed that Ellerbee, Glisson, Price, and Stinson were acting

within their discretionary authority during the events giving rise to this lawsuit.

After a defendant establishes that he was acting within his discretionary authority, "the burden shifts to the plaintiff to show that qualified immunity is not appropriate." *Id.* In determining whether qualified immunity is appropriate, the courts apply a two-part test. First, the court must determine whether, taken in the light most favorable to the party asserting the injury, the facts alleged show that the officer's conduct violated a constitutional right. *Saucier v. Katz*, 533 U.S. 194, 201 (2001); *see also Lee*, 284 F.3d at 1194. If no constitutional right would have been violated under the plaintiff's version of the facts, there is no need for further inquiry. *Lee*, 284 F.3d at 1194. If, however, plaintiff's version of the facts establishes a violation of a constitutional right, the court must then determine whether the right was clearly established at the time of the officer's conduct. *Saucier*, 533 U.S. at 201. A right is clearly established if it is "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Hope*, 536 U.S. at 739; *accord Saucier*, 533 U.S. at 202; *see also Evans v. Stephens*, 407 F.3d 1272, 1282 (11th Cir. 2005) (right is clearly established if "it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted"). The unlawfulness of the action must be apparent in light of pre-existing law, but there is no requirement that the very action in question has been previously held unlawful. *Hope*, 536 U.S. at 739.

*i. § 1983 Unlawful Seizure Claim*

The Walker Plaintiffs contend that the Metro Agents violated Kenneth Walker's right to be free from unreasonable search and seizure because they stopped the Yukon without probable cause or reasonable suspicion. In general, the Fourth Amendment to the United States Constitution, applicable to the states by virtue of the Fourteenth Amendment, prohibits law enforcement officials from making searches or seizures without probable cause. *See United States v. Dunn*, 345 F.3d 1285, 1288 (11th Cir. 2003). There is an exception to this rule: a law enforcement officer may, consistent with the Fourth Amendment, "'conduct a brief, investigatory stop when the officer has a reasonable, articulable suspicion that criminal activity is afoot.'" *Jackson v. Sauls*, 206 F.3d 1156, 1165 (11th Cir. 2000) (quoting *Illinois v. Wardlow*, 528 U.S. 119 (2000)). Reasonable suspicion must be based on objective facts, and it requires "'more than an inchoate and unparticularized suspicion or hunch.'" *United States v. Nunez*, 455 F.3d 1223, 1226 (11th Cir. 2006) (quoting *United States v. Powell*, 222 F.3d 913, 917 (11th Cir. 2000)).

In this case, it is undisputed that the stop of the Yukon was a "seizure" within the meaning of the Fourth Amendment. The Metro agents were allowed to stop the Yukon if, "under the totality of the circumstances . . . from the collective knowledge of the officers involved in the stop," they had an objectively reasonable suspicion that the Yukon's occupants had engaged, or were about to engage, in a crime. *United States v. Acosta*, 363 F.3d 1141, 1145 (11th Cir. 2004). Because the Metro agents involved in the stop of the Yukon have asserted a qualified immunity defense, "the issue is not whether reasonable suspicion existed in fact, but whether the officer[s] had

30

'arguable' reasonable suspicion to support an investigatory stop."
*Jackson*, 206 F.3d at 1166. Arguable reasonable suspicion would exist
in this case if a reasonable officer in the same circumstances and
possessing the same information as the Metro agents could have
believed that reasonable suspicion existed to stop the Yukon. *See*
*Lee*, 284 F.3d at 1195 (defining arguable probable cause). In
determining whether arguable reasonable suspicion existed, the Court
"must take 'the perspective of a reasonable officer on the scene,
rather than with the 20/20 vision of hindsight.'" *Harris v. Coweta*
*County*, 433 F.3d 807, 813 n.6 (11th Cir. 2005).

The first question in this case is whether Stinson and Price—the
two Metro agents who made the decision to order the stop of the
Yukon—had arguable reasonable suspicion to order the stop. The
answer to this question depends upon what information Stinson and
Price had available to them at the time that they ordered the stop.
The evidence in the present record is in conflict on this issue.
Plaintiffs have filed an affidavit from the CI contradicting in part
what Price and Stinson say the CI told them on the night in question.
For the reasons that follow, if the CI's version of what happened is
taken as true, then the Court finds that genuine issues of material
fact exist as to whether Stinson and Price had arguable reasonable
suspicion to order the stop. If Stinson and Price's version is
accepted as true, then they likely had arguable reasonable suspicion.
It is not for this Court at this stage of the proceedings to resolve
this conflict and determine who is telling the truth. Instead, at
this summary judgment stage, the Court must construe the facts in
favor of the Plaintiffs, which requires the Court to accept the CI's
version of the facts. Of course, at trial, no such constraint

31

exists, and the fact finder will determine from the trial testimony whom to believe.

The facts, when construed in Plaintiffs' favor, establish that a reasonable officer on the scene and presented with the same set of facts as Price and Stinson could not have believed that reasonable suspicion existed to stop the Yukon. First, there is the matter of what the CI actually told the Metro agents regarding Bo Jack's supplier. Although Price and Stinson contend that the CI described the Yukon as similar to an SUV driven by Bo Jack's drug suppliers, the CI denied that he gave any description of the Yukon. The CI claims that he said he had never seen Bo Jack's supplier, so he could not describe his vehicle. Price and Stinson also assert that the CI described Bo Jack's supplier as being armed and traveling with three or four other people. Again, the CI's affidavit squarely contradicts this assertion: the CI stated that he never met or saw the supplier and that he did not know who accompanied the supplier on his travels. In addition, Price and Stinson claim that the CI described the drug supplier as a large black male, and the Yukon's driver, Beaulah, matched that description. The CI stated, however, that he had never met or seen the supplier and did not know what he looked like. Viewed in the light most favorable to Plaintiffs, the evidence shows that the only information Price and Stinson had about the supplier is that the CI "heard somewhere" that the supplier was "a guy from Florida who brings the drugs up in an SUV." Finally, the evidence shows that the CI was told, after Stinson and Price learned that Kenneth Walker had been shot during the stop of the Yukon, to tell investigators that a man from the Yukon looked like Bo Jack's supplier from Florida and that the supplier and his associates were

32

heavily armed.  In other words, the evidence, viewed in the light most favorable to Plaintiffs, gives rise to a reasonable inference that Price and Stinson fabricated evidence after-the-fact to bolster their reasonable suspicion determination.[23]  The Court stresses that it is *not* finding that Stinson and Price *actually* fabricated evidence.  However, the Court must accept Plaintiffs' evidence as true for the purposes of summary judgment, and Plaintiffs' evidence would allow a reasonable fact finder to conclude that such fabrication did occur.[24]

Price and Stinson contend that, even without the disputed CI statements, they had arguable reasonable suspicion to stop the Yukon. They rely heavily on the CI's undisputed statements regarding Bo Jack, the phone conversations between the CI and Bo Jack, and their surveillance of the scene.  Price and Stinson argue that the evidence derived from these sources is as follows: (1) Bo Jack confirmed during conversations with the CI that extensive drug activity was taking place out of his apartment; (2) Bo Jack's apartment was 3-G in Northwoods Apartments; (3) Michael Powell was arrested with more than sixty grams of cocaine in the back seat armrest console of his car after he exited Building 3; (4) Bo Jack drove to the La Quinta motel while representing to the CI that he was acquiring more cocaine, Metro agents had observed drug activity at the La Quinta, and Bo Jack

---

[23]The Court recognizes that it need not "entertain conclusory and unsubstantiated allegations of fabrication of evidence." *Kingsland v. City of Miami*, 382 F.3d 1220, 1227 n.8 (11th Cir. 2004).  In this case, Plaintiffs have pointed to specific, direct evidence of fabrication.

[24]A reasonable fact finder could conclude that the evidence of fabrication casts some doubt on what objective facts were actually known to Price and Stinson at the time of the reasonable suspicion determination, particularly those facts supported only by Stinson and Price's statements.

spent only ten to fifteen minutes in the motel; (5) Bo Jack and the Yukon arrived nearly simultaneously at Northwoods Apartments; (6) Ransom spoke with Bo Jack and walked with him into Building 3 carrying a package; (7) Bo Jack did not answer his telephone while the Yukon's passengers were in Building 3 for ten to fifteen minutes, and the CI said he would not answer the phone while conducting drug deals;[25] and (8) the CI said that Bo Jack's apartment was a "drug trap."

The two most important pieces of information underlying all of the Metro agents' conclusions came exclusively from the CI: (1) Bo Jack was selling drugs out of apartment 3-G at Northwoods Apartments, and (2) Bo Jack was the person with whom the CI spoke on the recorded phone calls.  In evaluating the sufficiency of information provided by an informant, the "totality of the circumstances" must be considered, including factors such as corroboration of the informant's tip and the informant's veracity, reliability, and basis of knowledge. *United States v. Gonzalez*, 969 F.2d 999, 1002-03 (11th Cir. 1992).   The Eleventh Circuit in *Gonzalez* stressed that "corroboration of the details of an informant's tip by independent police work is of significant value." *Id.* at 1003.  Metro's policy regarding informant reliability reflects this principle, and the Metro agents knew that they needed to corroborate the CI's information to satisfy themselves that the information was reliable. That is exactly why the Metro agents took the CI to Northwoods Apartments that night:  because the CI had never before worked with Metro, he was not presumed by the officers to be reliable, and the

---

[25]This was not the only time during the evening that Bo Jack did not answer his phone when the CI called him.

Metro agents intended to have the CI complete a controlled drug buy from Bo Jack.   The purpose of the planned controlled buy was to corroborate the CI's statements regarding Bo Jack and to establish probable cause for a search of Bo Jack's apartment.   But the controlled buy never occurred.

In the absence of a controlled buy to corroborate the CI's information, the Metro officers could still corroborate the CI's information or otherwise determine that the CI was reliable. However, the evidence viewed in the light most favorable to Plaintiffs establishes that little corroboration occurred.  The Metro agents were not able to verify that Bo Jack lived in apartment 3-G; they could not confirm that Bo Jack was the person to whom the CI was speaking on the phone; they did not run a tag check on the black Acura which the CI pointed out as Bo Jack's car; they could not confirm that the person whom the CI identified as Bo Jack was, in fact, Bo Jack; they could not tell whether Powell was leaving apartment 3-G or another apartment in Building 3; they could not tell whether the man identified as Bo Jack was entering and leaving apartment 3-G; they could not tell whether the Yukon's occupants visited apartment 3-G; and the person speaking with the CI on the phone stated that he was not at his place at times when the Acura was at Northwoods Apartments.   Stinson and Price do point to some evidence of corroboration:  first, Powell's exit from Building 3 (and near-immediate arrest for drug possession) occurred around the same time as the phone conversation in which the CI was told that "all" of Bo Jack's cocaine was "leaving right now," and second, the timing of Bo Jack's visit to the La Quinta motel coincided with the phone

conversation in which the CI was told that Bo Jack was picking up drugs for the CI.[26]

Viewing the whole picture of the evidence, the Metro officers relied mainly upon the word of an untested CI to form their suspicion that there was drug activity in apartment 3-G. Even assuming that a reasonable officer on the scene with the same information could have believed that reasonable suspicion existed as to the apartment, that suspicion—without more—is not sufficient to give rise to arguable reasonable suspicion that the occupants of the Yukon were engaged in criminal activity.

No arguable reasonable suspicion could arise based on the CI's statement that he "heard somewhere" that the supplier was "a guy from Florida who brings the drugs up in an SUV." Even if the CI's statement had been more certain or specific, the mere presence of a Yukon SUV at the apartment building—with Georgia tags registered to a Georgia resident unknown to the officers and the CI—is not sufficient to create an objectively reasonable suspicion that the Yukon's occupants were the Florida drug dealers or that they were otherwise engaged in criminal activity.

Moreover, no arguable reasonable suspicion could arise based on the Yukon occupants' mere presence at Building 3 of the Northwoods Apartments. The general rule, which was clearly established prior to December 10, 2003, is that a person's mere presence in a known crime area does not give rise to a reasonable, particularized suspicion that the person is committing a crime: there must be presence *plus* some suspicious activity. *Illinois v. Wardlow*, 528 U.S. 119, 124

---

[26]As noted previously, the record does not always clearly establish the timing of each phone call in relation to the timing of other events.

36

(2000).  It is not enough for an officer to say that a person "looked suspicious"—there must be a reasonable basis for that conclusion. *Id.*  It is true that officers are not "required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation" and that the fact that a stop occurred in a "high crime area" is a relevant contextual consideration in determining whether there was reasonable suspicion for a stop.  *Id.*  Other relevant considerations include the suspect's demeanor—such as flight from the area or nervous and evasive behavior.  *Id.*  *See United States v. Powell*, 222 F.3d 913, 917-918 (11th Cir. 2000) (finding reasonable suspicion to arrest suspect based on suspect's multiple trips to and from house of *known* drug trafficker); *see also Nunez*, 455 F.3d at 1226 (finding reasonable suspicion to stop suspects who took large black trash bags from a house which officers had *probable cause* to believe was a marijuana grow house and placed the bags in the trunk of their car); *United States v. Canela*, 144 Fed. Appx. 17, 22, (11th Cir. 2005) (finding reasonable suspicion to stop suspect who appeared either to be transporting drugs for drug deal or conducting counter-surveillance of drug deal and who fled the scene immediately after undercover agents did a "takedown" of the primary target); *cf. Michigan v. Summers*, 452 U.S. 692, 705 (1981) (allowing detention of person who was seen leaving premises subject to valid warrant to search for contraband).

Here, the occupants of the Yukon were not present in a high crime area or a known drug area.  They were present at an apartment building which officers had, at most, based on the evidence viewed in the light most favorable to Plaintiffs, a reasonable suspicion of

criminal activity.  The only "suspicious" activities engaged in by the Yukon's occupants were: (1) Ransom carried a box into Building 3 but did not carry it out of Building 3, and (2) the four men stayed in Building 3 only a short period of time.  The Court finds that this information is not enough to create an objectively reasonable suspicion that the Yukon's occupants were engaged in criminal activity.  The implication of Defendants' argument is that any time individuals visit a place where police officers suspect (but do not have probable cause to believe) that drugs are present, the officers may reasonably stop and detain those individuals when they leave.  Such a rule would render meaningless the *Wardlow* rule and would essentially allow officers to base a seizure on little more than a hunch.  The Fourth Amendment clearly requires more than that.  *See Nunez*, 455 F.3d at 1226.

In summary, the law was clearly established prior to December 10, 2003, that Stinson and Price needed reasonable suspicion to order the stop of the Yukon.  *See Lee*, 284 F.3d at 1195.  If a jury were to credit Plaintiffs' evidence regarding what facts Price and Stinson had when they made their reasonable suspicion determination and the evidence that Price and Stinson fabricated evidence, then Price and Stinson had no reasonable basis for ordering the stop of the Yukon.  Therefore, a reasonable law enforcement officer in Price and Stinson's shoes would have known that he lacked reasonable suspicion for stopping the Yukon and that he was violating clearly established law when he ordered the stop.  Although the Court is "loath to second-guess" the decisions made by law enforcement officers in the field, the Court cannot find as a matter of law that Stinson and Price had a reasonable basis for ordering the stop of the

Yukon.  *Vaughan v. Cox*, 343 F.3d 1323, 1331 (11th Cir. 2003).  For these reasons, the Court concludes that Stinson and Price are not entitled to qualified immunity on the Walker Plaintiffs' unlawful seizure claim, and their summary judgment motions are denied as to that claim.

Having determined from the evidence construed in favor of the Plaintiffs that Stinson and Price did not have arguable reasonable suspicion to support the stop of the Yukon, the Court must now determine whether Ellerbee and Glisson may also be held liable for the unlawful seizure of the Yukon.  Like Stinson and Price, Ellerbee and Glisson assert a qualified immunity defense.  They argue that they had arguable reasonable suspicion to stop the Yukon.  Unlike Stinson and Price, Ellerbee and Glisson did not actually make an independent reasonable suspicion determination.  Rather, they relied upon the information given to them by Stinson and Price when Stinson and Price instructed them to stop the Yukon.  As discussed previously, Glisson and Ellerbee are entitled to qualified immunity if a reasonable officer under the same circumstances and possessing the same information as they had could have believed that reasonable suspicion existed to stop the Yukon.  *See Lee*, 284 F.3d at 1195 (defining arguable probable cause).

When Glisson and Ellerbee participated in the stop of the Yukon, they knew that Stinson and Price had been working with a CI on a drug investigation, they knew that Stinson and Price indicated that the men in the Yukon were drug suppliers who were armed and dangerous, and they knew that Stinson and Price instructed them to stop the Yukon.  Based on this information, the Court concludes that a reasonable officer under the same circumstances could have believed

39

that reasonable suspicion existed to stop the Yukon.   There is no evidence that either Glisson or Ellerbee had any reason to suspect—at the time of the stop—that Stinson and Price did not have reasonable suspicion when they ordered the stop.[27]   The Court finds that it is objectively reasonable for law enforcement officers to rely upon a reasonable suspicion determination made by members of their team who are conducting surveillance, so long as the officers making the stop reasonably believe that the determination is proper.   Here, there is no evidence that Glisson and Ellerbee were unreasonable in relying upon the reasonable suspicion determination made by Stinson and Price.   *Cf. Gonzalez*, 969 F.2d at 1005-06 (finding that an objectively reasonable mistake of fact "can properly contribute to determination of probable cause to arrest and can count just as much as a correct belief as long as the mistaken belief was reasonable in light of all the circumstances").   Therefore, the Court finds that Ellerbee and Glisson are entitled to qualified immunity on the Walker Plaintiffs' unlawful seizure claims.   Accordingly, Ellerbee and Glisson are granted summary judgment as to those claims.

### ii. § 1983 Excessive Force

In addition to their unlawful seizure claims, the Walker Plaintiffs assert separate claims for excessive force used against Kenneth Walker.   First, they contend that *any* force used during the

---

[27]There is evidence that after Kenneth Walker was shot, Ellerbee accompanied the CI to his interview with the internal investigator and that Ellerbee actually questioned the CI during that interview.   The Walker Plaintiffs contend that the purpose of Ellerbee's presence was to "bird dog" the CI, making sure that the CI stuck to the fabricated story.   Even if that is a logical inference from the facts, Plaintiffs have pointed to absolutely no evidence that Ellerbee knew or had reason to suspect *at the time of the stop* that Stinson and Price did not have an objectively reasonable suspicion to support the stop of the Yukon.

stop was excessive because the stop was unlawful.  Second, they contend that Glisson used excessive force when he shot and killed Kenneth Walker.  This case presents a fact pattern that is somewhat unusual:  two of the defendants are entitled to qualified immunity regarding the stop at issue, but two are not.  Because the degree of force that is permissible depends in part upon whether the stop is lawful, the Court finds it necessary to analyze the excessive force claims separately for each set of Defendants.  The same standard applies to all of these claims:  all claims that officers used excessive force in the course of a seizure are analyzed under the Fourth Amendment's reasonableness standard.  *Jackson*, 206 F.3d at 1169 (citing *Graham v. Connor*, 490 U.S. 386, 395 (1989)).

   *1. Price and Stinson*.  While it is true that the "right to make an arrest 'necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it,'" an officer who does not have the right to make an arrest "does not have the right to use any degree of force in making that arrest."  *Bashir v. Rockdale County*, 445 F.3d 1323, 1332 (11th Cir. 2006) (quoting *Graham*, 490 U.S. at 396).  In general, when an excessive force claim is based on allegations that the stop was illegal, such a claim is "entirely derivative of, and is subsumed within, the unlawful arrest claim."  *Bashir*, 445 F.3d at 1332; *accord Jackson*, 206 F.3d at 1171.  Although there is no discrete excessive force claim in such cases, the injured party may recover damages suffered due to the use of force in effecting the unlawful seizure.  *Bashir*, 445 F.3d at 1332.

   Therefore, in this case, if the Walker Plaintiffs prevail on the unlawful seizure claim against Stinson and Price, they are entitled to recover damages due to the use of force during that seizure.  The

remaining question is whether those damages properly include damages associated with the shooting or whether those damages should be limited to the force used prior to the shooting.  Stinson and Price contend that the shooting was not proximately caused by their order to stop the Yukon, so Stinson and Price cannot be held liable for damages resulting from the shooting.  "For damages to be proximately caused by a constitutional tort, a plaintiff must show that, except for that constitutional tort, such injuries and damages would not have occurred and further that such injuries and damages were the *reasonably foreseeable* consequences of the tortious acts or omissions in issue."  *Jackson*, 206 F.3d at 1168 (emphasis added).

The Court finds the case of *Harris v. Coweta County* to be instructive on this issue.  433 F.3d at 816-17.  In *Harris*, a law enforcement supervisor authorized an officer to stop the plaintiff's vehicle using a specific, "safe" maneuver.  The officer did not use the safe stop maneuver.  Instead, he rammed the plaintiff's vehicle with his own car at a high rate of speed, causing substantial injury to the plaintiff.  The Eleventh Circuit found that the officer's conduct amounted to use of deadly force that was not reasonable under the circumstances.  *Harris*, 433 F.3d at 816.  The Eleventh Circuit also found that the supervisor's conduct—authorizing a safe stop maneuver—was *not* the cause of the plaintiff's injury because the officer did not perform the authorized maneuver and because the supervisor did not authorize the use of deadly force.  *Id.*[28]

---

[28]In *Harris*, it was undisputed that the law enforcement officers had a proper basis for stopping the plaintiff.  *Harris*, 433 F.3d at 810 (finding that officers observed plaintiff driving 73 miles per hour in 55 mile-per-hour zone and that when officers attempted to pull over plaintiff, plaintiff led officers on a high speed chase).  The question before the

In the instant case, the Court finds that Glisson's shooting of Kenneth Walker was not the reasonably foreseeable consequence of Price and Stinson's order to stop the Yukon. As discussed *infra* § 2(a)(ii)(3), Glisson used deadly force against Kenneth Walker even though deadly force was not warranted. Moreover, Glisson's conduct during the stop was inconsistent with the Muscogee County Sheriff's Department training and procedures in at least four respects. Under the rationale of *Harris*, if Glisson had complied with the Muscogee County Sheriff's Department training and procedures, his conduct could probably be considered the reasonably foreseeable consequence of the illegal stop. However, the evidence shows that Glisson did *not* comply with the Muscogee County Sheriff's Department training and procedures when he participated in the stop of the Yukon. The Court cannot find that Glisson's conduct—a clear divergence from the Muscogee County Sheriff's Department training and procedures—is the reasonably foreseeable consequence of Price and Stinson's order to stop the Yukon. Accordingly, Price and Stinson's motions for summary judgment as to the excessive force claims based on the shooting are granted.

2. *Ellerbee*. As discussed previously, Ellerbee had arguable reasonable suspicion to stop the Yukon based on the representations made to him by Price and Stinson. Nonetheless, Ellerbee may be held liable for a discrete excessive force claim if he used an unreasonable amount of force during his participation in the stop of the Yukon. *See Bashir*, 445 F.3d at 1332. Again, the "right to make

---

Eleventh Circuit was only whether the *quantum* of force used in effecting the stop was reasonable under the circumstances.

an arrest 'necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.'" *Id.* (quoting *Graham*, 490 U.S. at 396). The Walker Plaintiffs contend that the tactical deployment conducted upon the Yukon was an objectively unreasonable use of force. The Court finds, however, that the tactical deployment did not violate law that was clearly established at the time of the stop and that Ellerbee is entitled to qualified immunity for the part he played in it.

The force used by an officer in carrying out a seizure "must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight." *Lee*, 284 F.3d at 1198. The "force that may be considered excessive in one setting may be considered necessary and reasonable under different circumstances." *Courson v. McMillian*, 939 F.2d 1479, 1495 n.26 (11th Cir. 1991). The use of force must be judged "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Jackson*, 206 F.3d at 1170.

In this case, the information from Price and Stinson led Ellerbee to the reasonable belief that the Yukon's four occupants were drug suppliers who were armed and dangerous. Under such circumstances, the Court cannot find that the tactical deployment—which involved approximately ten officers approaching the Yukon with weapons drawn and removing the Yukon's occupants—was an objectively unreasonable use of force that violated clearly

44

established law.[29]    First, the law recognized that in some
cases—particularly those involving narcotics searches—"sudden
violence" is foreseeable, so the risk of harm to the officers (and
the search targets) is "minimized if the officers routinely exercise
unquestioned command of the situation." *Michigan*, 452 U.S. at
702-703.   Second, the law established that "the use of guns in
connection with a stop is permissible where the police reasonably
believe they are necessary for their protection." *Courson*, 939 F.2d
at 1495-96 (holding that deputy did not use excessive force during
investigatory stop when he required plaintiffs to lie face down on
the ground with a shotgun pointed at them while he waited for
backup).

     In this case, given that Ellerbee reasonably believed that he
was conducting a stop of a vehicle occupied by four armed drug
suppliers, Ellerbee reasonably believed that some display of force
was necessary for his protection.  With regard to the *amount* of force
Ellerbee used, the Court cannot find that the facts of this case "are
'so far beyond the hazy border between excessive and acceptable force
that [Ellerbee] had to know he was violating the Constitution.'"
*Lee*, 284 F.3d at 1199 (quoting *Smith v. Mattox*, 127 F.3d 1416, 1419
(11th Cir. 1997)).   For these reasons, the Court cannot find that
Ellerbee's participation in the tactical deployment violated clearly
established law.   Therefore, Ellerbee is entitled to qualified
immunity, and his summary judgment motion is granted as to this claim.

---

     [29]The evidence shows that Ellerbee's specific conduct included
determining where to stop the Yukon and attempting to help Glisson remove
Kenneth Walker from the Yukon and place him on the ground.

*3. Glisson.* As with Ellerbee, the Court cannot find that Glisson's participation in the tactical deployment—standing alone—violated clearly established law. However, Glisson did not merely participate in a "display" of weapons—he actually used deadly force against Kenneth Walker when he shot Walker with an HK Mp5 submachine gun. *See Harris*, 433 F.3d at 814 (defining "deadly force" as force that "creates a substantial risk of causing death or serious bodily injury"). It was clearly established on December 10, 2003 that deadly force may not be used unless it is reasonable under the circumstances. *See Vaughan*, 343 F.3d at 1329-32 (denying qualified immunity to officer who used deadly force against a suspect under circumstances which a jury could find did not warrant deadly force); *see also Tennessee v. Garner*, 471 U.S. 1, 11-12 (1985) (providing framework for determining whether deadly force is reasonable). Deadly force is considered "reasonable" if an officer "(1) 'has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others' or 'that he has committed a crime involving the infliction or threatened infliction of serious physical harm'; (2) reasonably believes that the use of deadly force was necessary to prevent escape; *and* (3) has given some warning about the possible use of deadly force, if feasible." *Vaughan*, 343 F.3d at 1329-30 (quoting *Garner*, 471 U.S. at 11-12).

In this case, it is generally undisputed that deadly force was not warranted. There is no evidence that Glisson or any other agent saw a weapon on Kenneth Walker, that Kenneth Walker accosted an agent, or that Kenneth Walker threatened any of the agents. Under the facts viewed in the light most favorable to Plaintiffs, Glisson shot Kenneth Walker despite the fact that deadly force was not

46

warranted.  Such an act amounts to a violation of clearly established law.  Therefore, Glisson is not entitled to qualified immunity as to the Walker Plaintiffs' excessive force claims against him.[30]

### iii. § 1983 Equal Protection Claim

In their Complaint, the Walker Plaintiffs assert that "Defendants" violated Kenneth Walker's Fourteenth Amendment right to equal protection based on his race.[31]  The Court finds that Defendants are entitled to summary judgment on this issue.  To state an equal protection claim, the Walker Plaintiffs must show that "through state action, similarly situated persons have been treated disparately" *and* that the Metro agents' actions were motivated by race.  *See Draper v. Reynolds,* 369 F.3d 1270, 1278 n.14 (11th Cir. 2004).  Here, the Walker Plaintiffs pointed the Court to no evidence regarding similarly situated persons and to insufficient evidence to show that Defendants' actions were motivated by race.[32]  The Walker Plaintiffs contend that the Metro agents' actions were motivated by race because Price and Stinson stated that the CI described the drug supplier as a large black male, and there is evidence that this description was fabricated by the officers after the stop.  Even if the officers did describe a potential suspect by reference to his race, this evidence

---

[30]The Court notes that even if the jury does not find that Glisson *intentionally* shot Kenneth Walker, the evidence still may convince the jury that Glisson used objectively unreasonable force when he attempted to handcuff Kenneth Walker while holding a submachine gun.

[31]It is not clear to the Court whether the Walker Plaintiffs have abandoned this claim.  Therefore, the claim warrants some discussion.

[32]The Court notes that Plaintiffs' law enforcement expert, Fred Robinette, testified that he did not believe the Metro agents were engaged in racial profiling.  Of course, that testimony would not preclude finding a genuine issue of material fact so long as Plaintiffs pointed to sufficient evidence that the Metro agents' actions were motivated by race.

is insufficient to create a genuine issue of material fact on the question whether the officers were motivated by race when they ordered the stop of the Yukon. Therefore, Ellerbee, Glisson, Price, and Stinson are entitled to summary judgment on this claim.

### iv. Failure to Train Claim

The Walker Plaintiffs also alleged that "Defendants" failed to train and supervise Glisson and the other Defendants in violation of § 1983. It appears from the Walker Plaintiffs' opposition to summary judgment that this failure to train and supervise claim has been abandoned. Moreover, the Walker Plaintiffs have pointed the Court to no evidence creating a genuine issue of material fact on this claim. Specifically, the Walker Plaintiffs have not pointed the Court to evidence showing that Ellerbee, Glisson, Price, or Stinson had supervisory authority over any member of the Metro team, and the Walker Plaintiffs have not pointed the Court to any evidence that any failure to train or supervise by these Defendants amounted to deliberate indifference to the rights of persons with whom the Defendants' subordinates come into contact. *See Belcher v. City of Foley*, 30 F.3d 1390, 1397 (11th Cir. 1994); *see also infra* § 3(a)(iii). Therefore, Ellerbee, Glisson, Price, and Stinson are entitled to summary judgment on the failure to train and supervise claim.

### b. § 1985 Conspiracy Claim

In addition to the Walker Plaintiffs' § 1983 claims, the Walker Plaintiffs have asserted claims under § 1985(3). The elements of a cause of action under § 1985(3) are: "(1) a conspiracy, (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal

privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy, (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." *Childree v. UAP/GA CHEM, Inc.*, 92 F.3d 1140, 1146-47 (11th Cir. 1996)*; accord Denney v. City of Albany*, 247 F.3d 1172, 1190 (11th Cir. 2001).  Even assuming that the Walker Plaintiffs have presented evidence sufficient to meet elements one, three and four, their claim fails because they have not met the second element.  "The second element 'requires a showing of some racial, or perhaps otherwise class-based, invidiously discriminatory animus behind the conspirators' action.'" *Childree*, 92 F.3d at 1147 (quoting *Lucero v. Operation Rescue*, 954 F.2d 624, 627 (11th Cir.1992)).  As discussed previously, the Walker Plaintiffs contend that the Metro agents' actions were motivated by race because Price and Stinson stated that the CI described the drug supplier as a large black male, and there is evidence that this description was fabricated by the officers after the stop.  Again, the Court finds that this evidence is insufficient to create a genuine issue of material fact on the question whether the Metro agents were motivated by race when they ordered the stop of the Yukon.[33]  For that reason, Ellerbee, Glisson, Price, and Stinson are entitled to summary judgment on this claim.

   *c. Georgia Law Claims*

   The Walker Plaintiffs also asserted a number of state law claims against Ellerbee, Glisson, Price, and Stinson, including claims for wrongful death (against Glisson only), false arrest, false

---

[33]Again, Plaintiffs' law enforcement expert testified that he did not believe the Metro agents were engaged in racial profiling.

imprisonment, assault and battery, and failure to provide medical care. Ellerbee, Glisson, Price, and Stinson contend that they are entitled to official immunity for their conduct.

Under Georgia law, public officials "are subject to suit only when they negligently perform or fail to perform their 'ministerial functions' or when they act with actual malice or intent to cause injury in the performance of their 'official functions.'" *Gilbert*, 264 Ga. at 753, 452 S.E.2d 476, 483; *accord* Ga. Const. art. I § II ¶ IX(d). In this case, the officers were performing discretionary official functions when they participated in the stop of the Yukon. Therefore, they are entitled to official immunity unless Plaintiffs show that they acted with "actual malice or intent to cause injury." *Gilbert*, 264 Ga. at 753, 452 S.E.2d 476, 483. "'[I]n the context of official immunity, actual malice means a deliberate intention to do a wrongful act [and] [s]uch act may be accomplished with or without ill will and whether or not injury was intended.'" *Meagher v. Quick*, 264 Ga. App. 639, 645, 594 S.E.2d 182, 187 (2003)(quoting *Adams v. Hazelwood*, 271 Ga. 414, 415 (2), 520 S.E.2d 896 (1999)). "Wilful, wanton and reckless conduct does not equate with the actual malice necessary to defeat a claim of official immunity." *Hanse v. Phillips*, 276 Ga. App. 558, 563, 623 S.E.2d 746, 750 (2005).

There is no evidence in the record to show that Ellerbee acted with actual malice or intent to cause injury. There is also no evidence to show that Price and Stinson acted with actual malice or intent to cause injury. Although the Court found, based on the evidence viewed in the light most favorable to the Plaintiffs, that Price and Stinson did not have a reasonable basis to stop the Yukon, there is no evidence from which the Court can conclude that their

conduct was based on a "*deliberate intention* to do a wrongful act." For these reasons, Ellerbee, Price, and Stinson are entitled to official immunity on the Walker Plaintiffs' state law claims against them, and their motions for summary judgment as to the Walker Plaintiffs' state law claims are therefore granted.

In contrast, the evidence viewed in the light most favorable to the Walker Plaintiffs shows that genuine issues of material fact exist as to whether Glisson should be entitled to official immunity when he shot Kenneth Walker even though deadly force was not warranted.  Therefore, Glisson is not entitled to summary judgment based on official immunity for the Walker Plaintiffs' wrongful death and assault and battery claims against him.  As to the Walker Plaintiffs' other state law claims against Glisson, there is no evidence that Glisson acted with actual malice or intent to injure *except* when he shot Kenneth Walker, so he is entitled to official immunity for the Walker Plaintiffs' Georgia law claims for false arrest, false imprisonment, and failure to provide medical care, and his Motion for Summary Judgment as to those claims is granted.

### 3. Beaulah Plaintiffs' Claims Against Sheriff and His Deputies in Their Individual Capacities

#### a. § 1983 Claims

The Beaulah Plaintiffs make § 1983 claims against the following officers in their individual capacities:  Moore, Williams, Fegreus, Ellerbee, Taylor, Blair, Davila, Glisson, Stinson, and Williford. The Beaulah Plaintiffs contend that these Defendants unlawfully seized them and used excessive force against them in violation of the Fourth Amendment.

51

i. § 1983 Unlawful Seizure Claims

The Beaulah Plaintiffs contend that the Metro Agents violated their right to be free from unreasonable search and seizure because they stopped the Yukon without probable cause or reasonable suspicion.  This unlawful seizure claim is based upon the same facts and circumstances underlying the Walker Plaintiffs' unlawful seizure claims, discussed supra.  All of the Defendants contend that they are entitled to qualified immunity as to the unlawful seizure claims.

Stinson, along with Price, made the decision to stop the Yukon.[34] As discussed previously, Stinson is not entitled to qualified immunity for his decision to stop the Yukon because, under the facts construed favorably to the Plaintiffs, he did not have arguable reasonable suspicion to support the stop of the Yukon.  Therefore, Stinson's Motion for Summary Judgment as to the Beaulah Plaintiffs' unlawful seizure claim against him in his individual capacity is denied.[35]

Moore, Williams, Fegreus, Ellerbee, Taylor, Blair, Davila, Glisson, and Williford all participated in the stop of the Yukon, but they did not participate in the reasonable suspicion determination. Rather, they stopped the Yukon based upon the orders of Stinson and Price, knowing that Stinson and Price had been working with a CI on a drug investigation and that Stinson and Price indicated that the men in the Yukon were drug suppliers who were armed and dangerous.

---

[34]Again, the Beaulah Plaintiffs did not name Price as a defendant in this action.

[35]As discussed infra, Stinson is also not entitled to qualified immunity as to the Beaulah Plaintiffs' claims that the stop matured into an arrest.

Based on this information, the Court concludes that a reasonable officer in the same circumstances and possessing the same information as the Metro agents could have believed that reasonable suspicion existed to stop the Yukon.  *See Lee*, 284 F.3d at 1195 (defining arguable probable cause).  Moreover, the Court has been presented with no evidence that any of these agents acted unreasonably in relying upon the reasonable suspicion determination made by Stinson and Price.  For these reasons, and for same reasons that Ellerbee and Glisson are entitled to qualified immunity on the Walker Plaintiffs' unlawful seizure claims, Moore, Williams, Fegreus, Ellerbee, Taylor, Blair, Davila, Glisson, and Williford are entitled to qualified immunity as to the Beaulah Plaintiffs' unlawful seizure claims, and the Court therefore grants their summary judgment motion on this issue.

The Beaulah Plaintiffs contend that even if the individual officers had a reasonable basis for the initial stop of the Yukon, the stop went too far and matured into an arrest when the officers kept the Beaulah Plaintiffs handcuffed on the scene for between forty minutes and two hours and later transported them to the Columbus Government Center, where they were held for one and a half to two hours before being questioned and then released.  It is true that a valid investigatory stop can mature into an arrest.  *Acosta*, 363 F.3d at 1144-45.  To determine whether a stop matured into an arrest, the Court must determine whether, under the totality of the circumstances, the stop "was reasonably related in scope to the circumstances which justified the interference in the first place.'"  *Acosta*, 363 F.3d at 1145 (quoting *United States v. Sharpe*, 470 U.S. 675, 682 (1985)).  In each individual case, the courts must determine

where the line of demarcation is—by weighing a "limited violation of individual privacy involved against the opposing interests in crime prevention and detection and in the police officer's safety." *Acosta*, 363 F.3d at 1146.  The Eleventh Circuit applies four non-exclusive factors to assist in drawing the line between an investigatory stop and an arrest:  1) the law enforcement purposes served by the detention, 2) the diligence with which the police pursue the investigation, 3) the scope and intrusiveness of the detention, and 4) the duration of the detention.  *Id.*

Under the facts viewed in the light most favorable to the Beaulah Plaintiffs, at least two, if not all four, of these factors weigh in favor of finding that the stop of the Yukon matured into an arrest when the officers kept the suspects handcuffed on the scene for up to two hours and then transported them to the Government Center, where they were held for an additional two hours before being interviewed and released.[36]  *See United States v. Virden*, 417 F. Supp. 2d 1360, 1367 (M.D. Ga. 2006) (finding *de facto* arrest where officers kept suspect at stop site for short time and transferred him, handcuffed, in police car to police search location).  Based on these factors, the stop of the Beaulah Plaintiffs was, in most important

---

[36]First, there is no evidence that the officers utilized "brief, minimally intrusive investigation techniques."  *Acosta*, 363 F.3d at 1146. Second, there is no evidence that safety concerns necessitated holding the Beaulah Plaintiffs in handcuffs or holding cells for several hours.  *See id.*  Those two factors, standing alone, would warrant finding that the stop matured into an arrest.  *See Virden*, 417 F. Supp. 2d at 1367.  In addition, Defendants have pointed the Court to no evidence indicating that the officers "were diligent in pursuing their investigation" of the Beaulah Plaintiffs or that their methods "were carried out without unnecessary delay."  *Acosta*, 363 F.3d at 1146.  Also, there is no evidence as to why the investigation of the Beaulah Plaintiffs took up to four hours, and the Court cannot find from the record that the duration of the detention was reasonable.  *Id.* at 1147.

respects, indistinguishable from a traditional arrest.  At the time of the incident, the law was clear that an officer could not, based solely on reasonable suspicion, detain a suspect in such a manner. See *Kaupp v. Texas*, 538 U.S. 626, 630 (2003)(finding that removal of person from his home to police station was sufficiently like arrest to require probable cause); *see also Dunaway v. New York*, 442 U.S. 200, 212-213 (1979) (finding that removal of person from neighbor's home to police station was arrest).  There is no evidence that anything occurred between the time of the stop and the time of the Beaulah Plaintiffs' release to give the officers probable cause (or arguable probable cause) to provide a basis for their detention.[37]

The question then becomes *who* violated Beaulah Plaintiffs' Fourth Amendment rights by effectively arresting them without probable cause.  Although there is evidence that Moore, Williams, Fegreus, Ellerbee, Taylor, Blair, Davila, Glisson, and Williford were present at the scene of the stop, there is no evidence that any of these Defendants made the decision to detain the Beaulah Plaintiffs at the scene of the stop or to transport them to the Government Center.  Therefore, these Defendants are entitled to qualified immunity on the unlawful seizure claims arising from the extent, intrusiveness, and duration of the detention.  The evidence does show that Captain Troy Culpepper, based on Stinson's input that he might be able to pursue drug charges against the Beaulah Plaintiffs,

---

[37]Defendants contend that there were open containers of beer in the Yukon and that there was thus probable cause to detain the Beaulah Plaintiffs for a violation of the Georgia open container law.  However, the Court must, at this stage, view the evidence in the light most favorable to Plaintiffs.  Under the Beaulah Plaintiffs' version of the facts, there were no open containers of alcohol in the Yukon—so there was no probable cause to arrest for an open container violation.

decided to transport the Beaulah Plaintiffs to the Government Center. Culpepper is not a defendant in this case, so he cannot be held liable in this action for the detention.  Therefore, Stinson is the only Defendant in this action who could potentially be held liable for any damages resulting from the extent and duration of the Beaulah Plaintiffs' detention.[38]  The evidence in the record would support a jury's conclusion that the detention of the Beaulah Plaintiffs was the reasonably foreseeable result of Stinson's decision to stop the Yukon and his subsequent actions with regard to the Beaulah Plaintiffs' detention.  As discussed previously, the detention was not supported by arguable probable cause.  Because the law was clearly established at the time of the incident that such a detention could not be done without probable cause, Stinson is not entitled to qualified immunity on this claim, and his Motion for Summary Judgment is thus denied.

> ii. § 1983 Excessive Force Claims

In addition to their unlawful seizure claims, the Beaulah Plaintiffs also contend that Moore, Williams, Fegreus, Ellerbee, Taylor, Blair, Davila, Glisson, Williford, and Stinson used excessive force against them in violation of the Fourth Amendment.

To the extent that the Beaulah Plaintiffs' excessive force claims are based on the allegations that the *stop* was illegal, those claims are "entirely derivative of, and [are] subsumed within, the unlawful arrest claim.  *Bashir*, 445 F.3d at 1332; *accord Jackson*, 206

---

[38]The Court stresses that it is *not*, as a matter of law, deciding that the stop matured into an arrest without arguable probable cause.  That is simply the Court's conclusion viewing the evidence in the light most favorable to the Plaintiffs.

F.3d at 1171.  Although there is no discrete excessive force claim in such cases, the injured party may recover damages suffered due to the use of force in effecting the unlawful seizure.  *Bashir*, 445 F.3d at 1332.  Therefore, if the Beaulah Plaintiffs prevail on their unlawful seizure claims against Stinson, they are entitled to recover damages arising from the reasonably foreseeable use of force during that seizure.

As for the remaining Defendants, who were at the scene and participated in the tactical deployment (Moore, Williams, Fegreus, Ellerbee, Taylor, Blair, Davila, Glisson, and Williford), the Court previously found that they had arguable reasonable suspicion to stop the Yukon based on the representations made to them by Price and Stinson.  Each of these Defendants may, however, be held liable for discrete excessive force claims if he used an unreasonable amount of force during his participation in the stop of the Yukon.  *See Bashir*, 445 F.3d at 1332.  Like the Walker Plaintiffs, the Beaulah Plaintiffs assert that the tactical deployment conducted upon the Yukon was an objectively unreasonable use of force.  For the same reasons the Court discussed *supra* in section 2(a)(ii)(2) with regard to the Walker Plaintiffs' excessive force claims against Ellerbee, the Court cannot find that the tactical deployment participation of Moore, Williams, Fegreus, Ellerbee, Taylor, Blair, Davila, Glisson, and Williford violated clearly established law.[39]  Therefore, they are

---

[39]While the evidence shows that Glisson used deadly force against Kenneth Walker, it does not show that he used any force against the Beaulah Plaintiffs equal to or greater than the quantum of force used by any of the other Defendants against the Beaulah Plaintiffs.  Therefore, the Court finds that his conduct—at least with regard to the Beaulah Plaintiffs—did not fall so far beyond the "hazy border between excessive and acceptable force" that he had to know his actions violated the Constitution.  *Lee*, 284

entitled to qualified immunity for their participation in the stop of the Yukon. *See Courson*, 939 F.2d at 1495-96; *see also Jackson*, 206 F.3d at 1170.

### iii. § 1983 Claims Against Sheriff Johnson

In addition to their claims against the officers who participated in the stop of the Yukon, the Beaulah Plaintiffs raise § 1983 claims against Johnson for failure to train and failure to supervise.[40]  As discussed *supra*, based on the facts viewed in the light most favorable to the Beaulah Plaintiffs, the deputies committed constitutional violations when they stopped the Yukon without arguable reasonable suspicion and detained the Beaulah Plaintiffs without arguable probable cause.  Therefore, the Court must determine whether Johnson may be held liable for those violations.

A supervisor may be held liable under § 1983 for the constitutional violations of his subordinates "when the supervisor personally participates in the alleged constitutional violation or when there is a causal connection between the actions of the supervising official and the alleged constitutional deprivation." *Valdes v. Crosby*, 450 F.3d 1231, 1236 (11th Cir. 2006).  "A causal connection may be established when:  1) a 'history of widespread abuse' puts the responsible supervisor on notice of the need to correct the alleged deprivation, and he or she fails to do so; 2) a

―――――――――――――

F.3d at 1199.

[40]The Beaulah Plaintiffs' argument centers upon their contention that the officers were not adequately trained to conduct the tactical deployment on the Yukon.  The Beaulah Plaintiffs apparently do not contend that there was a failure to train with regard to the decision to stop the Yukon.

supervisor's custom or policy results in deliberate indifference to constitutional rights; or 3) facts support an inference that the supervisor directed subordinates to act unlawfully or knew that subordinates would act unlawfully and failed to stop them from doing so." *Id.* at 1237 (quoting *Cottone v. Jenne,* 326 F.3d 1352, 1360 (11th Cir. 2003)).  A supervisor may also be held liable for failure to train his subordinates, but only if his "failure to train amounts to deliberate indifference to rights of persons with whom the subordinates come into contact" and that failure actually causes the plaintiff's injury. *Belcher*, 30 F.3d at 1397; *cf. City of Canton v. Harris*, 489 U.S. 378, 391-92 (1989) (finding, in the municipal liability context, that deliberate indifference required to impose liability for failure to train an employee is not necessarily the same degree of fault as is required to make out a constitutional violation by the employee).  "Failure to train can amount to deliberate indifference when the need for more or different training is obvious, such as when there exists a history of abuse by subordinates that has put the supervisor on notice of the need for corrective measures, and when the failure to train is likely to result in the violation of a constitutional right." *Belcher*, 30 F.3d at 1397-98.

In this case, there is no evidence that Johnson personally participated in the stop of the Yukon or that the deputies were following specific directions from Johnson regarding the stop, detention, or use of force.  The Beaulah Plaintiffs have pointed the Court to no evidence of a "history of widespread abuse" that would have put Johnson on notice of a need to correct the deputies. Plaintiffs have pointed to no policy or custom that resulted in

deliberate indifference to constitutional rights.  Plaintiffs have pointed to no evidence that would support an inference that Johnson directed his subordinates to act unlawfully or knew that they would act unlawfully and failed to stop them from doing so.  And Plaintiffs have pointed to no evidence of a failure to train amounting to deliberate indifference to the rights of persons with whom the deputies come in contact.[41]  For these reasons, Johnson cannot be held liable under a supervisor liability theory or a failure to train theory, and he is entitled to summary judgment on the Beaulah Plaintiffs' individual capacity claims against him.

   *b. Georgia Law Claims.*

   The Beaulah Plaintiffs have, in addition to their § 1983 claims, asserted claims against Moore, Williams, Fegreus, Ellerbee, Taylor, Blair, Davila, Glisson, Stinson, and Williford under Georgia law for false arrest and false imprisonment.  These Defendants contend that they are entitled to official immunity.  As discussed *supra* § 2(c), Georgia public officials performing discretionary functions are entitled to official immunity from suit for injuries arising from their conduct unless they act "with actual malice or intent to cause injury."  *Gilbert*, 264 Ga. at 753, 452 S.E.2d 476, 483; *accord* Ga. Const. art. I § II ¶ IX(d).  This is a high standard:  actual malice "means a deliberate intention to do a wrongful act."  *Meagher*, 264 Ga. App. at 645, 594 S.E.2d at 187.

---

[41]The Beaulah Plaintiffs' expert, Alto Spencer, opined that the officers were not properly trained with regard to proper use of handcuffs during detentions.  This opinion was based solely upon the officers' actions during the December 10, 2003 incident.  However, neither Mr. Spencer nor the Beaulah Plaintiffs pointed the Court to any evidence that there was an obvious need for more or different training.

For the same reasons the Court discussed *supra* in section 2(c) with regard to the Walker Plaintiffs' Georgia law claims against Ellerbee, Price, and Stinson, the Court cannot find that the conduct of Moore, Williams, Fegreus, Ellerbee, Taylor, Blair, Davila, Glisson, Stinson, and Williford satisfies the "actual malice or intent to cause injury" standard.[42]   Therefore, these Defendants are entitled to official immunity on the Beaulah Plaintiffs' state law claims against them, and their summary judgment motion is granted as to the Beaulah Plaintiffs' state law claims against them.

## CONCLUSION

For the reasons discussed above, the Court grants Defendants' motions for summary judgment on the following claims: (1) Plaintiffs' official capacity § 1983 claims; (2) Plaintiffs' § 1983 claims against Columbus; (3) Plaintiffs' official capacity state claims; (4) the Walker Plaintiffs' § 1983 unlawful seizure claims against all Defendants except Price and Stinson; (5) the Walker Plaintiffs' § 1983 excessive force claims against all Defendants except Glisson; (6) the Walker Plaintiffs' § 1983 equal protection claims; (7) the Walker Plaintiffs' § 1983 failure to train claims; (8) the Walker Plaintiffs' § 1985(3) claims; (9) the Walker Plaintiffs' state law claims against all Defendants, except the wrongful death claim against Glisson; (10) the Beaulah Plaintiffs' § 1983 unlawful seizure claims against all Defendants except Stinson; (11) the Beaulah

---

[42]Again, though the evidence shows that Glisson used deadly force against Kenneth Walker, it does not show that he used any force against the Beaulah Plaintiffs equal to or greater than the quantum of force used by any of the other Defendants against the Beaulah Plaintiffs or that such use of force was inflicted "with actual malice or intent to cause injury."

Plaintiffs' § 1983 excessive force claims against all Defendants;[43] (12) the Beaulah Plaintiffs' § 1983 failure to train claims against Johnson; and (13) the Beaulah Plaintiffs' state law claims against all Defendants.

The Court denies Defendants' summary judgment motions as to the following claims: (1) the Walker Plaintiffs' § 1983 unlawful seizure claims against Price and Stinson in their individual capacities; (2) the Walker Plaintiffs' § 1983 excessive force claims against Glisson in his individual capacity; (3) the Walker Plaintiffs' Georgia wrongful death claim against Glisson in his individual capacity; and (4) the Beaulah Plaintiffs' § 1983 unlawful seizure claims against Stinson in his individual capacity.   Accordingly, these are the only claims remaining to be tried in these two cases.[44]

IT IS SO ORDERED, this 31st day of August, 2006.

S/Clay D. Land
CLAY D. LAND
UNITED STATES DISTRICT JUDGE

---

[43]As discussed *supra* § 3(a)(ii), Stinson may still be held liable for the reasonably foreseeable use of force during the stop. *See Bashir*, 445 F.3d at 1332.

[44] The Court's rulings should not be interpreted to suggest that Price and Stinson may not eventually be entitled to qualified immunity. *See Harris*, 433 F.3d 807, 821 n.18 (noting that officer "is not foreclosed from seeking to assert a qualified immunity defense at trial if the facts proven at trial differ from those [the court considered] for summary judgment purposes").   The Court simply finds today that based on the CI's affidavit, genuine issues of material fact exist to be tried, and thus Price and Stinson are not entitled to qualified immunity as a matter of law at the summary judgment stage.   At trial, the Court intends to submit special interrogatories to the jury on the factual conflict that exists between Price and Stinson's testimony and the testimony of the CI.   Based on the jury's resolution of the conflict in the evidence, the Court will make a ruling at that time on whether Price and Stinson are entitled to qualified immunity.